PAUL R. CORT, State Bar No. 184336
Earthjustice
50 California Street
San Francisco, CA 94111
pcort@earthjustice.org
Tel: 415-217-2000
Fax: 415-217-2040

TOSH SAGAR, *Pro Hac Vice* Pending
JAMES S. PEW, *Pro Hac Vice* Pending
Earthjustice
1625 Massachusetts Ave., NW, Ste. 702
Washington, DC 20036
tsagar@earthjustice.org, jpew@earthjustice.org
Tel: 202-667-4500
Fax: 202-667-2356

*Counsel for Plaintiffs Citizens for Pennsylvania's Future,
Gasp, Louisiana Bucket Brigade, and Sierra Club*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| CITIZENS FOR PENNSYLVANIA'S FUTURE, GASP, LOUISIANA BUCKET BRIGADE, and SIERRA CLUB,<br><br>                    *Plaintiffs*,<br><br>          v.<br><br>ANDREW WHEELER, Administrator, U.S. Environmental Protection Agency, in his official capacity,<br><br>                    *Defendant*. | Civil Action No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      This is a suit to compel the Administrator of the United States Environmental Protection Agency ("EPA" or "the agency") to take actions mandated by the Clean Air Act, 42 U.S.C. §§ 7401-7671q ("the Act") to protect public health and the environment from coke ovens, major industrial sources of highly toxic air pollutants. The Act requires the Administrator to "review, and revise as necessary (taking into account developments in practices, processes, and control technologies)" the emission standards for hazardous air pollutants promulgated under § 7412(d) no later than eight years after such standards are initially promulgated. *Id.* § 7412(d)(6). In addition, eight years after promulgating § 7412(d) standards, the Administrator either must promulgate additional "residual risk" standards under § 7412(f)(2), due to the risk remaining after the application of the § 7412(d) standards, or must determine that residual risk standards are not required to protect human health or the environment. *Id.* § 7412(f)(2). Yet, the Administrator has missed the statutory deadlines to complete the required regulatory duties for the two categories of sources of toxic air pollution that are the subject of this complaint. The Administrator has not taken the actions required by § 7412(d)(6) and § 7412(f)(2) for each of the categories of sources of hazardous air pollutants enumerated in Table A, below (column entitled "Source Category") (collectively, the "Coke Oven Source Categories"):

| Table A:  Source Categories Covered By This Complaint | | |
|---|---|---|
| **Source Category** | **Date Of Promulgation** | **Deadline For Action Pursuant To § 7412(d)(6) And § 7412(f)(2)** |
| 1.    Coke Oven Batteries, 70 Fed. Reg. 19,992 (codified at 40 C.F.R. Part 63, Subpart L) | April 15, 2005 | April 15, 2013 |

| Table A:  Source Categories Covered By This Complaint | | |
|---|---|---|
| **Source Category** | **Date Of Promulgation** | **Deadline For Action Pursuant To § 7412(d)(6) And § 7412(f)(2)** |
| 2.   Coke Ovens: Pushing, Quenching, and Battery Stacks, 68 Fed. Reg. 18,008 (codified at 40 C.F.R. Part 63, Subpart CCCCC), as amended by 70 Fed. Reg. 44,285 | August 2, 2005 (or, alternatively, April 14, 2003) | August 2, 2013 (or, alternatively, April 14, 2011) |

2.      Due to the Defendant Administrator's failures to act, Plaintiffs Citizens for Pennsylvania's Future, Gasp, Louisiana Bucket Brigade, and Sierra Club (collectively, "Plaintiffs") seek both a determination that the Defendant Administrator's failures to perform each action required by 42 U.S.C. § 7412(d)(6) and § 7412(f)(2) violate the Clean Air Act, and an order to compel the Administrator to take each required action in accordance with an expeditious deadline set by this Court.

## JURISDICTION AND VENUE

3.      This action arises under the Clean Air Act, 42 U.S.C. § 7412(d)(6), (f)(2). This Court has jurisdiction over this action pursuant to 42 U.S.C. § 7604(a)(2), 28 U.S.C. § 1331, and 28 U.S.C. § 1361. This Court may order the Administrator to perform the requisite acts and duties, may issue a declaratory judgment, and may grant further relief pursuant to the Clean Air Act, 42 U.S.C. § 7604(a), the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and 28 U.S.C. § 1361. Plaintiffs have a right to bring this action pursuant to the Clean Air Act, 42 U.S.C. § 7604(a)(2), 28 U.S.C. § 1361, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

4.      By certified letters to the Administrator posted on February 13, 2019, Plaintiffs gave notice of this action as required by 42 U.S.C. § 7604(b)(2).

5.      Venue is vested in this Court under 28 U.S.C. § 1391(e) because Plaintiff Sierra Club maintains its principal place of business in this district.

**PARTIES**

6.      Gasp is a nonprofit health advocacy organization with a mission to advance healthy air and environmental justice in Birmingham, Alabama. Gasp strives to reduce air pollution and to educate the public on the health risks associated with poor air quality in order to secure the right of Alabamians to breathe clean air. Gasp brings this action on behalf of itself and its members.

7.      Louisiana Bucket Brigade is a nonprofit environmental health and justice organization located in New Orleans, Louisiana. Its mission is to work with communities to create Louisiana neighborhoods free from toxic air pollution. Louisiana Bucket Brigade brings this action on behalf of itself and its members.

8.      Citizens for Pennsylvania's Future (d/b/a PennFuture) is a nonprofit, Pennsylvania-based, environmental organization whose activities include advocating for legislative action on a state and federal level; providing education for the public; and engaging in legal actions to ensure environmental protections. PennFuture's mission is to lead the transition to a clean energy economy in Pennsylvania and beyond. PennFuture works to protect our air, land and water, and to empower citizens to build sustainable communities for future generations. PennFuture brings this action on behalf of itself and its members.

9.      Sierra Club is a nonprofit corporation organized and existing under the laws of the State of California, with its headquarters located in Oakland, California. A national organization with 67 chapters and about 800,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's

ecosystems and resources; to educating and enlisting humanity to protect and restore the quality

of the natural and human environment; and to using all lawful means to carry out these

objectives. The Sierra Club is dedicated to the protection of public health and the environment,

including clean air. Sierra Club brings this action on behalf of itself and its members.

10.     Defendant Andrew Wheeler is the Administrator of the EPA. In that role he is

charged with the duty to uphold the Clean Air Act and to take required regulatory actions

according to the schedules established therein.

## LEGAL FRAMEWORK

11.     The Clean Air Act has the purpose "to protect and enhance the quality of the

Nation's air resources so as to promote the public health and welfare and the productive capacity

of its population." 42 U.S.C. § 7401(b)(1).

12.     A "primary goal" of the Act is "pollution prevention." *Id.* § 7401(c). Congress

found the Act to be necessary in part because "the growth in the amount and complexity of air

pollution brought about by urbanization, industrial development, and the increasing use of motor

vehicles, has resulted in mounting dangers to the public health and welfare, including injury to

agricultural crops and livestock, damage to and the deterioration of property, and hazards to air

and ground transportation." *Id.* § 7401(a)(2).

13.     To accomplish its objectives, the Act prescribes a regulatory framework within

which EPA is required to set technology and risk-based standards by specific deadlines to reduce

emissions of hazardous air pollutants[1] and the harm to health and the environment these

emissions cause. *Id.* § 7412.

---

[1] The term "hazardous air pollutant" is defined as "any air pollutant listed pursuant to
[§ 7412(b)]." 42 U.S.C. § 7412(a)(6) (citing *id.* § 7412(b)).

14. In the 1990 Clean Air Act Amendments, Congress established new requirements for EPA to control toxic air pollution. *Id.* By statute, Congress listed 189 pollutants as "hazardous air pollutants" and required EPA to list every other compound "known to cause or [that] may reasonably be anticipated to cause adverse effects to human health or adverse environmental effects." *Id.* § 7412(b)(1), (b)(3)(B); *see also id.* § 7412(c)(6).[2] Congress listed "coke oven emissions" as one of the original 189 hazardous air pollutants. *Id.* § 7412(b)(1).

15. The Act requires EPA to list categories of major sources of hazardous air pollutants. 42 U.S.C. § 7412(c)(1). A "major source" is defined as "any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants." *Id.* § 7412(a)(1).

16. Congress expressly identified "coke oven batteries" as a category of major sources of hazardous air pollutants. 42 U.S.C. § 7412(d)(8).

17. EPA must promulgate emission standards for each listed category or subcategory of major sources of hazardous air pollutants, including coke oven batteries. *Id.* § 7412(d). These standards are often referred to as "maximum achievable control technology" or "MACT" standards.

18. For the coke oven batteries source category, Congress mandated that EPA set MACT standards to ensure that emissions from identified emissions points in the process of coke

---

[2] Currently, 187 hazardous air pollutants are listed for regulation. EPA, *Technology Transfer Network – Air Toxics Web Site: Modifications to the 112(b)1 Hazardous Air Pollutants*, http://www.epa.gov/ttn/atw/pollutants/atwsmod.html (last updated Feb. 23, 2016).

production—charging, doors, lids, and offtakes—do not exceed express statutory limits. 42 U.S.C. § 7412(d)(8)(A).

19.     Once the Administrator has promulgated MACT standards for a source category, "[t]he Administrator shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), [MACT] standards…no less often than every 8 years." *Id.* § 7412(d)(6). This provision requires the Administrator either to promulgate revised MACT standards or to issue a final determination not to revise the existing standards based upon a published finding that revision is not "necessary" to ensure the standards satisfy § 7412(d). *Id.*

20.     Section 7412(f) requires further action "to protect health and environment." It mandates that EPA submit a report to Congress regarding residual risk—i.e. "the risk to public health remaining, or likely to remain" after the application of MACT standards under § 7412(d). *Id.* § 7412(f)(1). If Congress does not act on the recommendations submitted in the report, Section 7412(f)(2) directs that:

> (A)     …the Administrator shall, within 8 years after promulgation of standards for each category or subcategory of sources pursuant to [§ 7412(d)], promulgate standards for such category or subcategory if promulgation of such standards is required in order to provide an ample margin of safety to protect public health in accordance with this section … or to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect.  Emission standards promulgated under this subsection shall provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990) …. If standards promulgated pursuant to [§ 7412(d)] and applicable to a category or subcategory of sources emitting a pollutant (or pollutants) classified as a known, probable or possible human carcinogen do not reduce lifetime excess cancer risks to the individual most exposed to emissions from a source in the category or subcategory to less than one in one million, the Administrator shall promulgate standards under this subsection for such source category.
>
> …

(C)     The Administrator shall determine whether or not to promulgate such standards and, if the Administrator decides to promulgate such standards, shall promulgate the standards 8 years after promulgation of the [§ 7412(d) standards] for each source category or subcategory concerned.

*Id.* § 7412(f)(2). Thus, if residual risk standards are "required in order to provide an ample margin of safety to protect public health" or "to prevent … an adverse environmental effect," then the Administrator must promulgate such standards within eight years of the promulgation of § 7412(d) standards. *Id.* § 7412(f)(2)(A).

21.     In 1999, EPA submitted a report to Congress pursuant to § 7412(f)(1). *See* EPA, EPA-453/R-99-001, *Residual Risk Report to Congress* (Mar. 1999), http://www.epa.gov/airtoxics/rrisk/risk_rep.pdf. Congress did not act on that report's recommendations. Congressional inaction triggered the duty of the Administrator to determine whether to promulgate residual risk standards under §7412(f)(2) for those source categories for which EPA had promulgated § 7412(d) standards. 42 U.S.C. § 7412(f)(2). Therefore, under § 7412(f)(2), EPA is required either to promulgate residual risk standards that will protect the public with an ample margin of safety or to determine that such standards are not necessary.

22.     The Act guarantees citizens a right to present their views and information to EPA and have them considered by the agency. The Act applies § 7607(d) rulemaking requirements to "the promulgation or revision of any … emission standard or limitation under section 7412(d) of this title" and "any standard under section 7412(f) of this title," among others. *Id.* § 7607(d)(1)(C). Section 7607(d) requires EPA to provide public notice of proposed rulemaking accompanied by a statement of its basis and purpose, which must include the factual data on which the proposed rule is based and the methodology used in obtaining and analyzing the data. *Id.* § 7607(d)(3). Section 7607(d) also requires EPA to allow any person to submit written comments, data, or documentary information, and to present data, views, or arguments orally.

*Id.* § 7607(d)(5). EPA must consider such comments, data, and arguments submitted, and respond to each of the significant comments, criticisms, and new data when promulgating the final rule. *Id.* § 7607(d)(6)(B).

23. Section 7412(d) and section 7412(f) standards become effective "upon promulgation." *See id.* § 7412(d)(10), (f)(3); *see also id.* § 7412(f)(4) (setting compliance dates for § 7412(f) standards); *id.* § 7412(i) (setting compliance schedule for § 7412(d) standards).

## FACTS

24. Cokemaking is the process of heating coal at very high temperatures to remove impurities in order to produce coke, a fuel with high carbon content that is used in steel production and melting scrap iron. This process of destructive distillation removes the impurities in the coal which form coke oven emissions, a complex mixtures of dust, vapors, and gases, which Congress listed as a hazardous air pollutant under the Clean Air Act. 42 U.S.C. § 7412(b)(1).

25. Coke is made in a coke oven, a large chamber in which the coal is held and heated, and a series of co-located coke ovens is known as a coke oven battery.

26. To make coke, coal is first loaded into a coke oven ("charging"), the doors and lids to the oven are closed, and the coal is heated for several hours at temperatures up to 2000 degrees Fahrenheit ("coking"). After coking is completed, the air in the oven is vented to the atmosphere ("soaking"). Next, the doors to the oven are opened and the incandescent coke is pushed out of the oven into a specialized rail car ("pushing"). The rail car transports the incandescent coke to a quench tower, typically at the end of the battery, where it is deluged with water ("quenching").

---

27.     Charging, coking, soaking, pushing, and quenching all result in the formation of coke oven emissions.

28.     Coke oven emissions are an oily, yellow-brown smoke composed of 43 constituent pollutants that are each listed as hazardous air pollutants under the Clean Air Act. Constituent hazardous air pollutants include organic compounds—including polycyclic organic matter (POM), polynuclear aromatic hydrocarbons (PAH), and volatile organic compounds (VOC), such as benzene, toluene, and xylene—metals, such as lead and mercury, and other hazardous air pollutants, such as hydrochloric acid and hydrofluoric acid.

29.     Coke oven emissions are hazardous. EPA has recognized that coke oven emissions can cause serious acute and chronic human health effects. Breathing these pollutants can cause cancer as well as other kinds of chronic, long-term harm. In addition, breathing coke oven emissions can cause acute harm from short-term exposure.

30.     EPA has classified coke oven emissions as a known human carcinogen. Studies of workers in coke oven batteries show an increased risk of death from cancer of the lung, trachea and bronchus, kidney, prostate, and other sites. EPA has recognized that carcinogens have no safe level of human exposure. *Natural Res. Def. Council v. EPA*, 824 F.2d 1211, 1215 (D.C. Cir. 1987) (observing that EPA determined "that known and probable carcinogens have no safe threshold"); *see also* S. Rep. No. 101-228, at 175 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3560 ("Federal Government health policy since the mid-1950s has been premised on the principle that there is no safe level of exposure to a carcinogen").

31.     EPA's own risk assessment indicates that approximately 4 million people are exposed to coke oven emissions. As a result, 500,000 people face a cancer risk greater than 1 in

1,000,000. National Emissions Standards for Coke Oven Batteries, 70 Fed. Reg. 19,992, 19,993 (Apr. 15, 2005).

32.     In humans, coke oven emissions are associated with other chronic health disorders including, blood disorders, damage to the central nervous system, and respiratory lesions, and acute health disorders, including irritation of skin, eyes, and mucous membranes, and depression of the central nervous system. Additionally, animal studies have reported weakness, depression, shortness of breath, general edema, and effects on the liver from acute oral exposure to coke oven emissions.

33.     Some of the hazardous air pollutants emitted from coke ovens persist in the environment or bioaccumulate.

34.     For example, EPA has determined that lead, a constituent of coke oven emissions, is a persistent, bioaccumulative, and toxic heavy metal that threatens the neurological development of children and can precipitate high blood pressure, heart disease, kidney disease, and reduced fertility in adults. Lead is likely to cause cancer. Lead and Lead Compounds; Lowering of Reporting Thresholds; Community Right-to-Know Toxic Chemical Release Reporting, 66 Fed. Reg. 4500, 4501-04 (Jan. 17, 2001); EPA, *Lead Compounds, Hazard Summary*, https://www.epa.gov/sites/production/files/2016-09/documents/lead-compounds.pdf (last updated Sep. 2011); EPA, *Basic Information About Lead Air Pollution*, https://www.epa.gov/lead-air-pollution/basic-information-about-lead-air-pollution (last updated Mar. 30, 2016). There is no safe level of human exposure to lead. Nat'l Inst. of Envtl. Health Scis., *Lead*, www.niehs.nih.gov/health/topics/agents/lead/ (last updated Oct. 12, 2018); World Health Org.; *Lead poisoning and health*, www.who.int/mediacentre/factsheets/fs379/en/ (last updated Aug. 2015).

35.     In another example, mercury, a constituent of coke oven emissions, is deposited

in water and accumulates in the aquatic food chain. EPA, *How People are Exposed to Mercury*,

https://www.epa.gov/mercury/how-people-are-exposed-mercury (last updated Apr. 3, 2019).

EPA has determined that pregnant women and developing fetuses and young children are

particularly vulnerable to mercury exposure. EPA, *Health Effects of Exposures to Mercury*,

https://www.epa.gov/mercury/health-effects-exposures-mercury (last updated Jan. 29, 2019);

National Emission Standards for Hazardous Air Pollutants from Coal- and Oil-Fired Electric

Utility Steam Generating Units and Standards of Performance for Fossil-Fuel-Fired Electric

Utility, Industrial-Commercial-Institutional, and Small Industrial-Commercial-Institutional

Steam Generating Units, 76 Fed. Reg. 24,976, 24,977-78 (May 3, 2011). Pollutants that persist or

bioaccumulate in the environment can harm human health via routes or pathways other than

inhalation, such as when a pollutant falls on the soil and children are exposed through playing in

the soil, or when people eat fish, shellfish, breast-milk, or other food in which such pollutants

have accumulated. *See, e.g.*, EPA, *Basic Information about Mercury*,

http://www.epa.gov/mercury/basic-information-about-mercury (last updated Jan. 29, 2019);

EPA, *How People are Exposed to Mercury*. In addition, EPA has found that such pollutants can

harm fish and plants. *See, e.g.*, EPA, *Basic Information about Mercury*; EPA, EPA-452/R-97-

008, *Mercury Study Report to Congress*, Vol. VI at 2-26 to 2-27 (Dec. 1997),

http://www.epa.gov/sites/production/files/2015-09/documents/volume6.pdf.

36.     EPA has listed two categories as major sources of hazardous air pollutants that

involve coke oven batteries, Coke Oven Batteries and Coke Ovens: Pushing, Quenching, and

Battery Stacks. Initial List of Categories of Sources Under Section 112(c)(1) of the Clean Air

Act Amendments of 1990, 57 Fed. Reg. 31,576 (July 16, 1992); National Emission Standards for

Hazardous Air Pollutants; Revision of Initial List of Categories of Sources and Schedule for Standards Under Sections 112(c) and (e) of the Clean Air Act Amendments of 1990, 61 Fed. Reg. 28,197 (June 4, 1996); National Emission Standards for Hazardous Air Pollutants: Revision of Source Category List and Schedule for Standards Under Section 112 of the Clean Air Act, 64 Fed. Reg. 63,025 (Nov. 18, 1999).

37.     As EPA has explained, the two Coke Oven Source Categories cover different emission points in facilities that contain coke oven batteries. As the Clean Air Act expressly singled out the emissions resulting from charging and coking—by establishing maximum limits on coke oven emissions from charging and leakage during coking from doors, lids, and offtakes, 42 U.S.C. § 7412(d)(8)(A)—EPA established the source category entitled "Coke Oven Batteries" to cover only those statutorily enumerated emissions points. EPA established a second source category, entitled "Coke Oven: Pushing, Quenching, and Battery Stacks," to cover other emissions points from coke oven batteries that are not expressly enumerated in the Clean Air Act.

38.     <u>Coke Oven Batteries</u>

a.     The Administrator promulgated national emission standards for hazardous air pollutants for Coke Oven Batteries on April 15, 2005. 70 Fed. Reg. 19,992.

b.     The Administrator was required to take final action to fulfill his 42 U.S.C. § 7412(f)(2) and § 7412(d)(6) duties for the Coke Oven Batteries source category by April 15, 2013, *i.e.*, "within 8 years after promulgation" and "no less often than every 8 years."

c.     More than eight years have passed since the Administrator promulgated emission standards under 42 U.S.C. § 7412 for Coke Oven Batteries.

d.      The Administrator has not completed the reviews required by § 7412(d)(6) and § 7412(f)(2) for Coke Oven Batteries.

e.      The Administrator has not published public notice of a proposed rule or determination, and has not accepted comments, data, or argument on a proposed rule or determination, nor has he responded to significant comments or new data, or issued a statement of basis and purpose for a final rule or determination for the reviews required by § 7412(d)(6) and § 7412(f)(2) for Coke Oven Batteries.

f.      Since April 15, 2005, the Administrator has not promulgated a final rule or determination pursuant to § 7412(f)(2) for Coke Oven Batteries.

g.      Since April 15, 2005, the Administrator has not promulgated a revised final rule or determination pursuant to § 7412(d)(6) for Coke Oven Batteries.

39.     <u>Coke Ovens: Pushing Quenching, and Battery Stacks</u>

a.      The Administrator promulgated national emission standards for hazardous air pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks on April 14, 2003. 68 Fed. Reg. 18,008. Those standards were challenged and, pursuant to a settlement of that challenge, revised on August 2, 2005. 70 Fed. Reg. 44285.

b.      The Administrator was required to take final action to fulfill his 42 U.S.C. § 7412(f)(2) and § 7412(d)(6) duties for Coke Ovens: Pushing, Quenching, and Battery Stacks source category by August 2, 2013, or, alternatively, April 14, 2011, *i.e.*, "within 8 years after promulgation" and "no less often than every 8 years."

c.      More than eight years have passed since the Administrator promulgated emission standards under 42 U.S.C. § 7412 for Coke Ovens: Pushing, Quenching, and Battery Stacks.

d.     The Administrator has not completed the reviews required by § 7412(d)(6) and § 7412(f)(2) for Coke Ovens: Pushing, Quenching, and Battery Stacks.

e.     The Administrator has not published public notice of a proposed rule or determination, and has not accepted comments, data, or argument on a proposed rule or determination, nor has he responded to significant comments or new data, or issued a statement of basis and purpose for a final rule or determination for the reviews required by § 7412(d)(6) and § 7412(f)(2) for Coke Ovens: Pushing, Quenching, and Battery Stacks.

f.     Since August 2, 2005, the Administrator has not promulgated a final rule or determination pursuant to § 7412(f)(2) for Coke Ovens: Pushing, Quenching, and Battery Stacks.

g.     No rule or determination promulgated pursuant to § 7412(f)(2) for Coke Ovens: Pushing, Quenching, and Battery Stacks is currently effective.

h.     Since, August 2, 2005, the Administrator has not promulgated a revised final rule or determination pursuant to § 7412(d)(6) for Coke Ovens: Pushing, Quenching, and Battery Stacks.

**i.**     No rule or determination promulgated pursuant to § 7412(d)(6) for Coke Ovens: Pushing, Quenching, and Battery Stacks is currently effective.

### ALLEGATIONS OF INJURY

40.     Plaintiffs and their members have been, are being, and will continue to be harmed by the Administrator's failures to take the actions required by 42 U.S.C. § 7412(d)(6) and § 7412(f)(2) for the Coke Oven Source Categories.

41.     Plaintiffs' members live, work, travel, recreate, and engage in a wide variety of other activities near coke ovens batteries and facilities where coke oven batteries will be constructed. Plaintiffs' members suffer or will suffer exposure and other harm to their health,

recreational, aesthetic, educational, professional, and other interests due to breathing the hazardous air pollutants emitted by coke ovens and by other pathways of exposure as described in paragraphs 29-35, above. Exposure to hazardous air pollutants emitted by sources in the Coke Oven Source Categories has adverse health effects which may include respiratory, neurological, developmental, and reproductive harm; damage to bodily organs and the central nervous system; and cancer, as well as other health effects described in paragraphs 29-35, above.

42.     Plaintiffs' members are concerned that coke oven emissions and emissions of other hazardous air pollutants are or will be present in the locations where they live, work, travel, recreate, and engage in other activities. These reasonable concerns about their increased exposure from such activities and other resulting harms from such exposure diminish their enjoyment of activities and areas they previously enjoyed or would like to continue to engage in or use and thereby harm their recreational, aesthetic, educational, professional, and other interests.

43.     Plaintiffs and their members suffer additional harm because they do not have information, published findings, or determinations from the Administrator regarding: the best available current pollution control methods, practices, and technologies to achieve emission reductions; the health and environmental risks that remain after application of the existing standards; or other information relevant to the need for stronger emission standards for the sources in the Coke Oven Source Categories. This information would be provided to Plaintiffs, their members, and all other interested members of the public as a result of the Administrator's required actions pursuant to § 7412(d)(6) and § 7412(f)(2). *See, e.g.*, 42 U.S.C. § 7607(d)(3)-(6) (describing notice and informational disclosures required as part of rulemakings under § 7412). If Plaintiffs and their members had this information, they would use it to work for stronger health

and environmental protections; to educate members, supporters, and the public pursuant to their organizational missions; and to protect themselves and their families from hazardous air pollutants and affected land, water, and food. The denial of this information impairs Plaintiffs' ability to provide information and services to their members to assist them in protecting their interests, hampers the ability of Plaintiffs and their members to take actions to protect their health and communities, and diminishes their enjoyment of activities in their daily life.

44.    Plaintiffs and their members suffer harm because they are denied the opportunity to submit written comments, data, and documentary information to EPA and to present data, views, or arguments to EPA and have them considered by EPA and responded to as part of the overdue § 7412(d)(6) and § 7412(f)(2) rulemakings. The Administrator's failures to conduct the overdue rulemakings deny Plaintiffs and their members the opportunity to seek greater health protections and emissions reductions, and to have EPA consider and respond to such comments in taking the final actions required by § 7412(d)(6) and § 7412(f)(2). Deprivation of the ability to present comments and arguments and have them considered and addressed by EPA impairs Plaintiffs' and their members' ability to serve and protect their interests and fulfill their organizational missions.

45.    Plaintiffs and their members suffer harm because the Administrator has not issued a final rule or determination under § 7412(d)(6) and § 7412(f)(2) addressing matters these provisions require, as discussed above. Any such rule or determination would be judicially reviewable. *See id.* § 7607(b); *see also id.* § 7607(d). Deprivation of the right to judicial review harms the ability of Plaintiffs and their members to protect their interests and fulfill their organizational missions.

46.     The Administrator's failures to take actions required by § 7412(d)(6) and § 7412(f)(2) deprive Plaintiffs' members of the cleaner air that would result from those actions. Consequently, Defendant prolongs and increases Plaintiffs' members' exposure to hazardous air pollutants and the related and resulting health, recreational, aesthetic, and other injuries as described above. Defendant also prolongs and increases the hazardous air pollutant exposure of wildlife, plants, water, land, local communities, and ecosystems, resulting in harm to Plaintiffs' members' interests, as described above. Emission reductions required under § 7412(d)(6) and § 7412(f)(2) would reduce these exposures, and would reduce the related health, recreational, aesthetic, and other harms suffered by Plaintiffs' members.

47.     By not taking the actions required by § 7412(d)(6) and § 7412(f)(2), the Administrator deprives Plaintiffs and their members of information, published findings, and determinations, as described above. *See, e.g.*, *id.* § 7607(d)(3)-(6). In addition, the Administrator's failures to take the actions required by § 7412(d)(6) and § 7412(f)(2) deprive Plaintiffs and their members of the opportunity to receive judicial review of the lawfulness of the final EPA actions. *See id.* § 7607(b). These failures make it more difficult for Plaintiffs and their members to seek health and environmental protections from hazardous air pollutants; to shield themselves, their families, and other community members from exposure to such pollutants; to protect their health, recreational, aesthetic, and other interests; and to be able to enjoy activities in their daily life without concerns about exposure to hazardous air pollutants. These failures also impair Plaintiffs' abilities to provide educational services to their members concerning hazardous air pollution from the sources in the Coke Oven Source Categories and hinder Plaintiffs' ability to provide services and take actions vital to fulfilling their public health missions.

48.     For all of the foregoing reasons, the failures complained of herein cause Plaintiffs and their members injuries for which they have no adequate remedy at law. Granting the requested relief would redress these injuries.

## CLAIMS FOR RELIEF

49.     The allegations of all foregoing paragraphs are hereby incorporated as if set forth fully herein.

### Violations of § 7412(d)(6) of the Clean Air Act

50.     Each of the Administrator's ongoing failures to review and either revise or issue a revision determination regarding the emission standards for both Coke Oven Source Categories enumerated in Paragraph 1, above, in accordance with 42 U.S.C. § 7412(d)(6), constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary" within the meaning of § 7604(a)(2) of the Clean Air Act for each such source category.

51.     Each day the Administrator fails to take these legally required actions, Defendant commits new, additional, and ongoing violations of its duties under § 7412(d)(6).

### Violations of § 7412(f)(2) of the Clean Air Act

52.     Each of the Administrator's ongoing failures either to promulgate § 7412(f)(2) residual risk standards or to issue a final determination not to promulgate such standards for each of the Coke Oven Source Categories enumerated in Paragraph 1, above, constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary" within the meaning of § 7604(a)(2) of the Clean Air Act for each such source category.

53.     Each day the Administrator fails to take these legally required actions, Defendant commits new, additional, and ongoing violations of its duties under § 7412(f)(2).

**PRAYER FOR RELIEF**

54.     WHEREFORE, Plaintiffs respectfully request, for each of the Coke Oven Source Categories enumerated in Paragraph 1, above, that the Court:

(1)     Declare that each of the Defendant Administrator's failures within eight years to review and either revise standards promulgated under § 7412(d) or issue a final determination that such revision is not necessary for each of the Coke Oven Source Categories pursuant to § 7412(d)(6), constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of § 7604(a)(2);

(2)     Order the Defendant Administrator to review and either to revise the emission standards or to issue a final determination that such revision is not necessary for each of the Coke Oven Source Categories pursuant to § 7412(d)(6) in accordance with an expeditious deadline specified by this Court;

(3)     Declare that each of the Defendant Administrator's failures, within eight years of promulgating an emission standard, either to promulgate § 7412(f)(2) standards or to issue a final determination that such standards are not required for each of the Coke Oven Source Categories constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of § 7604(a)(2);

(4)     Order the Defendant Administrator either to promulgate § 7412(f)(2) standards or to issue a final determination that such standards are not required for each of the Coke Oven Source Categories pursuant to § 7412(f)(2) in accordance with an expeditious deadline specified by this Court;

(5)     Retain jurisdiction to ensure compliance with this Court's decree;

(6)     Award Plaintiffs the costs of this action, including attorney's fees; and,

(7)      Grant such other relief as the Court deems just and proper.


DATED:        April 15, 2019              Respectfully Submitted,

                                          /s/ Tosh Sagar
                                          Tosh Sagar (D.C. Bar No. 1562693)
                                          James S. Pew (D.C. Bar No. 448830)
                                          Earthjustice
                                          1625 Massachusetts Ave., NW, Suite 702
                                          Washington, DC 20036
                                          tsagar@earthjustice.org jpew@earthjustice.org
                                          Tel: 202-667-4500
                                          Fax: 202-667-2356


                                          *Attorneys for Plaintiffs*