PAUL R. CORT, State Bar No. 184336
Earthjustice
50 California Street
San Francisco, CA 94111
pcort@earthjustice.org
Tel: 415-217-2000
Fax: 415-217-2040

TOSH SAGAR, Admitted *Pro Hac Vice*
JAMES S. PEW, Admitted *Pro Hac Vice*
Earthjustice
1625 Massachusetts Ave, NW, Ste. 702
Washington, DC 20036
tsagar@earthjustice.org, jpew@earthjustice.org
Tel: 202-667-4500
Fax: 202-667-2356

*Counsel for Plaintiffs Citizens for Pennsylvania's Future,*
*Gasp, Louisiana Bucket Brigade, and Sierra Club*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| CITIZENS FOR PENNSYLVANIA'S FUTURE, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> ANDREW WHEELER in his official capacity as Administrator of the United States Environmental Protection Agency, <br><br> *Defendant*. | Case No: 3:19-cv-02004 <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................iii

NOTICE OF MOTION FOR SUMMARY JUDGMENT..............................................1

MOTION FOR SUMMARY JUDGMENT.................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..............................................1

INTRODUCTION ...................................................................................................2

STATEMENT OF THE ISSUES..............................................................................3

FACTUAL AND LEGAL BACKGROUND ................................................................3

    I.     COKE OVEN EMISSIONS ARE HARMFUL TO HUMAN HEALTH AND
           THE ENVIRONMENT ...............................................................................3

    II.    THE CLEAN AIR ACT OBLIGATES EPA TO PROTECT PUBLIC
           HEALTH AND THE ENVIRONMENT FROM HAZARDOUS AIR
           POLLUTANTS LIKE COKE OVEN EMISSIONS.........................................5

    III.   EPA HAS OVERDUE LEGAL OBLIGATIONS TO REGULATE COKE
           OVENS. ..................................................................................................9

ARGUMENT.........................................................................................................11

    I.     LEGAL STANDARD..................................................................................11

    II.    EPA HAS FAILED TO PERFORM ITS CLEAN AIR ACT § 7412(D)(6)
           AND § 7412(F)(2) DUTIES FOR THE COKE OVEN SOURCE
           CATEGORIES............................................................................................13

         A.  EPA concedes that it failed to fulfill three non-discretionary duties ....................13

         B.  EPA must conduct a residual risk rulemaking for Coke Oven Batteries
            Category under § 7412(f)(2) .................................................................13

    III.   THIS COURT SHOULD COMPEL EPA TO COMPLETE THE OVERDUE
           ACTIONS BY A PROMPT DEADLINE.......................................................17

    IV.   PLAINTIFFS SATISFY ALL THRESHOLD REQUIREMENTS FOR
           BRINGING SUIT INCLUDING JURISDICTION, NOTICE, VENUE, AND
           STANDING ..............................................................................................23

CONCLUSION......................................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                  **PAGE(S)**

*Alaska v. Fed. Subsistence Bd.*,
   544 F.3d 1089 (9th Cir. 2008) ......................................................12, 17

*Animal Legal Def. Fund v. United States Dep't of Agric.*,
   935 F.3d 858 (9th Cir. 2019) .................................................................25

*Ass'n of Battery Recyclers, Inc. v. EPA*,
   716 F.3d 667 (D.C. Cir. 2013)..........................................................16, 17

*Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*,
   159 F.3d 358 (9th Cir. 1998) .................................................................12

*Blue Ridge Envtl. Def. League v. Pruitt*,
   261 F. Supp. 3d 53 (D.D.C. 2017)............................................19, 20, 22

*Bowen v. Georgetown Univ. Hosp.*,
   488 U.S. 204 (1988)................................................................................12

*Cal. Communities Against Toxics v. Pruitt*,
   241 F. Supp. 3d 199 (D.D.C. 2017) .......................................................20

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)................................................................................11

*Cmty. In-Power and Development Ass'n v. Pruitt*,
   304 F. Supp. 3d 212 (D.D.C. 2018)..............................20, 21, 22, 23

*Ecological Rights Found. v. Pac. Lumber Co.*,
   230 F.3d 1141 (9th Cir. 2000) ...............................................................23

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)................................................................................24

*Hall v. Norton*,
   266 F.3d 969 (9th Cir. 2001) .................................................................24

*Horsehead Res. Dev. Co. v. EPA*,
   130 F.3d 1090 (D.C. Cir. 1997)..............................................................15

*Landmark Legal Found. v. IRS*,
   267 F.3d 1132 (D.C. Cir. 2001)..............................................................12

*Mont. Shooting Sports Ass'n v. Holder*,
   727 F.3d 975 (9th Cir. 2013) .................................................................23

Plaintiffs' Notice of Motion and Motion for Summary Judgment, Case No. 3:19-cv-02004

*Nat. Res. Def. Council v. EPA,*
    529 F.3d 1077 (D.C. Cir. 2008) .................................................................................15, 17

*Nat. Res. Def. Council v. EPA,*
    755 F.3d 1010 (D.C. Cir. 2014) ........................................................................................24

*Nat. Res. Def. Council v. EPA,*
    824 F.2d 1211 (D.C. Cir. 1987) ..........................................................................................4

*Nat. Res. Def. Council v. Jewell,*
    749 F.3d 776 (9th Cir. 2014) ...........................................................................................24

*Nat. Res. Def. Council v. Train,*
    510 F.2d 692 (D.C. Cir. 1974) ..........................................................................................18

*Nw. Envtl. Def. Ctr. v. Brennen,*
    958 F.2d 930 (9th Cir. 1992) ...........................................................................................15

*Presidio Historical Ass'n v. Presidio Trust,*
    811 F.3d 1154 (9th Cir. 2016) .........................................................................................12

*Price v. Stevedoring Servs. of Am., Inc.,*
    697 F.3d 820 (9th Cir. 2012) .....................................................................................12, 17

*Sierra Club v. EPA,*
    551 F.3d 1019 (D.C. Cir. 2008) ..........................................................................................6

*Sierra Club v. Johnson,*
    444 F. Supp. 2d 46 (D.D.C. 2006) .................................................................18, 20, 21, 22

*Sierra Club v. McCarthy,*
    No. 15-cv-01165-HSG, 2016 WL 1055120 (N.D. Cal. Mar. 15, 2016) ...............13, 18, 19, 23

*Sierra Club v. Thomas,*
    658 F. Supp. 165 (N.D. Cal. 1987) .............................................................................18, 22

*Sierra Club v. Wheeler,*
    330 F. Supp. 3d 407 (D.D.C. 2018) .................................................................................20

*U.S. v. Mead Corp,*
    533 U.S. 218 (2001) .........................................................................................................17

*Wilderness Soc'y v. U.S. Fish & Wildlife Serv.,*
    353 F.3d 1051 (9th Cir. 2003) (en banc), *amended on reh'g en banc in part*
    *sub nom., Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 360 F.3d 1374 (9th
    Cir. 2004) ...................................................................................................................12, 14

Plaintiffs' Notice of Motion and Motion for Summary Judgment, Case No. 3:19-cv-02004

## STATUTES

28 U.S.C. § 1391(e)(1)(C) .................................................................................23

28 U.S.C. § 2201 ................................................................................................2

28 U.S.C. § 2202 ................................................................................................2

42 U.S.C. § 7401(b)(1) .......................................................................................5

42 U.S.C. § 7412 ....................................................................................1, 2, 5, 6

42 U.S.C. § 7412(i)(8) ........................................................................................9

42 U.S.C. § 7412(b)(1) .......................................................................................6

42 U.S.C. § 7412(b)(2) .......................................................................................6

42 U.S.C. § 7412(c)(1) .....................................................................................6, 7

42 U.S.C. § 7412(d) ...............................................................................3, 20, 23

42 U.S.C. § 7412(d)(1) ........................................................................7, 8, 13, 16

42 U.S.C. § 7412(d)(2) .......................................................................................7

42 U.S.C. § 7412(d)(3) .......................................................................................7

42 U.S.C. § 7412(d)(6) ...........................................................7, 13, 15, 17, 24

42 U.S.C. § 7412(d)(8) ..................................................................................7, 8, 9

42 U.S.C. § 7412(e) ............................................................................................9

42 U.S.C. § 7412(e)(1) .......................................................................................7

42 U.S.C. § 7412(f) .........................................................................................8, 10

42 U.S.C. § 7412(f)(2) .............................................................................3, 9, 14, 17

42 U.S.C. § 7412(f)(2)(A) ..................................................................................8

42 U.S.C. § 7412(f)(2)(C) ..................................................................................8

42 U.S.C. § 7602(k) ..........................................................................................14

42 U.S.C. § 7604(a) ..........................................................................................18

42 U.S.C. § 7604(a)(2) ...................................................................................13, 23

42 U.S.C. § 7607(d) ....................................................................................................8

42 U.S.C. § 7607(d)(1) .........................................................................................16, 24

42 U.S.C. § 7607(d)(1)(C) ........................................................................................8

42 U.S.C. § 7607(d)(3) ..............................................................................................8

42 U.S.C. § 7607(d)(4) ........................................................................................8, 16

42 U.S.C. § 7607(d)(5) ........................................................................................8, 16

42 U.S.C. § 7607(d)(6) ........................................................................................8, 16

## REGULATIONS

40 C.F.R. § 63.303(d) .........................................................................................10, 15

40 C.F.R. § 63.303(d)(1)...........................................................................................14

## LEGISLATIVE HISTORY

S. Rep. No. 101-228 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385......................4, 5, 6

H.R. Rep. 101-490 (1990), *reprinted in* Committee on Environment and Public
    Works, 2 Legislative History of the Clean Air Act Amendments of 1990
    (1993)........................................................................................................................5

## FEDERAL REGISTER NOTICES

57 Fed. Reg. 31,576 (Jul. 16, 1992)........................................................................1, 9

58 Fed. Reg. 57,898 (Oct. 27, 1993)..........................................................................9

64 Fed. Reg. 63,025 (Nov. 18, 1999)..........................................................................9

66 Fed. Reg. 4500 (Jan. 17, 2001) ..............................................................................4

68 Fed. Reg. 18,008 (Apr. 14, 2003) ...................................................................10, 13

69 Fed. Reg. 48,338 (Aug. 9, 2004).........................................................9, 10, 15, 18

70 Fed. Reg. 19,992 (Apr. 15, 2005) ...........................................10, 13, 14, 15, 18

70 Fed. Reg. 44,285 (Aug. 2, 2005)........................................................................................10, 13

84 Fed. Reg. 36,304 (Jul. 26, 2019)........................................................................................21, 22

84 Fed. Reg. 51,310 (Sep. 27, 2019) ...........................................................................................22


**OTHER AUTHORITIES**

Hon. Henry A. Waxman, An Overview of the Clean Air Act Amendments of
   1990, 21 Envtl. L. 1721 (1991).................................................................................................6, 7

Plaintiffs' Notice of Motion and Motion for Summary Judgment, Case No. 3:19-cv-02004

## NOTICE OF MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that the following Motion for Summary Judgment will be heard by the Honorable Vincent Chhabria, United States District Judge, on February 27, 2020, at 10 AM in Courtroom 4, 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102.

## MOTION FOR SUMMARY JUDGMENT

Plaintiffs Citizens for Pennsylvania's Future, Gasp, Louisiana Bucket Brigade, and Sierra Club move for summary judgment under Federal Rule of Civil Procedure 56 on the basis of the points and authorities below, the attached declarations and exhibits, the record of this action, and any arguments presented at the motion hearing. This is an action to compel Defendant Administrator of the U.S. Environmental Protection Agency ("EPA") to perform rulemakings mandated by the Clean Air Act ("Act") to protect human health and the environment from major sources of highly toxic air pollution. 42 U.S.C. § 7412. There is no genuine issue as to any material fact, and Plaintiffs are entitled to summary judgment as a matter of law on the question of liability. Therefore, pursuant to 42 U.S.C. § 7604(a)(2), Plaintiffs respectfully request that this Court declare that Defendant's failures to take the following actions constitute unlawful failures to perform non-discretionary acts or duties under the Act:

1. EPA has failed to take action to fulfill its non-discretionary duties under 42 U.S.C. § 7412(d)(6) to "review, and revise as necessary," emission standards for the source categories Coke Oven Batteries and Coke Ovens: Pushing, Quenching, and Battery Stacks;[1] and

2. EPA has failed to take action to fulfill its non-discretionary duties under 42 U.S.C. § 7412(f)(2) to either promulgate risk-based emission standards or make a final determination

---

[1] For convenience, Plaintiffs use "Coke Oven Batteries" to refer to the category "Coke Ovens: Charging, Top Side, and Door Leaks." *See, e.g.*, 57 Fed. Reg. 31,576 (Jul. 16, 1992).

that such standards are not required to protect public health and the environment for the source categories Coke Oven Batteries and Coke Ovens: Pushing, Quenching, and Battery Stacks.

Plaintiffs further request that this Court, pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C. §§ 2201-02, order EPA to perform each of these non-discretionary acts and duties by an expeditious deadline, set forth in the accompanying memorandum.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiffs are entitled to summary judgment on all claims that EPA failed to take actions required under 42 U.S.C. § 7412 to protect the public and the environment from hazardous coke oven emissions. Those provisions mandate that EPA: establish standards for categories of major sources of hazardous air pollution, including coke ovens; periodically assess the sufficiency of those standards; and then update those standards if required. Here, EPA failed to complete four periodic assessments: for the Pushing, Quenching, and Battery Stacks Category, (1) a review under § 7412(d)(6) and (2) a residual risk rulemaking under § 7412(f)(2); and for the Coke Oven Batteries Category, (3) a review under § 7412(d)(6) and (4) a residual risk rulemaking under § 7412(f)(2). EPA does not dispute any material facts at issue. Indeed, EPA concedes liability with respect to Plaintiffs' first three claims, entitling Plaintiffs to summary judgment. *See* Answer ¶¶ 1, 38-39.

Plaintiffs are also entitled to summary judgment on the disputed fourth claim: whether EPA must conduct a residual risk rulemaking for the Coke Oven Batteries Category. In 2005, EPA conducted a review of the existing standards for that source category, determined that revision of those standards was "necessary" under § 7412(d)(6), and promulgated revised standards. That "promulgation of standards for [the Coke Oven Batteries Category]...pursuant to

2

subsection (d)," triggered EPA's obligations to conduct a residual risk rulemaking "within 8 years." 42 U.S.C. § 7412(f)(2). Over 14 years later, EPA has not completed this residual risk rulemaking, a fact it does not dispute. EPA's defense—that it has no obligation to conduct such a rulemaking—is foreclosed by the Act's plain, unambiguous meaning. Therefore, Plaintiffs are entitled to summary judgment on this claim as well.

Accordingly, the Court should declare EPA to be in violation of its non-discretionary duties and order EPA to complete these actions on an expeditious timeframe: no more than 12 months for EPA to publish its proposal for each required action and no more than 16 months for EPA to finalize each required action. Coke oven emissions continue to present significant health risks to Plaintiffs' members, including unacceptably high cancer risks, and they should not have to wait any longer for the protections to which they are entitled under the Act.

## STATEMENT OF THE ISSUES

1. Whether EPA failed to take action for the Coke Oven Batteries Category as required by 42 U.S.C. § 7412(d), (f)?

2. Whether completing the overdue mandatory actions by the dates requested by Plaintiffs is impossible?

## FACTUAL AND LEGAL BACKGROUND

## I.    COKE OVEN EMISSIONS ARE HARMFUL TO HUMAN HEALTH AND THE ENVIRONMENT

Coke ovens are large industrial facilities that heat coal to form coke, thereby releasing large amounts coke oven emissions: an oily, yellow-brown smoke that is known to cause cancer, lead to a variety of other chronic health problems, and bioaccumulate and persist in the environment. *See* EPA, Risk Assessment Document for Coke Oven MACT Residual Risk 6-13 (Dec. 22, 2003) ("2003 Risk Assessment"), Ex. 12. These coke oven emissions are composed of

40-plus distinct hazardous pollutants, including volatile organic compounds—such as benzene, toluene, and xylene—metals such as lead and mercury, and other hazardous air pollutants, such as hydrochloric acid and hydrofluoric acid. 2003 Risk Assessment 84.

EPA has classified coke oven emissions as a known human carcinogen. 2003 Risk Assessment 12. Workers in coke oven batteries show an increased risk of death from cancer of the lung, kidney, prostate, and other organs. *Id.* There is no safe level of human exposure to coke oven emissions. *Nat. Res. Def. Council v. EPA*, 824 F.2d 1211, 1215 (D.C. Cir. 1987) (observing that EPA determined "that known and probable carcinogens have no safe threshold"); *see also* S. Rep. No. 101-228, at 175 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3560 ("Federal Government health policy since the mid-1950s has been premised on the principle that there is no safe level of exposure to a carcinogen").

Coke oven emissions are also associated with other chronic health disorders, including blood disorders, damage to the central nervous system, and respiratory lesions. 2003 Risk Assessment 151. And the constituents of coke oven emissions persist in the environment and bioaccumulate. For example, lead, a constituent of coke oven emissions, is a persistent, bioaccumulative, and toxic heavy metal that threatens the neurological development of children and can precipitate high blood pressure, heart disease, kidney disease, and reduced fertility in adults. 66 Fed. Reg. 4500, 4501-04 (Jan. 17, 2001); EPA, *Lead Compounds, Hazard Summary*, https://www.epa.gov/sites/production/files/2016-09/documents/lead-compounds.pdf (last updated Sep. 2011); EPA, *Basic Information About Lead Air Pollution*, https://www.epa.gov/lead-air-pollution/basic-information-about-lead-air-pollution (last updated Nov. 29, 2017). There is no safe level of human exposure to lead. Nat'l Inst. of Envtl. Health Scis., *Lead*, www.niehs.nih.gov/health/topics/agents/lead/ (last updated Oct. 12, 2018); World

4

Health Org.; *Lead poisoning and health*, www.who.int/mediacentre/factsheets/fs379/en/ (last updated Aug. 23, 2019).

II.   **THE CLEAN AIR ACT OBLIGATES EPA TO PROTECT PUBLIC HEALTH AND THE ENVIRONMENT FROM HAZARDOUS AIR POLLUTANTS LIKE COKE OVEN EMISSIONS.**

One of the core provisions of the Act, 42 U.S.C. § 7412, regulates hazardous air pollutants—highly toxic industrial byproducts like benzene, mercury, and lead that can cause cancer, developmental harm, and other serious health effects—including coke ovens emissions. Congress found that "emissions of toxic air pollutants" present "exceptionally high levels of risk" of cancer and other "serious illnesses." *See* H.R. Rep. 101-490, at 151-54 (1990), *reprinted in* Committee on Environment and Public Works, 2 Legislative History of the Clean Air Act Amendments of 1990, 3021, 3175-78 (1993). Thus, § 7412 advances the Act's core goals "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare." 42 U.S.C. § 7401(b)(1).

To protect the public from these hazardous air pollutants, Congress enacted the Clean Air Amendments of 1990 ("1990 Amendments), establishing strict deadlines for EPA to regulate sources that emit hazardous air pollutants. Prior to the 1990 Amendments, the Act afforded EPA wide latitude to identify toxic pollutants and set standards to restrict their emissions. However, EPA's implementation of these requirements was a failure: "In the 20 years since [the Clean Air Act] was enacted, EPA ha[d] acted to establish standards under section [7412] for seven hazardous air pollutants. This [wa]s only a small fraction of the many substances associated … with cancer, birth defects, neurological damage, or other serious health effects." H.R. Rep. 490 at 151-54, 2 Legislative History of the Clean Air Act Amendments of 1990, at 3175-78; *see also* S.

Rep. 101-228, at 127, 1990 U.S.C.C.A.N. at 3513 ("The law has worked poorly. In 18 years, EPA has regulated only some sources of only seven chemicals.").

In the 1990 Amendments, Congress responded to EPA's glacial pace in addressing toxic air pollution by stripping EPA of much of its discretion. S. Rep. 101-228, at 132, 1990 U.S.C.C.A.N. at 3517-18 (making "fundamental changes in the basic provisions" of the Clean Air Act in response to EPA's "record of false starts and failed opportunities"); *see also Sierra Club v. EPA*, 551 F.3d 1019, 1028 (D.C. Cir. 2008) (explaining that "the text, history and structure of section 112," 42 U.S.C. § 7412, show Congress intended to "[e]liminat[e] much of EPA's discretion"). In the 1990 Amendments, Congress enacted statutory requirements for EPA to take specific actions by firm deadlines to "force[] regulatory action." S. Rep. 101-228, at 128, 156, 1990 U.S.C.C.A.N. at 3513, 3541; *see also id.* at 127-33, 1990 U.S.C.C.A.N. at 3512-18; Hon. Henry A. Waxman, An Overview of the Clean Air Act Amendments of 1990, 21 Envtl. L. 1721, 1742 (1991) ("To an extent unprecedented …, the pollution control programs of the 1990 Amendments include very detailed mandatory directives to EPA, rather than more general mandates or broad grants of authority that would allow for wide latitude in EPA's implementation of the [Act's] programs.").

To begin, Congress listed 189 hazardous air pollutants that EPA must regulate, including "coke oven emissions." 42 U.S.C. § 7412(b)(1). Congress mandated that EPA "periodically" revise the list, adding new pollutants that present or may present "a threat of adverse human health effects…or adverse environmental effects." *Id.* § 7412(b)(2).

Having identified the hazardous air pollutants EPA must regulate, Congress required EPA to identify "categories" of major sources of hazardous air pollutants and publish a list of each category within one year of enactment of the 1990 Amendments. *Id.* § 7412(c)(1). And, like

6

the list of hazardous air pollutants, Congress mandated that EPA periodically revise the list of source categories. *Id.*

Once EPA identified the various categories of major sources, Congress mandated that EPA establish emissions standards for each source category; complete standard setting for all source categories within a minimum timeframe; and periodically revisit and, where needed, update those emissions standards. First, for each category of major sources, EPA must initially establish emission standards requiring the "maximum degree of reduction" that is achievable by major sources. *Id.* § 7412(d)(1)-(3). These initial standards require that all sources in a category match the level of emissions achieved by the best (*i.e.*, lowest-emitting) sources within the category. *Id.* § 7412(d)(3). The 1990 Amendments created strict deadlines for EPA to finalize regulations "establishing" these initial emission standards, such that EPA would establish standards for all then-listed categories no later than 2000. 42 U.S.C. § 7412(e)(1). For coke oven batteries, Congress expressly mandated that EPA establish these initial emissions standards no later than December 31, 1992, and further mandated that those initial emission standards meet certain statutory minimums. *Id.* § 7412(d)(8).

EPA's duties do not end there. At least every eight years, EPA must "review, and revise as necessary," these § 7412(d) emission standards, "taking into account developments in practices, processes, and control technologies." *Id.* § 7412(d)(6). Thus, in mandating that EPA make all "necessary" revisions, Congress sought to ensure that EPA does not freeze standards for a source category at the levels achievable when EPA initially established them. *Id.*; *see* Waxman, 21 Envtl. L. at 1775-76 & n.256 (Congress intended that: "the continual tightening of existing source standards will be assured").

Both the establishment of initial emission standards under § 7412(d)(1) (and for coke

ovens, under § 7412(d)(8)) and the periodic revision of those standards under § 7412(d)(6),

require EPA to "promulgate" regulations using the Act's notice and comment rulemaking

procedures: giving public notice by publishing the proposed action in the Federal Register;

allowing the public to submit comments and data; and then promulgating the standard as a final

rule. 42 U.S.C. § 7607(d)(1)(C), (d)(3)-(6). For example, if EPA determines it is necessary to

revise an initial limit allowing emissions of 10-pounds-per-hour down to 5-pounds-per-hour, it

must publish that new limit in the Federal Register and in the Code of Federal Regulations.[2]

The "promulgation" of standards for a given source category under § 7412(d) triggers a

second EPA duty to assess the risks that remain after a § 7412(d) standard is promulgated and

determine whether further emission reductions are needed to protect people and the environment.

*Id.* § 7412(f). Specifically, the Act requires that "within 8 years after promulgation of standards

for each category or subcategory of sources pursuant to subsection (d)," EPA

"shall…promulgate standards for [each] category or subcategory if … required in order to

provide an ample margin of safety to protect public health … or to prevent, taking into

consideration costs, energy, safety, and other relevant factors, an adverse environmental effect."

*Id.* § 7412(f)(2)(A); *see also id.* § 7412(f)(2)(C).[3] Accordingly, under § 7412(f)(2), EPA is

---

[2] Where EPA reviews an existing emission standard under § 7412(d)(6), but believes that revision is not necessary, EPA must give notice of the proposed determination and then issue a final determination not to revise the existing standards. 42 U.S.C. § 7607(d).

[3] EPA's regulatory duties under 42 U.S.C. § 7412(f)(2) were triggered by Congress's failure to act on EPA's recommendations, which EPA submitted to Congress in 1999. *See* EPA, Residual

Plaintiffs' Notice of Motion and Motion for Summary Judgment, Case No. 3:19-cv-02004

required either to set new standards that protect the public with an ample margin of safety or to

determine that such standards are not required.[4] Congress mandated that EPA complete the initial

residual risk rulemakings for all source categories by 2008. *Id.* § 7412(e) (requiring

establishment of initial § 7412(d) standards for all source categories to be complete by 2000); *id.*

§ 7412(f)(2) (requiring residual risk rulemakings to be completed within 8 years).

## III.   EPA HAS OVERDUE LEGAL OBLIGATIONS TO REGULATE COKE OVENS.

Pursuant to this framework, EPA has listed two distinct categories of major sources that

emit "coke oven emissions": (1) Coke Oven Batteries and (2) Coke Ovens: Pushing, Quenching,

and Battery Stacks. *E.g.*, 57 Fed. Reg. 31,576 (Jul. 16, 1992); 64 Fed. Reg. 63,025 (Nov. 18,

1999). These two categories cover different emission points within the same coke oven facilities.

69 Fed. Reg. at 48,340. The Coke Oven Batteries Category includes those emission points in a

coke oven facility for which Congress set minimum statutory standards in § 7412(d)(8). *Id.* The

Pushing, Quenching, and Battery Stacks Category covers other emission points within a coke

oven facility. *Id.*

For the Coke Oven Batteries Category, EPA established initial emission standards under

§ 7412(d) in October 1993. 58 Fed. Reg. 57,898 (Oct. 27, 1993). This rulemaking triggered

EPA's obligations to: (1) conduct an analysis of the risk from the category that remained after

the promulgation of these initial standards and determine whether to promulgate additional

---

Risk Report to Congress (Mar. 1999), Ex. 13 (*available at*
http://www.epa.gov/airtoxics/rrisk/risk_rep.pdf); 69 Fed. Reg. 48,338, 48,339 (Aug. 9, 2004)
("Congress did not act on any of the recommendations in the report, triggering the [§ 7412(f)(2)]
standard-setting process").

[4] For "coke oven batteries," Congress also created alternate standards that regulated sources
could choose to comply with. 42 U.S.C. § 7412(i)(8); 69 Fed. Reg. at 48,340 (describing the
separate standard "tracks"). These standards pertain to compliance obligations of regulated
entities and do not affect EPA's obligations to set standards under § 7412. *See id.*

standards to protect human health and the environment under § 7412(f)(2); and (2) review the initial standards and revise them if necessary in light of subsequent developments under § 7412(d)(6). EPA was required to complete these actions by October 2001.

EPA belatedly completed these actions in a combined risk and technology review published in April 2005. 70 Fed. Reg. 19,992 (Apr. 15, 2005) ("2005 Risk and Technology Review"). In that rulemaking, EPA determined that the initial emission standards from 1993 did not provide an ample margin of safety (i.e. that the residual risks were too high), and therefore, promulgated additional standards under § 7412(f) to reduce those risks. *Id.* Additionally, pursuant to its review under § 7412(d)(6), EPA determined that revision of the initial emission standards was necessary in light of subsequent developments within the industry, and consequently, revised the initial standards, for example by setting opacity limits based on what the best sources were achieving. 69 Fed. Reg. at 48,351 (noting sources could now control leakages more effectively and "proposing to revise the standards to incorporate a limit of 20 percent opacity for charging for new sources."); 70 Fed. Reg. at 20,009-10 (finalizing "the proposed limit for charging (20 percent opacity…) in 40 C.F.R. § 63.303(d)"); 63 C.F.R. § 63.303(d) (containing final, revised opacity limits).

For the Pushing, Quenching, and Battery Stacks Category, EPA initially established emission standards under § 7412(d) in 2003, 68 Fed. Reg. 18,008 (Apr. 14, 2003) and, following a settlement of litigation challenging those initial standards, amended them in 2005. 70 Fed. Reg. 44,285, 44,286 (Aug. 2, 2005) (amending the standards and describing litigation history). These rulemakings triggered EPA's obligations to: (1) conduct a residual risk rulemaking under § 7412(f)(2); and (2) review the standards, and revise them as necessary, under § 7412(d)(6).

EPA was required to complete these actions by April 2011 (and certainly not later than August, 2013).

Despite having promulgated standards pursuant to § 7412(d) for the Coke Oven Batteries Category in the 2005 Risk and Technology Review, and having promulgated standards pursuant to § 7412(d) for the Pushing, Quenching, and Battery Stacks Category in both 2003 and 2005, EPA has not subsequently completed § 7412(d)(6) or § 7412(f)(2) rulemakings for either source category. Answer ¶¶ 1, 38-39.

## ARGUMENT

Plaintiffs are entitled to summary judgment as a matter of law. EPA has unfulfilled non-discretionary duties under § 7412(d)(6) and § 7412(f)(2) for both Coke Oven Source Categories. EPA disputes only whether it has a legal obligation to complete a residual risk rulemaking under § 7412(f)(2) for the Coke Oven Batteries Category. Answer ¶ 1. As the Act unambiguously mandates that EPA complete this review and there are no disputed issues of material fact as to any of the claims, Plaintiffs are entitled to summary judgment on all claims and an order declaring EPA to be in violation of its legal obligations and requiring EPA to expeditiously fulfill its statutory obligations.

## I.      LEGAL STANDARD

Summary judgment must be granted when, viewing the facts in the light most favorable to the nonmoving party, the records show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to cite "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 324 (1986); *accord* Fed. R. Civ. P. 56(c)(1)(A); *see also Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 365 (9th Cir. 1998).

Where an agency has not interpreted a statute "in any legally-binding regulation or in any official agency interpretation," the court owes "no deference" to agency counsel's "litigation position." *Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089, 1095 (9th Cir. 2008); *Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 827-30 (9th Cir. 2012) (agency's litigating position is not entitled to deference because it does not carry "'the force of law'" (quoting *U.S. v. Mead Corp*, 533 U.S. 218, 227 (2001))).

Where deference is inapplicable, the court must "decide for [itself] the best reading" of the statute. *Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1136 (D.C. Cir. 2001); *see, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 215 (1988) ("The case before us is resolved by the particular statutory scheme in question."). To do so, the court utilizes "the traditional tools of statutory construction." *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir. 2003) (en banc) (cleaned up), *amended on reh'g en banc in part sub nom.*, *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 360 F.3d 1374 (9th Cir. 2004). In conducting this inquiry, agency counsel's litigating position is not entitled to any special respect where it is "not the product of any considered development" and the agency has not "been consistent." *Presidio Historical Ass'n v. Presidio Trust*, 811 F.3d 1154, 1166 (9th Cir. 2016); *Alaska*, 544 F.3d at 1095 (declining to apply "*Skidmore* deference to litigation positions unmoored from any official agency interpretation").

## II.     EPA HAS FAILED TO PERFORM ITS CLEAN AIR ACT § 7412(D)(6) AND § 7412(F)(2) DUTIES FOR THE COKE OVEN SOURCE CATEGORIES.

### A.     EPA concedes that it failed to fulfill three non-discretionary duties.

The Court should grant summary judgment on the three undisputed claims, as the undisputed material facts entitle Plaintiffs to judgment as a matter of law. For the Pushing, Quenching, and Battery Stacks Category, EPA promulgated initial emission standards under § 7412(d)(1) in 2003, 68 Fed. Reg. 18,008, which it then amended in 2005, 70 Fed. Reg. 44,285. Subsequently, EPA has not reviewed or made a determination of whether to revise these standards as required by § 7412(d)(6), or conducted a residual risk rulemaking under § 7412(f)(2). Additionally, in 2005 EPA promulgated revised emission standards for the Coke Oven Batteries Category under § 7412(d)(6), but subsequently has not reviewed or made a determination of whether to revise these standards as required by § 7412(d)(6). As more than eight years have passed without EPA taking these required actions, *see id.* § 7412(d)(6), (f)(2) (establishing deadlines), EPA's failures to comply with the Act's deadlines constitute failures to perform acts or duties "which [are] not discretionary." 42 U.S.C. § 7604(a)(2); *e.g.*, *Sierra Club v. McCarthy*, No. 15-cv-01165-HSG, 2016 WL 1055120, *1 (N.D. Cal. Mar. 15, 2016).

### B.     EPA must conduct a residual risk rulemaking for Coke Oven Batteries Category under § 7412(f)(2).

Despite the fact that EPA has not conducted a residual risk rulemaking for the Coke Oven Batteries Category since it promulgated revised standards in 2005, 70 Fed. Reg. at 20,013, EPA asserts that it does not have any "outstanding obligation to conduct a risk review under § 7412(f)(2)" for the Category, Answer ¶ 1. EPA's position is foreclosed by the plain, unambiguous meaning of the Act.

EPA must conduct a residual risk rulemaking for the Coke Oven Batteries Category

within 8 years of the "promulgation of standards…pursuant to subsection (d)," 42 U.S.C. § 7412(f)(2), a requirement EPA triggered when it revised the initial standards for the Category as the culmination of the 2005 Risk and Technology Review, 70 Fed. Reg. at 20,009-10, 20,013. These revised regulations (1) constitute standards, (2) which EPA promulgated, (3) pursuant to EPA's authority under § 7412(d), and therefore, they satisfy the criteria that trigger EPA's obligation to conduct a residual risk rulemaking. The traditional tools of statutory construction, EPA's own description of its action in the 2005 Risk and Technology Review, and EPA's prior positions all confirm this straightforward, common sense interpretation of § 7412(f)(2). *See Wilderness Soc'y*, 353 F.3d at 1061 (where, as here, "no statutory or regulatory provision expressly defines the meaning of [a statutory] term" the court must "first consider the common sense meaning of the statute's words.").

First, the revised regulations for the Coke Oven Batteries Category—establishing minimum opacity limits— are a "standard" for purposes of § 7412(f)(2) because they are a "criterion for measuring acceptability." STANDARD, Black's Law Dictionary (11th ed. 2019); *see* 40 C.F.R. § 63.303(d)(1) ("The owner or operator shall not discharge or cause to be discharged to the atmosphere from charging operations any fugitive emissions that exhibit an opacity greater than 20 percent…"). That ordinary meaning also comports with the Act's more specific definition of an "emission standard." 42 U.S.C. § 7602(k) (defining an "emission standard" as "a requirement established by…the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including…any design, equipment, work practice or operational standard promulgated under [the Act].").

Second, EPA plainly "promulgate[d]" these revised standards by publishing them in the Federal Register and in the Code of Federal Regulations, as the consummation of a rulemaking,

where they now carry the force of law. PROMULGATE, Black's Law Dictionary (11th ed. 2019). ("1. To declare or announce publicly; to proclaim [or] 2. To put (a law or decree) into force or effect. 3. Administrative law. (Of an administrative agency) to carry out the formal process of rulemaking by publishing the proposed regulation, inviting public comments, and approving or rejecting the proposal."); 70 Fed. Reg. at 20,013 (publishing revised standards in the Federal Register); 63 C.F.R. § 63.303(d) (containing final opacity limits). Thus, under the Act even "as EPA reads it," "promulgate" refers to the agency's "oblig[ation] to conduct a rulemaking." *Nat. Res. Def. Council v. EPA*, 529 F.3d 1077, 1083 (D.C. Cir. 2008) (holding that EPA "promulgated" a standard when it simply "readopted," verbatim, an existing regulation in a subsequent rulemaking). Courts have adopted that ordinary meaning in statute after statute and there is no reason to depart from the ordinary meaning in interpreting the Act or § 7412(f)(2). *Nw. Envtl. Def. Ctr. v. Brennen*, 958 F.2d 930, 934 (9th Cir. 1992) ("the ordinary meaning of the word 'promulgate' is 'to publish' or 'to announce officially'"); *Horsehead Res. Dev. Co. v. EPA*, 130 F.3d 1090, 1092-93 (D.C. Cir. 1997) ("'promulgation' is accorded its 'ordinary meaning'— i.e., publication in the *Federal Register*").

Third, these revised standards were promulgated "pursuant to subsection (d)," i.e., EPA finalized and published them "in carrying out" the review and revision "authorized by" § 7412(d). PURSUANT TO, Black's Law Dictionary (11th ed. 2019). These changes were a result of EPA's review of the Coke Oven Batteries Category under § 7412(d)(6) and determination that revisions were necessary accounting for "developments" within the industry that better controlled leaks. 42 U.S.C. § 7412(d)(6); *see* 70 Fed. Reg. at 20,009-10 (describing rationale for revisions); 69 Fed. Reg. at 48,351 (same). And EPA itself described the revision as "pursuant to the 8-year review requirements of CAA section 112(d)(6)." 70 Fed. Reg. at 19,993.

15

In conditioning a residual risk rulemaking on EPA's promulgation of standards "pursuant to subsection (d)," the text plainly does not distinguish between the establishment of standards for a source category pursuant to § 7412(d)(1) and the revision of standards pursuant to § 7412(d)(6). 42 U.S.C. § 7412(f)(2). In either case, EPA is acting pursuant to its authority under § 7412(d), thereby triggering the requirement to conduct a residual risk review. Indeed, in the past EPA has acknowledged that, when it revised standards under § 7412(d)(6), it "promulgated the Rule following its review of the 1995 emission standard pursuant to Sections 112(d)(6) and (f)(2) of the Act." Brief for EPA at 9-10 (describing rulemaking in which EPA promulgated revised standards under § 7412(d)(6)) (emphasis added), *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667 (D.C. Cir. 2013). In that very case, the D.C. Circuit described a prior rulemaking, in which EPA determined that revisions were not necessary under § 7412(d)(6), as an instance where EPA "never promulgated revised standards." *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d at 673 (describing differences between the challenge to the prior rulemaking and the petitioners' challenge). Therefore, just as EPA does not dispute that it must conduct a residual risk rulemaking for the Pushing, Quenching, and Battery Stacks Category following the promulgation of initial standards, so too EPA cannot dispute that it must conduct a residual risk rulemaking for the Coke Oven Batteries Category following the promulgation of revised standards.

The structure of the Act confirms that the ordinary meaning controls. The Act's generally applicable rulemaking provisions specify the manner in which EPA must "promulgate" final rules. 42 U.S.C. § 7607(d)(4)-(6). And these promulgation requirements apply equally to the establishment of initial emission standards under § 7412(d)(1) and the revision of such standards under § 7412(d)(6). *Id.* § 7607(d)(1).

Finally, EPA's litigating position—that it is under no obligation to conduct a residual risk rulemaking, *see* Answer ¶ 1—is not entitled to any deference. *Alaska*, 544 F.3d at 1095; *Mead*, 533 U.S. at 228 (courts treat agency litigating positions with "near indifference"). EPA has not issued an interpretation of § 7412(f)(2) that exempts revised standards, promulgated pursuant to § 7412(d)(6), from subsequent residual risk rulemaking, let alone an interpretation that "speaks with the force of law." *Stevedoring Servs.*, 697 F.3d at 827-30. For that reason, the Court should also not defer to any post-hoc interpretation that EPA counsel subsequently advances in support of EPA's litigating position. *Alaska*, 544 F.3d at 1095; *Stevedoring Servs.*, 697 F.3d at 827 (no deference given to agency's "litigating position"). Nor would any such interpretation be entitled to a lesser form of deference or respect, as it would directly contradict EPA's own representations in prior litigation. *Alaska*, 544 F.3d at 1095 (no *Skidmore* deference); *see Mead*, 533 U.S. at 228 (level of respect is based on the "consistency" of the agency's position (cleaned up)). For example, in the past EPA has stated that, when EPA finalized revised standards under § 7412(d)(6), EPA "promulgated the Rule following its review of the 1995 emission standard pursuant to Sections 112(d)(6) and (f)(2) of the Act, 42 U.S.C. §§ 7412(d)(6), (f)(2)." Brief for EPA at 9-10 (describing rule in which EPA promulgated revised standards under § 7412(d)(6)) (emphasis added), *Ass'n of Battery Recyclers, Inc.*, 716 F.3d 667; *Nat. Res. Def. Council v. EPA*, 529 F.3d at 1083 ("as EPA reads it, the word 'promulgate' means the agency is obliged to conduct a rulemaking" (emphasis added)).

## III.   THIS COURT SHOULD COMPEL EPA TO COMPLETE THE OVERDUE ACTIONS BY A PROMPT DEADLINE.

As a remedy, Plaintiffs request that the Court declare EPA in violation of its non-discretionary duties to conclude rulemakings under § 7412(d)(6) and § 7412(f)(2) for both Coke Oven Source Categories, and order EPA to fulfill its required statutory obligations by publishing

17

a notice of each proposed action in no less than 12 months and finalizing each action in no less than 16 months.

Where, as here, EPA has failed to fulfill a non-discretionary act or duty, the Act provides for a specific form of relief: authorizing district courts "to order the Administrator to perform" the required act or duty, 42 U.S.C. § 7604(a), by "set[ting] enforceable deadlines" for EPA to correct its statutory violations as soon as possible. *Nat. Res. Def. Council v. Train*, 510 F.2d 692, 705, 712-13 (D.C. Cir. 1974). A court-ordered deadline "should serve like adrenalin, to heighten the response and to stimulate the fullest use of resources." *Id.* at 712. EPA bears an especially "heavy burden" of proving that expeditious compliance with Plaintiffs' proposed deadlines would be "impossible." *E.g.*, *Sierra Club v. Johnson*, 444 F. Supp. 2d 46, 58 (D.D.C. 2006); *Sierra Club v. Thomas*, 658 F. Supp. 165, 170-71 (N.D. Cal. 1987); *see also McCarthy*, 2016 WL 1055120 at *3 (similar).

Urgent action is needed to address the ongoing health and environmental threats posed by toxic coke ovens emissions, and Plaintiffs' proposed schedule provides sufficient time for EPA to perform the required analyses, determine whether revised or additional emission standards are needed, and publish the proposed and final actions in the Federal Register. It has been fourteen years since EPA last took action for the Coke Oven Source Categories, and over six years since the expiration of the statutory deadlines for further action. The current standards are more than outdated. EPA itself recognized that hundreds of thousands of people exposed to coke oven emissions still face greater than a one-in-one-million cancer risk and that the maximum individual cancer risk would be 270 times that level. 70 Fed. Reg. at 19,993-94. And EPA has recognized that it has not completed its task to address those risks. 69 Fed. Reg. at 48,340-41 ("our determination of the ample margin of safety level for the total coke oven facility…will not

be fully addressed until residual risk assessments for all coke plant source categories are completed"). Communities near coke ovens need EPA to fulfill its duties promptly to assure that they receive the emission reductions and protections required by § 7412(d)(6) and § 7412(f)(2).

EPA can meet Plaintiffs' proposed schedule. Courts have previously found that deadlines of a similar length were sufficient for EPA to complete a greater number of risk-and-technology rulemakings under § 7412(d) and § 7412(f), more complex rulemakings, or both. For example, in a recent lawsuit the court ordered EPA to complete combined risk-and-technology rulemaking for 7 source categories within 21 months, and once those reviews were complete, to complete risk-and-technology rulemakings for an additional 6 categories within 18 months. *Blue Ridge Envtl. Def. League v. Pruitt*, 261 F. Supp. 3d 53, 60 (D.D.C. 2017). Similarly, a court in this District determined that EPA could complete risk-and-technology rulemakings for 2 distinct source categories within 18.5 months. *McCarthy*, 2016 WL 1055120 at *3-6.

Here, Plaintiffs' proposed schedule of 16 months to take final action for 2 categories is more than sufficient. First, EPA is not starting from scratch: it previously completed a risk-and-technology rulemaking for the Coke Oven Batteries Category in 2005. Second, as that rulemaking demonstrates, the analysis required for the overdue rulemakings overlaps significantly. *See* 2003 Risk Assessment 86-97. As the Coke Oven Source Categories cover emission points in the same facilities, in order to assess emissions and risks from Coke Oven Batteries, EPA must also assess emissions and risks from Pushing, Quenching, and Battery stacks, and *vice versa. Id.* Thus, requiring EPA to complete 2 interrelated risk and technology reviews in 16 months is possible. *Blue Ridge*, 261 F. Supp. 3d at 60 (the "Act makes clear that Congress contemplated that the EPA could promulgate dozens of air toxics rules in a condensed amount of time").

19

EPA is not entitled to more time, because it has not acted with the "utmost diligence." *Johnson*, 444 F. Supp. 2d at 58 (quoting *Train*, 510 F.2d at 713). Indeed, EPA has "failed to demonstrate any diligence whatever in discharging its statutory duty to promulgate regulations and has in fact ignored that duty for several years." *Cmty. In-Power and Development Ass'n v. Pruitt*, 304 F. Supp. 3d 212, 220 (D.D.C. 2018) (describing EPA's implementation of § 7412(d), (f)). In several cases litigated in just the last few years, courts have held that EPA failed to meet the deadlines established in § 7412(d) & (f) for over <u>40</u> source categories. *E.g. Blue Ridge*, 261 F. Supp. 3d at 55 (13 source categories); *Cmty. In-Power*, 304 F. Supp. 3d at 215 (9 source categories); *Cal. Communities Against Toxics v. Pruitt*, 241 F. Supp. 3d 199, 202 (D.D.C. 2017) (20 source categories). Each case follows the same pattern: EPA fails to comply with the statutory deadlines under § 7412(d) & (f); EPA waits until a citizen suit is filed; in response to the suit, EPA admits its failure to comply with the deadlines; but then EPA vigorously contests how much additional time the court should give the agency to remedy its failure, asserting that it is overworked. Thus, "EPA has fulfilled its statutory duties only when forced by litigation to do so." *Johnson*, 444 F. Supp. 2d at 58.

Instead of complying with the deadlines to protect people from coke ovens, EPA "prioritize[s] its own regulatory agenda over that set by Congress in the 1990 Clean Air Act amendments." *Id.* Thus, courts in recent years have found that EPA—including the very division that EPA itself tasked with regulating sources of hazardous air pollutants under § 7412—devotes significant resources to "discretionary" activities instead of complying with EPA's non-discretionary obligations. *E.g.*, *Cmty. In-Power*, 304 F. Supp. 3d. at 221-22 (noting that EPA conceded that Sector Policy and Programs Division ("SPPD") employees were working on discretionary activities); *Sierra Club v. Wheeler*, 330 F. Supp. 3d 407, 423 (D.D.C. 2018) (noting

"significant evidence that EPA, including SPPD, is engaging in a number of other discretionary activities"); *see* EPA Joint Letter at 1 (Dkt. No. 27) (identifying SPPD as the division that will conduct the actions that are the subject of this lawsuit). EPA's unlawful conduct flouts the will of Congress: "it is inappropriate for an agency to divert to purely discretionary rulemaking resources that conceivably could go towards fulfilling obligations clearly mandated by Congress." *Johnson*, 444 F. Supp. 2d at 57; *Cmty. In-Power*, 304 F. Supp. 3d. at 221 (same).

Subsequently, EPA has continued this pattern of unlawful conduct, devoting staff time and resources to discretionary activities that could be used to address its non-discretionary obligations under § 7412, including its obligations with respect to the Coke Ovens Source Categories. For example, the Office of Air and Radiation ("OAR")—of which SPPD is a component—has found staff time and resources to propose a rule significantly weakening regulations under § 7412 that determine whether a source of hazardous air pollutants is classified as a major source, a change with significant nationwide implications. 84 Fed. Reg. 36,304 (Jul. 26, 2019).[5] Additionally, OAR has found staff time and resources to withdraw the state of California's waiver to set fuel-efficiency standards for automobiles—a waiver EPA itself had

---

[5] *See* Amena H. Saiyid, *EPA Announces Reversal of Decades-Old Air Toxics Policy (2)*, Bloomberg Environment (Jun. 25, 2019), https://news.bloombergenvironment.com/environment-and-energy/epa-closer-to-reversing-decades-old-air-toxics-policy (last accessed Dec. 14, 2019) (describing action).

Plaintiffs' Notice of Motion and Motion for Summary Judgment, Case No. 3:19-cv-02004

previously granted—upending decades of EPA practice. 84 Fed. Reg. 51,310 (Sep. 27, 2019).[6]

Both actions were entirely discretionary—there was neither a statutory nor court-ordered

deadline for EPA to take these actions.[7] Indeed, EPA took these actions <u>after</u> it had admitted in

this case that it had overdue non-discretionary obligations to complete the required rulemakings

for the Coke Ovens Source Categories. *Compare* Answer ¶ 1 (filed June 14, 2019), *with* 84 Fed.

Reg. 36,304 (published Jul. 26, 2019) *and* 84 Fed. Reg. 51,310 (published Sep. 27, 2019).

In light of EPA's "footdragging," the Court should "turn a skeptical eye" to any claim

that Plaintiffs' proposed deadlines are impossible. *Johnson*, 444 F. Supp. 2d at 53-54. Indeed,

EPA's recent submission to this Court suggest that EPA will reprise the same argument—that

SPPD employees are overworked—that courts have repeatedly and recently rejected. *Compare*

EPA Joint Letter at 1-2; *with, e.g.*, *Cmty. In-Power*, 304 F. Supp. 3d. at 221-22, *and Blue Ridge*,

261 F. Supp. 3d at 61. EPA's submission focused solely on the workload of SPPD employees,

ignoring the other resources and personnel that EPA could bring to bear to complete rulemakings

for the Coke Oven Source Categories. *See Thomas*, 658 F. Supp. at 174 (EPA has the authority

to "shift[] resources in response to statutory requirements and court orders."); *Cmty. In-Power*,

304 F. Supp. 3d at 224-25 (noting that EPA must demonstrate it is impossible to hire "new

personnel, including contractors" or "reallocate" resources and personnel within the agency).

---

[6] *See* Coral Davenport, *Trump to Revoke California's Authority to Set Stricter Auto Emissions Rules*, N.Y. Times (Sep. 20, 2019), https://www.nytimes.com/2019/09/17/climate/trump-california-emissions-waiver.html (last accessed Dec. 13, 2019) (describing action).

[7] EPA has itself identified these as discretionary activities in the Semi-Annual Regulatory Agenda it submitted to the Office of Management and Budget. OMB, "Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act," Ex. 10 (noting "Legal Deadline: None" for rule altering framework by which sources are determined to be major sources); OMB, "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks," Ex. 11 (noting "Legal Deadline: None" for rule withdrawing California's Clean Air Act waiver).

Critically, EPA's letter failed to address the issue of whether it has impermissibly diverted "otherwise-available" staff to discretionary activities. *See id.* at 221 (failure to do so "undermines [any] claim that all potentially available resources are already fully utilized").

The Court should adopt Plaintiffs' proposed deadlines for EPA to remedy its failures.

## IV.  PLAINTIFFS SATISFY ALL THRESHOLD REQUIREMENTS FOR BRINGING SUIT INCLUDING JURISDICTION, NOTICE, VENUE, AND STANDING.

This Court has jurisdiction under the Act's citizen suit provision, which authorizes district courts to hear actions to compel EPA's performance of "any act or duty" under the Act "which is not discretionary with [EPA]." 42 U.S.C. § 7604(a)(2). Plaintiffs provided notice as required by 42 U.S.C. § 7604(b)(2). Answer ¶ 4; Letter from Plaintiffs to EPA Administrator Andrew Wheeler (Feb. 13, 2019), Ex. 9. Venue is proper in this Court because Plaintiff Sierra Club is headquartered in Oakland, and thus resides in this district. 28 U.S.C. § 1391(e)(1)(C).

Plaintiffs have associational standing to bring this suit: Plaintiffs' members ("Members") would have standing to sue in their own right; Plaintiffs' interest in safeguarding public health and the environment from coke ovens is germane to their organizational purposes, Organizational Decls., Exs. 5-7; and this suit will not require individual participation of members. *See, e.g.*, *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000); *McCarthy*, 2016 WL 1055120 at *2, n.2 (finding standing in suit alleging similar failures to perform § 7412(d), (f) duties).[8]

Members would have standing to sue in their own right because they live, work, recreate, and engage in other activities near coke ovens, are thereby exposed to coke oven emissions, which harms their health, recreational, aesthetic, and other interests. Members Decls., Exs. 1-4;

---

[8] Showing that "even one" plaintiff has standing establishes jurisdiction. *See Mont. Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 981 (9th Cir. 2013) (cleaned up).

Plaintiffs' Notice of Motion and Motion for Summary Judgment, Case No. 3:19-cv-02004

*see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181-84 (2000) (members' reasonable concerns about the effects of pollutant discharges on their recreational and aesthetic interests constitute injury); *Hall v. Norton*, 266 F.3d 969, 973-74, 976 (9th Cir. 2001) (exposure to harmful air pollution when carrying out daily activities constitutes injury); *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1017 (D.C. Cir. 2014) (finding standing where members spend time near polluting facilities and "are concerned about the emissions' effects on their health"). Completing the regulatory actions and duties at issue would likely reduce Members' exposure to harmful coke oven emissions, reduce environmental damage in their communities, reduce their reasonable concerns about this pollution, and reduce the recreational, aesthetic, and other harms caused by EPA's failure to adequately regulate emissions from coke ovens. Member Decls., Exs. 1-4; *see, e.g.*, *Laidlaw Envtl. Servs.*, 528 U.S. at 187. Thus, these injuries are redressable: these mandated actions, if completed, "*could* protect" Members' health, recreational, aesthetic, and other interests. *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 782-83 (9th Cir. 2014) (finding standing based on alleged agency violation of procedural requirement designed to protect groups' concrete interests).

In addition, EPA's failures to publish the required proposed and final rulemakings and disclose the supporting data and analysis deprive Plaintiffs of information, injuring both Plaintiffs' Members and Plaintiffs themselves. Organizational Decls., Exs. 5-7; Kraybill Decl., Ex. 2. Had EPA completed these rulemakings, it would have been required to analyze "developments in practices, processes, and control technologies" for coke ovens, 42 U.S.C. § 7412(d)(6), along with risks to public health, including "cancer risks," *id.* § 7412(f)(2), and then disseminate its findings to the public using the Act's mandatory notice and comment rulemaking procedures, 42 U.S.C. § 7607(d)(1), (d)(3)-(6). By failing to complete the required

rulemakings and provide this information to Plaintiffs, EPA injures Plaintiffs and their Members.

*See Animal Legal Def. Fund v. United States Dep't of Agric.*, 935 F.3d 858, 867 (9th Cir. 2019)

("A plaintiff sustains a cognizable informational injury in fact when agency action cuts her off

from information which must be publicly disclosed pursuant to a statute." (cleaned up)). A Court

order would redress these injuries by requiring EPA to complete the mandated rulemakings and

publish this information.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court grant their motion for

summary judgment, declare EPA liable for failing to take the non-discretionary actions described

above, and order EPA to perform each required action on Plaintiffs' proposed schedule.

/s/ Tosh Sagar
TOSH SAGAR, Admitted *Pro Hac Vice*
JAMES S. PEW, Admitted *Pro Hac Vice*
Earthjustice
1625 Massachusetts Ave., NW, Ste. 702
Washington, DC 20036
tsagar@earthjustice.org,
jpew@earthjustice.org
Tel: 202-667-4500
Fax: 202-667-2356

PAUL R. CORT, State Bar No. 184336
Earthjustice
50 California Street
San Francisco, CA 94111
pcort@earthjustice.org
Tel: 415-217-2000
Fax: 415-217-2040

*Attorneys for Plaintiffs*