SYDNEY A. MENEES (D.C. Bar No. 1027544)
sydney.menees@usdoj.gov
United States Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
4 Constitution Square
150 M St. NE
Washington, DC 20002
Telephone (202) 514-2398
Facsimile (202) 514-8865

*Attorney for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITIZENS FOR PENNSYLVANIA'S FUTURE, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> ANDREW R. WHEELER, in his official capacity as the Administrator of the United States Environmental Protection Agency, <br><br> Defendant. | Case No. 3:19-cv-02004-VC <br><br> **DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, CROSS MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date: February 27, 2020 <br> Time: 10:00 am <br> Courtroom: 4, 17th Floor |

## TABLE OF CONTENTS

NOTICE OF CROSS MOTION FOR SUMMARY JUDGMENT ................................................1

OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT ...................................1

MEMORANDUM AND POINTS OF AUTHORITIES ...........................................................1

INTRODUCTION ..........................................................................................................1

STATEMENT OF ISSUES ...............................................................................................3

LEGAL AND FACTUAL BACKGROUND ..........................................................................4

I.      Statutory Background .........................................................................................4

II.     Factual Background ...........................................................................................6

STANDARD OF REVIEW ...............................................................................................7

ARGUMENT .................................................................................................................8

I.      CAA Section 112(f)(2) Makes Plain That a Residual Risk Review Is a One-Time Occurrence ......................................................................................................8

II.     To the Extent the Court Finds Section 112(f)(2) to Be Ambiguous Regarding the Timing of EPA's Obligations, EPA's Construction is Reasonable .................................10

        A.     The CAA Legislative History Supports EPA's Interpretation of Section 112(f)(2) ...........................................................................................11

        B.     Reading Section 112(f)(2) to Require a Subsequent Risk Review Would Provide No Greater Benefit to Human Health and Thus Waste Agency Resources ...........12

        C.     EPA Has Articulated Its Interpretation of CAA Section 112(f)(2) in the Federal Register and Acted Consistently With Its Interpretation .........................13

        D.     The Court Should Avoid Reading a Recurring Obligation to Perform Risk Reviews Into Section 112(f)(2) Where a Party Is Seeking to Compel Agency Action ...................................................................................................14

III.    EPA's Proposed Timetable Represents the Most Expeditious Schedule that the Agency Can Reasonably Meet ............................................................................15

IV.    Plaintiffs' Proposed Timetable is Unreasonable and Fails to Address the Complexity
       of the Actions at Issue....................................................................................................23

CONCLUSION...........................................................................................................................25

DEFENDANT'S OPPOSITION AND CROSS MOTION FOR
SUMMARY JUDGMENT | CASE NO. 3:19-cv-02004-VC

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alaska v. Fed. Subsistence Bd.*,
  544 F.3d 1089 (9th Cir. 2008) ............................................... 14

*Am. Lung Ass'n v. Browner*,
  884 F. Supp 345 (D. Ariz. 1994) ........................................... 15

*ASARCO, LLC v. Celanese Chem. Co.*,
  792 F.3d 1203 (9th Cir. 2015) ............................................... 9

*Ass'n of Battery Recyclers*,
  716 F.3d 667 (D.C. Cir. 2013) ............................................... 7

*Barnhart v. Walton*,
  535 U.S. 212 (2002) ............................................................. 7

*Blue Ridge Envtl. Def. League v. Pruitt*,
  261 F. Supp. 3d 53 (D.D.C. 2017) ................................... 17, 25

*Cal. Cmtys. Against Toxics v. Pruitt*,
  241 F. Supp. 3d 199 (D.D.C. 2017) ...................................... 17

*Celotex Corp. v. Caltrett*,
  477 U.S. 317 (1986) ............................................................. 7

*Cement Kiln Recycling Coal. v. EPA*,
  255 F.3d 855 (D.C. Cir. 2001) ............................................... 4

*Chevron, U.S.A., Inc. v. NRDC*,
  467 U.S. 837 (1984) ........................................................ 7, 10

*Cmty. In-Power & Development Ass'n v. Pruitt*,
  304 F. Supp. 3d 212 (D.D.C. 2018) ................................ 17, 25

*Cronin v. Browner*,
  90 F. Supp. 2d 364 (S.D.N.Y. 2000) .................................... 16

*Dep't of Homeland Sec. v. MacLean*,
  574 U.S. 383 (2015) ............................................................. 9

*Dep't of Treasury, IRS v. Fed. Labor Relations Auth.*,
  494 U.S. 922 (1990) ............................................................. 9

*Garcia v. United States,*
    469 U.S. 70 (1984) ............................................................................................ 12

*Heckler v. Ringer,*
    466 U.S. 602 (1984) .......................................................................................... 14

*Me. Ass'n of Handicapped Persons of Portland Me. v. Dole,*
    623 F. Supp. 920 (D. Me. 1985) ...................................................................... 16

*Metro. Stevedore Co. v. Rambo,*
    521 U.S. ............................................................................................................ 11

*N. Cal. River Watch v. Wilcox,*
    633 F.3d 766 (9th Cir. 2011) ........................................................................... 11

*Nat'l Ass'n. for Surface Finishing v. EPA,*
    795 F.3d 1 (D.C. Cir. 2015) ............................................................................. 10

*NRDC v. EPA,*
    529 F.3d 1077 (D.C. Cir. 2008) ................................................................... 7, 10

*NRDC v. Train,*
    510 F.2d 692 (D.C. Cir. 1975) ......................................................................... 15

*Our Children's Earth Found. v. EPA,*
    527 F.3d 842 (9th Cir. 2008) ........................................................................... 14

*Price v. Stevedoring Servs. of Am., Inc.,*
    697 F.3d 820 (9th Cir. 2012) ................................................................ 7, 11, 14

*Resident Councils of Washington v. Leavitt,*
    500 F.3d 1025 (9th Cir. 2007) ........................................................................... 9

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997) ........................................................................................... 9

*San Luis & Delta–Mendota Water Auth. v. United States,*
    672 F.3d 676 (9th Cir. 2012) ........................................................................... 11

*Sierra Club v. EPA,*
    353 F.3d 976 (D.C. Cir. 2004) ..................................................................... 5, 10

*Sierra Club v. Thomas,*
    658 F. Supp. 165 (N.D. Cal. 1987) ................................................................. 15

*Sierra Club v. Thomas,*
   828 F.2d 783 (D.C. Cir. 1987) ................................................................. 14, 15, 16

*Skidmore v. Swift & Co.,*
   323 U.S. 134 (1944) .......................................................................................... 8, 11

*Student Loan Fund of Idaho, Inc. v. U.S. Dep't of Educ.,*
   272 F.3d 1155 (9th Cir. 2001) .................................................................................. 8

*Tablada v. Thomas,*
   533 F.3d 800 (9th Cir. 2008) ................................................................................... 14

*United States v. Maria–Gonzalez,*
   268 F.3d 664 (9th Cir. 2001) ..................................................................................... 8

*United States v. Mead Corp.,*
   553 U.S. 218 (2001) ................................................................................................... 7

*United Steelworkers of Am. v. Rubber Mfrs. Ass'n,*
   783 F.2d 1117 (D.C. Cir. 1986) .............................................................................. 16

*Valencia v. Lynch,*
   811 F.3d 1211 (9th Cir. 2016) ................................................................................... 7

*Wadler v. Bio-Rad Labs., Inc.,*
   916 F.3d 1176 (9th Cir. 2019) ................................................................................... 9

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) ................................................................................................. 15

*Zuber v. Allen,*
   396 U.S. 168 (1969) ................................................................................................. 12


**United States Code**

42 U.S.C. § 7401 ........................................................................................................ 4

42 U.S.C. § 7412(b) .................................................................................................. 4

42 U.S.C. § 7412(b)(2) ............................................................................................. 4

42 U.S.C. §§ 7412(d) ................................................................................................ 4

42 U.S.C. § 7412(d)(6) ............................................................................................. 9

vi

42 U.S.C. § 7412(f) ............................................................................................................. 4

42 U.S.C. § 7412(f)(1) ........................................................................................................ 5

42 U.S.C. § 7412(f)(2) ............................................................................................ 1, 10, 12

42 U.S.C. § 7412(f)(2)(A) ........................................................................................... 2, 6, 9

42 U.S.C. § 7607(d) ............................................................................................................ 4

42 U.S.C. § 7607(d)(5) ...................................................................................................... 22

## Federal Rules of Civil Procedure

Fed. R. Civ. P. 56(a) .......................................................................................................... 7

## Code of Federal Regulations

40 C.F.R. Pt. 63, Subpt. L ............................................................................................ 6, 25

40 C.F.R. Pt. 63, Subpt. CCCCC ...................................................................................... 6

40 C.F.R. § 63.302 ............................................................................................................ 25

40 C.F.R. § 63.303 ............................................................................................................ 25

40 C.F.R. § 63.307 ............................................................................................................ 25

40 C.F.R. § 63.308 ............................................................................................................ 25

40 C.F.R. § 63.7290 .......................................................................................................... 25

40 C.F.R. § 63.7291 .......................................................................................................... 25

40 C.F.R. § 63.7292 .......................................................................................................... 25

40 C.F.R. § 63.7293 .......................................................................................................... 25

40 C.F.R. § 63.7294 .......................................................................................................... 25

40 C.F.R. § 63.7295 .......................................................................................................... 25

40 C.F.R. § 63.7296 .......................................................................................................... 25

**Federal Registers**

58 Fed. Reg. 51,735 (Sept. 30, 1993) ........................................................................... 23

58 Fed. Reg. 57,898 (Oct. 27, 1993) .............................................................................. 6

69 Fed. Reg. 48,338 (Aug. 9, 2004) ............................................................................... 13

70 Fed. Reg. 19,992 (Apr. 15, 2002) ................................................................... 6, 11, 13

70 Fed. Reg. 44,285 (Aug. 2, 2005) ................................................................................ 7

77 Fed. Reg. 55,698 (Sept. 11, 2012) ..................................................................... 10, 14

81 Fed. Reg. 97,046 (Dec. 30, 2016) ...................................................................... 11, 14

**House and Senate Reports**

H.R Rep. No. 101-490, Pt. 1 (1990). .............................................................................. 4

S. Rep. No. 101-228 (1989) ........................................................................................... 12

## NOTICE OF CROSS-MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that on February 27, 2020, at 10:00 a.m., before the Honorable Vince Chhabria, United States District Judge, in Courtroom 4, 17th Floor, 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Andrew R. Wheeler, in his official capacity as Administrator of the United States Environmental Protection Agency ("EPA" or "the Agency") will and hereby does move this Court to grant summary judgment as to remedy pursuant to Federal Rule of Civil Procedure 56 and Civil Local Rule 56-1 and enter EPA's proposed order. This motion is based on the points and authorities below, the attached declaration and exhibits, and argument that may be presented at any hearing on this cross-motion for summary judgment.

## OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT

EPA moves for summary judgment on the basis of the points and authorities below, the attached declaration, and any arguments presented at the motion hearing.  EPA opposes Plaintiffs' motion to compel EPA to perform a residual risk review for coke oven batteries under the Clean Air Act ("CAA"), 42 U.S.C. § 7412(f)(2), and Plaintiffs' proposed remedy as to all alleged nondiscretionary duties.  EPA also moves for an order directing EPA to implement EPA's proposed schedule for the remaining, uncontested nondiscretionary actions under 42 U.S.C. §§ 7412(d)(6) and (f)(2).

## MEMORANDUM AND POINTS OF AUTHORITIES

### INTRODUCTION

Under the Clean Air Act (CAA), 42 U.S.C. §§ 7401-7671q, EPA regulates emissions of hazardous air pollutants from many different types of sources.  Coke ovens – industrial factories that convert coal into coke – have two distinct source categories that EPA regulates: (1) Coke Oven Batteries (Subpart L) and (2) Coke Ovens: Pushing, Quenching, and Battery Stacks (Subpart CCCCC).  In four separate claims, Plaintiffs Citizens for Pennsylvania's Future, Louisiana Bucket Brigade, Gasp, and Sierra Club allege that EPA is obligated to complete a risk review and a technology review for each of these coke oven source categories.  Doc. 1, ¶¶ 50, 52.

EPA contests liability on one claim: whether it is required to perform a second residual risk review for coke oven batteries (Subpart L) under CAA section 112(f)(2)(A), 42 U.S.C. § 7412(f)(2)(A).  The risk review for this source category is no longer required because EPA already completed it in 2005.  The requirement to undertake a risk review is a one-time obligation that EPA uses to determine whether there are any residual health or environmental risks remaining after EPA promulgates the initial, technology-based standards for a particular source category.  As EPA has articulated in notice and comment rulemakings, the relevant provisions of the CAA demonstrate that EPA's risk review obligations are one time only. Performing recurring risk reviews would not benefit human health, and would thus be a waste of agency resources.  Further, EPA's interpretation that the risk review is a one-time obligation is consistent with the purpose and structure of CAA section 112.

EPA does not contest liability on the remaining three claims: the first-time risk and technology reviews for Subpart CCCCC, and the recurring technology review for Subpart L.  On these claims, the parties are briefing remedy only (i.e., the amount of time EPA necessary for EPA to adequately perform these agency actions through rulemaking).

Whether the Court finds that there are three or four outstanding nondiscretionary duties, performing risk and technology reviews for the coke oven source categories will take a significant amount of time.  Due in part to the mixture of pollutants, processes and emissions sources at coke ovens facilities, coke ovens are one of the most complex sources that EPA regulates under the CAA.  As explained in the declaration of Penny Lassiter, Director of the Sector Policies and Programs Division within EPA's Office of Air Quality Planning and Standards, Office of Air and Radiation, in order to conduct the reviews, EPA must collect data, perform modeling and analysis using that data, and undertake administrative processes to develop legally defensible reviews rules, among other tasks.  *See* Attach. A ("Lassiter Decl.").  The two source categories and two types of reviews are distinct and, accordingly, require different data and analyses.  However, EPA has already begun working on the initial steps for these reviews.  Based on the complexity of these source categories, the need to conduct thorough

2

and comprehensive analyses, and agency staff workloads, EPA has developed a reasonable schedule to complete these reviews.

As a remedy, the Court need only set a final deadline, not a proposed rule deadline.  CAA Sections 112(d)(6) and 112(f)(2) only contain deadlines by which EPA must *complete* those rules.  Plaintiffs improperly request a proposed rule deadline in addition to a final rule deadline.  Doc. 31 at 18.  However, to assist the Court in comparing remedies, EPA advances a deadline for proposed rules as well.  Accordingly, EPA requests that the Court enter an order directing the Agency to promulgate risk and technology reviews on the obligated source categories according to the following timetable:

By March 30, 2022: EPA shall sign proposed rules for all obligated coke oven source categories under 42 U.S.C. § 7412(d)(6) and § 7412(f)(2); and

By March 30, 2023: EPA shall sign final rules for those coke oven source categories under 42 U.S.C. § 7412(d)(6) and § 7412(f)(2).

EPA also explains why the remedy proposed by Plaintiffs is not appropriate or reasonable.  Specifically, Plaintiffs' proposed schedule is unsupported by the facts and relevant case law, and would subject EPA to an unworkable schedule for a rulemaking subject to judicial review.   EPA must be provided enough time to carry out a complex rulemaking process such that the Agency can defend its decisionmaking.

## STATEMENT OF ISSUES

1.      Should Plaintiffs' first claim be denied because EPA already fulfilled its obligation to perform a residual risk review under section 112(f)(2)(A) of the Clean Air Act, 42 U.S.C. § 7412(f)(2)(A) for Subpart L in 2005 and the Act does not impose a non-discretionary duty on EPA to conduct subsequent risk reviews?

2.      Should Plaintiffs' proposed remedy be rejected, and EPA's proposed remedy be entered, where EPA has provided a reasonable schedule for the remaining nondiscretionary duties to perform the complex risk and technology reviews for the coke oven source categories?

## LEGAL AND FACTUAL BACKGROUND

### I.    Statutory Background

The purpose of the CAA is to "protect and enhance the quality of the Nation's air resources."  42 U.S.C. § 7401.  Hazardous air pollutants, or "HAPs," are "pollutants which present, or may present . . . a threat of adverse human health effects . . . or adverse environmental effects whether through ambient concentrations, bioaccumulation, deposition, or otherwise."  42 U.S.C. § 7412(b)(2).  Prior to the 1990 Amendments, the CAA required EPA to regulate HAPs on the basis of risk.  H.R. Rep. No. 101-490, Pt. 1, at 150-51, 322 (1990), reprinted in 2 A Legislative History of the Clean Air Act Amendments of 1990 ("Legislative History") at 3174-75, 3346 (Comm. Print 1993).  Dissatisfied with the pace and difficulties inherent in setting risk-based regulations, Legislative History at 3346, Congress amended the CAA in 1990, establishing a two-phase approach – one technology-based and the other risk-based – for regulating HAP emissions.  42 U.S.C. §§ 7412(d) & (f); *see Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 857-58 (D.C. Cir. 2001).  In addition, Congress included a specific list of over 150 hazardous air pollutants for regulation under section 112(b) of the CAA and authorized EPA to revise that list. 42 U.S.C. § 7412(b).

In reviewing a challenge to EPA's initial standard regulating hazardous air pollutants from primary copper smelting operations, then-Judge Roberts, writing for the D.C. Circuit, concisely described the statutory requirements for the initial standard-setting process, as well as the subsequent risk review requirement:

> Congress established a two-phase approach for setting HAP emission standards under the 1990 Amendments.  *See National Lime*, 233 F.3d at 629.   During the first phase, EPA must promulgate technology-based emission standards for categories of sources that emit HAPs. 42 U.S.C. § 7412(d); Senate Report, at 148.  These emission standards are to be based not on an assessment of the risks posed by HAPs, but instead on the maximum achievable control technology (MACT) for sources in each category. Senate Report, at 148 ("The MACT standards are based on the performance of technology, and not on the health and environmental effects of hazardous air pollutants.").  The standards, at a minimum, must reflect the emissions limitation achieved by the best-performing sources in a particular category…. **The idea is to set limits that, as an initial matter,**

4

> **require all sources in a category to at least clean up their emissions to the level that their best performing peers have shown can be achieved**. *See* 42 U.S.C. § 7412(d)(3); National Emission Standards for Hazardous Air Pollutants for Primary Copper Smelting; Final Rule, 67 Fed. Reg. 40,478, 40,479 (June 12, 2002) (codified at 40 C.F.R. pt. 63) (Final Rule).
>
> The second phase then returns to a risk-based analysis. **That phase — which occurs within eight years after Section 7412(d) MACT standards are promulgated — requires EPA to consider whether residual risks remain that warrant more stringent standards than achieved through MACT. 42 U.S.C. § 7412(f). EPA must determine whether such standards are required "in order to provide an ample margin of safety to protect public health ... or to prevent ... an adverse environmental effect."** *Id.* § 7412(f)(2)(A); *see also* Senate Report, at 155 ("[The Amendments] require[] [EPA] to protect against all significant environmental effects when setting residual risk standards in the second phase.").

*Sierra Club v. EPA*, 353 F.3d 976 at 980 (D.C. Cir. 2004) (emphasis added).

Congress recognized that the technology-based MACT standards may not be sufficient to adequately protect public health. Concurrent with the MACT setting process, the CAA required EPA to submit a report to Congress on the methods to be used to assess the risk remaining after implementation of the technology-based MACT standards and to make recommendations as to the need for legislative changes needed to address residual risks to public health and the environment. 42 U.S.C. § 7412(f)(1). EPA submitted this report to Congress in 1999.[1] In the report, EPA stated that it believed that the CAA provides EPA with adequate authority to address residual risks under section 112(f)(2) through (6). In the absence of any further action by Congress in this area, CAA Section 112(f)(2) requires EPA to assess any risks remaining after compliance with the MACT standard and to set standards if required to provide an ample margin of safety to protect public health.[2] If the Administrator decides to promulgate such standards, the

---

[1] Residual Risk Report to Congress (March 1999), available at https://www.epa.gov/sites/production/files/2013-08/documents/risk_rep.pdf.

[2] An ample margin of safety is a level determined by the Administrator that includes consideration of all risk and health information, cost of emissions reductions, feasibility of emissions reductions, and uncertainty. The goal of section 112 is to minimize the number of people with a lifetime excess cancer risk from a source in a category or subcategory of one in 1 million.

CAA states that the Administrator "shall promulgate the standards 8 years after promulgation of the standards under subsection (d) of this section for each source category or subcategory concerned." 42 U.S.C. § 7412(f)(2)(A).

Further, within eight years of EPA's promulgation of technology-based standards for a given source category, and every eight years thereafter, EPA is to conduct a technology review. CAA section 112(d)(6) provides that the Administrator is to "review, and revise as necessary (taking into account developments in practices, processes, and control technologies) emission standards promulgated under this section no less often than every 8 years." 42 U.S.C. § 7412(d)(6) (parenthesis in the original). Thus, unlike the statutory language regarding the residual risk review, the CAA explicitly requires that the technology review must be repeated every 8 years. *Id*.

For the one-time risk review, EPA has typically combined it with the initial technology review for each source category in a single rulemaking. The Agency refers to these combined reviews as the "risk and technology review" or "RTR." The RTR process for each source category is a rulemaking that must comply with the procedural requirements of section 307(d) of the CAA, 42 U.S.C. § 7607(d).

## II.    Factual Background

Coke ovens convert coal into coke, which is a component of steel production. This process, called "coking," generates HAPs. EPA regulates two source categories related to coke ovens: Coke Oven Batteries (Subpart L) and Coke Ovens: Pushing, Quenching, and Battery Stacks (Subpart CCCCC). 40 C.F.R. Pt. 63, Subpt. L; 40 C.F.R. Pt. 63, Subpt. CCCCC.

EPA has completed many of its regulatory obligations for Subpart L. In 1993, EPA issued its initial technology-based national emission standards to control HAPs. 58 Fed. Reg. 57,898 (Oct. 27, 1993). In 2005, EPA conducted the RTR for Subpart L. 70 Fed. Reg. 19,992 (Apr. 15, 2002). Based on the residual risk review and the technology review, EPA revised the standards, resulting in certain requirements becoming more stringent, relative to the original 1993 emissions standards for Subpart L. *See id*. at 19,994. The RTR also found that the residual risk from the emissions standards was within the ample margin of safety. *See id*. There were no

challenges to the RTR when judicial review of it was available under CAA section 307(b), 42 U.S.C. § 7607(b).

For Subpart CCCCC, EPA issued its initial technology-based national emission standards to control HAPs in 2005, 70 Fed. Reg. 44,285 (Aug. 2, 2005), but has not yet performed an RTR for Subpart CCCCC sources.

## STANDARD OF REVIEW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Caltrett*, 477 U.S. 317 (1986).

An agency's interpretation of a statute it is charged with administering receives "considerable weight." *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844 (1984). To evaluate an agency's interpretation of a statute under *Chevron*, the Court first considers "whether Congress has directly spoken to the precise question at issue." *Id*. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-43. If the statute is ambiguous as to the specific issue, the Court considers "whether the agency's answer is based on a permissible construction of the statute." *Valencia v. Lynch*, 811 F.3d 1211, 1215 (9th Cir. 2016) (quoting *Chevron*, 467 U.S. 837 (1984)).

The *Chevron* framework applies when agencies interpret statutes in which Congress properly delegates its authority. 467 U.S. at 842. In *United States v. Mead Corporation*, 553 U.S. 218, 226-27 (2001), the Supreme Court further refined the applicability of Chevron to agency promulgations. However, "the absence of any formal procedure [does] not *categorically* preclude…Chevron deference." *Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 826 (9th Cir. 2012) (citing *Mead*, 553 U.S. 218 (2001)) (emphasis in original); *see also Barnhart v. Walton*, 535 U.S. 212, 221–22 (2002). Courts have previously applied *Chevron* to evaluating challenges to EPA's actions under section 112(f)(2). *See Ass'n of Battery Recyclers*, 716 F.3d 667, 674 (D.C. Cir. 2013)*; NRDC v. EPA*, 529 F.3d 1077, 1083 (D.C. Cir. 2008).

In the alternative, EPA's interpretation still carries persuasive force as a reasonable agency interpretation. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944). Under *Skidmore*, courts analyze the agency's reasoning and consistency in application of that reasoning.

## ARGUMENT

The Court should grant summary judgment in EPA's favor with respect to Plaintiffs' claim that EPA is required to conduct a residual risk review for Subpart L. Contrary to Plaintiffs' claim, the CAA requires EPA to conduct a residual risk review only once, within eight years after EPA promulgates emission standards for a source category or subcategory, and the subsequent rule revisions do not trigger a second risk review. The CAA does not require EPA to repeat the risk review eight years after revising the rule pursuant to CAA section 112(d)(6) as Plaintiffs contend. A plain reading of the statute under the first step of *Chevron* analysis indicates that EPA only has an obligation to conduct the residual risk review under CAA section 112(f)(2) once. But even if the Court finds the statute to be ambiguous, EPA's reading of the statute should be found reasonable under *Chevron* or *Skidmore.*

The Court should also grant EPA's summary judgment motion as to the appropriate remedy for the nondiscretionary duties to perform RTRs. In contrast to Plaintiffs' proposed remedy, EPA's remedy is based upon the complexity of the reviews and the necessary work that must be done to promulgate a rule that is based on a complete administrative record and defensible in any future challenge.

## I.    CAA Section 112(f)(2) Makes Plain That a Residual Risk Review Is a One-Time Occurrence.

"The language of a statute is controlling when the meaning is plain and unambiguous." *United States v. Maria–Gonzalez*, 268 F.3d 664, 668 (9th Cir. 2001). To determine if Congress has directly spoken to the issue of whether section 112(f)(2) requires EPA to perform a risk review eight years after each time it revises the standards pursuant to CAA Section 112(d)(6), the Court must "employ the traditional tools of statutory construction; if Congress had an intent on this issue, that intent is the law and must be given effect." *Student Loan Fund of Idaho, Inc. v. U.S. Dep't of Educ.*, 272 F.3d 1155, 1165 (9th Cir. 2001) (internal quotations omitted).

"The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *cf. ASARCO, LLC v. Celanese Chem. Co.*, 792 F.3d 1203, 1210 (9th Cir. 2015).  Courts must "presume that Congress acts intentionally when it uses particular wording in one part of a statute but omits it in another." *Wadler v. Bio-Rad Labs., Inc.*, 916 F.3d 1176, 1186 (9th Cir. 2019) (citing *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383 (2015)).  For example, when a statute uses the phrase "law, rule, or regulation" in one section but uses only the word "law" in a different section, the word "law" does not encompass rules or regulations.  *MacLean*, 574 U.S. at 390-93; *Dep't of Treasury, IRS v. Fed. Labor Relations Auth.*, 494 U.S. 922, 931–32 (1990).

Here, the plain language of section 112(f)(2)(A) states that:

> …the Administrator shall, within 8 years after promulgation of standards for each category or subcategory of sources pursuant to subsection (d) of this section, promulgate standards for such category or subcategory if promulgation of such standards is required in order to provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990) or to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect.

42 U.S.C. § 7412(f)(2)(A).  This process is the residual risk review.

As section 112(f)(2)(A) makes clear, EPA must perform the residual risk review "*within 8 years after promulgation of standards for each category or subcategory of sources*" (emphasis added).  *Id*.  If Congress intended that EPA conduct recurring risk reviews, it would have said so. Indeed, Congress did just that when it directed EPA to conduct a technology review under CAA Section 112(d)(6) "no less often than *every* eight years."  42 U.S.C. § 7412(d)(6) (emphasis added).  By using distinct phrasing, Congress intentionally established two different timing obligations under sections 112(f)(2) and 112(d)(6): one obligation that recurs every eight years (section 112(d)(6) technology review) and one obligation that occurs once within eight years of the first promulgation of emission standards for the category or subcategory (the risk review under section 112(f)(2)).  In order to give effect to the distinct words that Congress uses, *see Resident Councils of Washington v. Leavitt*, 500 F.3d 1025, 1031 (9th Cir. 2007), the Court

should find that section 112(f)(2) does not contain a continuing obligation to repeat the risk review process every eight years.

The lack of ambiguity in the language of section 112(f)(2) is further evidenced by decisions of the D.C. Circuit Court of Appeals, the court that resolves the vast majority of challenges to EPA rulemakings promulgated under the CAA.  Those decisions have noted the distinction between the timing of EPA's obligations under sections 112(d)(6) and 112(f)(2), and that the residual risk review is a "one-time obligation" that only occurs "after initial promulgation of 112(d) standards."  *See, e.g.*, *Nat'l Ass'n. for Surface Finishing v. EPA*, 795 F.3d 1, 5 (D.C. Cir. 2015) ("[The emission standard] entails two distinct, parallel analyses: a recurring 'technology review' under section 112(d)(6) and a one-time 'risk review' under section 112(f)(2)."); *NRDC v. EPA*, 529 F.3d 1077, 1080 (D.C. Cir. 2008) ("In the second stage of regulation, EPA was obliged to review any residual health risks that had not been eliminated by the initial technology-based standards."); *Sierra Club v. EPA*, 353 F.3d 976 (D.C. Cir. 2004). EPA is unaware of any court holding or otherwise stating that EPA is under an obligation to perform continuing risk reviews under section 112(f)(2).  Notably, until this action, EPA is unaware of any case in which a litigant has even asserted such an argument.

## II.   To the Extent the Court Finds Section 112(f)(2) to Be Ambiguous Regarding the Timing of EPA's Obligations, EPA's Construction Is Reasonable.

Assuming *arguendo* that there were any ambiguity as to the timing requirements in CAA section 112(f)(2), EPA's interpretation should be upheld under the second prong of *Chevron* analysis because interpreting section 112(f)(2) as a one-time obligation is not arbitrary, capricious, or an abuse of discretion.  *Chevron*, 467 U.S. at 843.

Further, under *Mead*, an agency interpretation receives deference if that promulgation is formal.  Here, EPA is the agency charged with administering the Clean Air Act, and it has authority to promulgate rules under section 112(f)(2).  42 U.S.C. § 7412(f)(2).  In notice and comment rulemakings that EPA has promulgated under § 112(f)(2), EPA describes its obligation under section 112(f)(2) as a "one-time review."  77 Fed. Reg. 55,698, 55,699 (Sept. 11, 2012) ("This review, known as the residual risk review—is a one-time review that must occur within 8

years of issuance of the MACT standard."); 81 Fed. Reg. 97,046, 97, 048 (Dec. 30, 2016) ("This review, known as the residual risk review, is a one-time review that the statute provides will be done within 8 years of issuance of the MACT standard.").

Additionally, in EPA's 2005 risk review for coke oven batteries under CAA Section 112(f)(2), EPA noted the distinction between the technology review and risk review: "[E]volving technology—which is the clear focus of section 112(d)(6)—is central to the purposes of section 112(d), while it is only one consideration among many that may be relevant under section 112(f). If Congress had intended section 112(d)(6) to encompass section 112(f), a broader range of considerations would logically have been mandated for the periodic review." 70 Fed. Reg. at 20,008-09. Thus, reevaluation is necessary under section 112(d)(6) because of evolving technology, but technology is not the focus of section 112(f)(2).

Even in cases where *Chevron* is found to be "inapplicable, reasonable agency interpretations may still carry 'at least some added persuasive force.'" *Price*, 697 F.3d at 832 (citing *Metro. Stevedore Co. v. Rambo*, 521 U.S. at 136). The added force is due to the agency's "specialized experience and broader investigations and information." *Skidmore*, 323 U.S. at 139-40. Should this Court decline to apply *Chevron*, EPA's interpretation is still entitled to some deference. Under *Skidmore*, "The weight of [an agency's interpretive decision] in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id*. at 140; *see also San Luis & Delta–Mendota Water Auth. v. United States*, 672 F.3d 676, 708 (9th Cir. 2012).

Here, EPA's interpretation is reasonable, as it is supported by the legislative history of the CAA, takes into account the structure of section 112, and has been consistently applied.

### A.     The CAA Legislative History Supports EPA's Interpretation of Section 112(f)(2).

When it is difficult to extract the plain meaning of a statute, courts looks to the legislative history. *N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 773 (9th Cir. 2011). "[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which

'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.'" *Garcia v. United States*, 469 U.S. 70, 76 (1984) (quoting *Zuber v. Allen*, 396 U.S. 168, 186 (1969)).  Here, the Senate Report for the CAA Amendments of 1989 describes Congressional intent that the residual risk review was to occur only after *initial* promulgation of standards for a source category:

> If a significant threat to public health or the environment remains after technology standards are implemented by a source category, EPA is to tighten the emission limitation for that category not later than five years after the *initial* standard is promulgated. This second phase of standards has come to be called "residual risk" because it is designed to eliminate the residual risks of concern which continue even after application of MACT standards.

S.Rep. No. 101-228, (1989) (emphasis added).[3]

### B.     Reading Section 112(f)(2) to Require a Subsequent Risk Review Would Provide No Greater Benefit to Human Health and Thus Waste of Agency Resources.

EPA's position is further reasonable because performing a residual risk review after every technology review would be a waste of agency resources since it would result in no greater benefit to human health.  After EPA promulgates its initial technology-based MACT standards for a given source category, it performs the residual risk review to make sure that there are no excessive risks to human health after that technology standard is in place.  Depending on the results of EPA's residual risk review, EPA will promulgate additional standards if necessary to provide an ample margin of safety to protect public health.  42 U.S.C. §7412(f)(2).  Future revisions to these standards pursuant to CAA Section 112(d)(6) technology review ensures that the standards will only become more stringent as a result of developments in practices, processes, and control technologies.  Given the overall structure of CAA Section 112 and how EPA sets standards, there is no reason for Congress to have required EPA to reassess residual risks following the tightening of a standard pursuant to the technology review.

---

[3] This report indicates that the residual risk review would occur five years after initial promulgation of standards, but that timeframe was revised to eight years in the enacted version of CAA section 112(f)(2).

EPA's RTR for Subpart L demonstrates how technology reviews effectuate stronger emission standards.  When originally promulgated in 1993, the technology-based MACT standard for the subcategory of new non-recovery batteries was to install a capture and control system for emissions that resulted from the process of charging the raw material of coal into the coke ovens.  *See, e.g.*, 69 Fed. Reg. 48,338, 48,350 (Aug. 9, 2004).  This standard merely required installation of the pollution control device; at the time, EPA did not have sufficient information to set any additional standard.  *Id.*  When EPA conducted the technology review in 2004, EPA learned of developments in practices, processes and control technologies that warranted issuing standards pursuant to CAA Section 112(d)(6).  *Id.*  Information available during the 2004 technology review indicated that these sources could meet additional requirements, including a 20 percent opacity limit and a limit on particulate matter emissions from the control device.  *Id.*; *see also* 70 Fed. Reg. at 20,013.  Lassiter Decl. at ¶¶ 8-10.  As such, the revision that resulted from the 2005 technology review that established emission standards and operating parameters made the Subpart L emission standards more stringent.

As part of the 2005 residual risk review for Subpart L, EPA made certain standards more stringent and, accounting for the revised standards, determined at that time that the residual risk was within an ample margin of safety.  *See* 70 Fed. Reg. at 19,994;  Lassiter Decl. at ¶¶ 8-9.  The revisions to the coke oven batteries rule in 2005 increased the stringency of the standards.  Because EPA also concluded in 2005 that the standards for coke oven batteries provided an ample margin of safety to protect public health, a second risk review now would be expected to have the same conclusion: that risks are acceptable and that the standards provide an ample margin of safety.  In contrast, the outstanding technology review has the potential to tighten the standard since it necessarily evaluates constantly evolving controls.

C.     **EPA Has Articulated Its Interpretation of CAA Section 112(f)(2) in the Federal Register and Acted Consistently With Its Interpretation.**

Plaintiffs wrongly characterize EPA's interpretation of section 112(f)(2) as merely a "litigation position."  Doc. 31 at 17.  As stated previously, EPA has repeatedly described its interpretation of section 112(f)(2) as a one-time obligation in numerous Federal Register notices.

13

*See, e.g.*, 77 Fed. Reg. at 55,699; 81 Fed. Reg. at 97,046; 70 Fed. Reg. at 20,008-09.  Moreover, EPA's longstanding conduct aligns with its interpretation of section 112(f)(2); EPA has never conducted a risk review under section 112(f)(2) more than once since the enactment of the CAA amendments in 1990.  Lassiter Decl. ¶ 5.  Where the parties put forth competing, reasonable interpretations, the agency's consistency can be the deciding factor.  *See Tablada v. Thomas*, 533 F.3d 800, 808 (9th Cir. 2008).  EPA has acted consistently in applying its interpretation that a risk review only happens once.

The cases that Plaintiffs cite in support of their "litigation position" theory provide no support whatsoever.  In *Alaska v. Federal Subsistence Board*, 544 F.3d 1089 (9th Cir. 2008), the agency was attempting to define a specific word – "population" – in the litigation and had never previously defined it in any legally binding regulation or any official agency interpretation.  *Id.* at 1095.  In *Price*, the only agency articulation of the amount of interest on compensation was a legal brief filed in support of an administrative decision.  *See Price* 697 F.3d at 825.  The *Price* Court further noted that the Director had taken inconsistent positions over the years.  *Id.* at 830. These cases are each easily distinguishable from the circumstances here, where EPA has both articulated its interpretation of section 112(f)(2) in notice and comment rulemakings and acted consistently with that interpretation over the course of decades.

### D.     The Court Should Avoid Reading a Recurring Obligation to Perform Risk Reviews Into Section 112(f)(2) Where a Party Is Seeking to Compel Agency Action.

Because a CAA citizen suit seeking to compel EPA to perform an agency action is akin to a suit seeking writ of mandamus under 28 U.S.C. § 1361, a plaintiff must cite to a "clear" nondiscretionary duty of the Administrator.  *Heckler v. Ringer*, 466 U.S. 602, 616-617 (1984). *Cf. Our Children's Earth Found. v. EPA*, 527 F.3d 842, 851 (9th Cir. 2008) (stating, in the context of a Clean Water Act citizen suit, that a duty must be "readily-ascertainable") (internal quotations omitted) (quoting *Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987).  As the *Sierra Club* court noted, "In the absence of a readily-ascertainable deadline, therefore, it will be almost impossible to conclude that Congress accords a particular agency action such high priority as to impose upon the agency a 'categorical[ ] mandat[e]' that deprives it of all discretion

14

over the timing of its work." 828 F.2d at 791 (alterations in the original). Doing so would "place competing demands upon the agency's time and resources." *Id.* As explained in the declaration of Penny Lassiter, EPA has a significant number of mandatory duties it is already performing, and any finding that EPA is under an ongoing obligation to perform risk reviews every eight years under section 112(f)(2) would greatly increase the amount of resources EPA would have to expend. Lassiter Decl. ¶¶ 15-17. Judicially imposing that obligation would deprive EPA of the discretion over the timing of its work.

Because EPA's rationale for not conducting recurring risk reviews is supported by legislative history, and is reasonable and consistent with EPA practice, EPA is not obligated to perform a second risk review for Coke Oven Batteries.

## III.    EPA's Proposed Timetable Represents the Most Expeditious Schedule that the Agency Can Reasonably Meet.

A district court has broad discretion to fashion equitable remedies. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-13 (1982). In a suit alleging violation of a congressionally mandated duty, the district court exercises its discretion to fashion a remedy by considering whether "the official involved . . . has in good faith employed the utmost diligence in discharging his statutory responsibilities." *NRDC v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1975). "The sound discretion of [a] . . . court does not embrace enforcement . . . of a party's duty to comply with an order that calls [on] him to do an impossibility." *Id.* Indeed, "it would be inappropriate to set an infeasible schedule in order to punish a delinquent agency." *Sierra Club v. Thomas*, 658 F. Supp. 165, 172 (N.D. Cal. 1987). Thus, a statutory deadline should not be enforced to the extent that it is impossible or infeasible to comply with such a deadline. *Am. Lung Ass'n v. Browner*, 884 F. Supp 345, 347 (D. Ariz. 1994).

In *Train*, the leading case on the subject of an agency's failure to meet statutory deadlines, the D.C. Circuit recognized two types of circumstances that might necessarily delay agency action and make it infeasible to comply with a particular deadline: (1) budgetary and manpower constraints, and (2) the need for an agency to have more time to sufficiently evaluate complex technical issues. 510 F.2d at 712-13. With respect to the latter, "[t]he public has a

15

significant interest in ensuring that the government does not [act] via a process that emphasizes expediency over quality and accuracy." *Cronin v. Browner*, 90 F. Supp. 2d 364, 373 (S.D.N.Y. 2000). In setting deadlines, courts have considered the agency's need for time to act in a manner that would withstand the scrutiny of subsequent challenge. *See Sierra Club v. Thomas*, 828 F.2d 783, 798-99 (D.C. Cir. 1987); *United Steelworkers of Am. v. Rubber Mfrs. Ass'n*, 783 F.2d 1117, 1120 (D.C. Cir. 1986) (holding judicial imposition of an overly hasty timetable on agency would ill serve the public interest); *Me. Ass'n of Handicapped Persons of Portland Me. v. Dole*, 623 F. Supp. 920, 926 (D. Me. 1985) (recognizing "the need to implement clear and effective regulations capable of withstanding the scrutiny of challenges following enactment."). In short, when an agency has missed a statutory deadline, a court should examine the relevant facts and circumstances and evaluate the time needed by the agency to make well-reasoned, scientifically supportable, and defensible decisions.

EPA acknowledges its outstanding obligation with respect to three of Plaintiffs' claims: the risk review for Subpart CCCCC; the technology review for Subpart CCCCC; and the technology review for Subpart L. *See* Doc. 14 ¶ 1. Therefore, the only determination for the court on those claims is the amount of time EPA needs to conduct rulemakings. EPA's proposed remedy would allow the Agency an appropriate amount of time to perform these obligations. And, in the event the Court disagrees with EPA's reading of CAA section 112(f)(2) with regard to the risk review for Subpart L, EPA offers a proposed remedy for that action as well. Doc. 28.

EPA proposes the following timetable:

- No later than March 30, 2022: EPA shall sign proposed rules for all obligated coke oven source categories under CAA sections 112(d)(6) and 112(f)(2); and

- No later than March 30, 2023: EPA shall sign final rules for those coke oven source categories under § 112(d)(6) and § 112(f)(2).

Under this schedule, EPA's proposed rules will be signed approximately two years from the oral argument in this case, and the final rules will be signed one year later.

As explained in detail in the Lassiter Declaration, many steps are required to complete reviews at issue here. ¶¶ 26-35. EPA's proposed schedule is based on EPA's long and

substantial experience performing these reviews and reflects the particular circumstances for each rulemaking based on EPA's current knowledge.

In addition, even though EPA refers to these rules collectively as RTRs, each rulemaking – whether consolidated or not – requires unique data and analyses. In other words, there are three (or possibly four) separate and distinct analyses at play: the technology reviews for both coke oven source categories and the risk reviews for both source categories. The technology and risk reviews are usually performed at the same time because this approach has significant efficiencies, but the two reviews are not directly related. While there are some commonalities, there are differences in the information necessary for each review.

The office charged with conducting these analyses, the Sector Policy and Programs Division ("SPPD"), is fully engaged with work on many other nondiscretionary actions, pursuant to court obligations and the CAA. *See* Doc. 31 at 20-22. SPPD is currently working on several other nondiscretionary duties. Specifically, recent court orders collectively require EPA to complete 20 CAA Section 112 RTR rulemakings by March 13, 2020; 6 more RTRs by June 30, 2020; and 9 additional RTRs by October 1, 2021. *Cal. Cmtys. Against Toxics v. Pruitt*, 241 F. Supp. 3d 199 (D.D.C. 2017); *Blue Ridge Envtl. Def. League v. Pruitt*, 261 F. Supp. 3d 53 (D.D.C. 2017); *Cmty. In-Power & Development Ass'n v. Pruitt*, 304 F. Supp. 3d 212 (D.D.C. 2018). SPPD staff are responsible for completing all 35 of these actions to satisfy those courts' orders. Lassiter Decl. ¶ 16. In addition to these 35, SPPD is obligated to complete technology reviews four more source categories pursuant to a Consent Decree. Lassiter Decl. ¶ 17.

As explained in the Lassiter Declaration (at ¶¶ 26-35), there are nine phases of the RTR rulemaking process, which are summarized below. The Declaration also provides the amount of time necessary for each phase and explains how that timetable applies for each of the rules based on the Agency's current understanding of the unique circumstances for each rule. Some of the phases are already completed. The majority of this effort is focused on the residual risk review, which requires the collection of substantial amounts of data and other information, as well as extensive modeling and analysis. Lassiter Decl. ¶¶ 26, 30-31. Most of the analysis related to the technology review is conducted in Phase V, concurrent with part of the residual risk review.

- Phase I.     Project Kickoff
- Phase II.    Preliminary Information Collection
- Phase III.   Supplemental Information Collection and Outreach to Stakeholders
- Phase IV.  Data Analyses and Modeling File Development
- Phase V.    Residual Risk Analyses and Technology Review
- Phase VI.  Development of Rule Proposal Package
- Phase VII. Proposed Rule Publication and Public Comment Period
- Phase VIII. Summarization of Comments, Development of Comment Responses and Analysis of Data
- Phase IX.  Development of Final Rule Package

**Phase I**:  This phase involved identifying a project team and stakeholders (*e.g.*, regulated entities and public interest groups), and a contractor to perform certain tasks due to the complexity of this project.  Lassiter Decl. ¶ 27.  EPA has already completed Phase I for the actions for which EPA concedes liability.  *Id*.  As such, there is no time allotment associated with this task in EPA's proposed schedule. *Id*.  However, the efforts completed for Phase I focused on the reviews for which EPA conceded liability.

**Phase II**:  In this phase, EPA conducted a literature review concerning the source category and technologies relevant to the source category.  Lassiter Decl. ¶ 28.  In 2016, EPA also collected test data and other relevant information through an information collection request sent to regulated sources, under CAA Section 114.  *Id*.  EPA obtained information regarding emissions, release parameters, controls, practices, the effectiveness of the current standards and developments in practices, processes, and control technologies and other information regarding the source category.  *Id.*

Phase II established the current inventory of facilities in the source category and their emissions.  Lassiter Decl. ¶ 28.  To do so, the project team coordinated with EPA's Office of Enforcement and Compliance Assurance and EPA Regional Offices, and state agencies and reviewed project files, permits, and EPA databases.  *Id.*  Once the facilities were identified, the project team determined emissions of hazardous air pollutants from facilities in the source

categories. *Id.* EPA is currently evaluating whether additional information is needed to characterize emissions from the data sources. *Id.* There is no time allotment associated with this task because EPA has also already completed Phase II, though the efforts completed for Phase II focused on the reviews for which EPA conceded liability. *Id.*

**Phase III**: EPA gathers supplemental information from stakeholders. Lassiter Decl. ¶ 29. EPA expects information collection will be necessary for one or both of the source categories in order to complete sound and defensible rulemakings. *Id.* Throughout Phase III, EPA plans to prepare written materials and brief stakeholders on the general plans for the project and conduct multiple meetings with the various stakeholder groups. *Id.* This stage has four different options for EPA to collect supplemental information: (1) EPA gathers information from key stakeholders (states, trade associations or environmental organizations) and internet sources, (2) EPA gathers additional information through follow-up communications with various companies as needed based on the CAA Section 114 request, or (3) EPA sends another Section 114 request – referred to as a "survey" – to nine or few entities; or (4) EPA sends a survey and test request to regulated entities.[4] *Id.*

EPA continues to evaluate the data but acknowledges that it may be advantageous to obtain additional information. Lassiter Decl. ¶ 29. EPA expects the preparation process for the surveys to take a minimum of 45 days, followed by a 21-day internal review, 7 days for revisions, a 30-day stakeholder review, and 14 days for final revisions and distribution to industry. *Id.* An adequate response period for subject entities is a minimum of 3 months, which allows time for review of the questions, gathering of information regarding processes, emission controls, raw materials, pollution prevention measures and other requested information, compilation of existing testing and monitoring data, development of emission estimates, quality assurance/quality control ("QA/QC"), review and approval by facility management, and formal submittal of information, with certification stating that the information submitted is an accurate

---

[4] If EPA sends Section 114 requests to more than nine entities, the Office of Management and Budget (OMB) has to approve the request; this approval is a very time-consuming process.

representation of facility operations and emissions.  *Id.*  EPA has allotted seven months for the completion of Phase III.  *Id.*

**Phase IV**: EPA inputs the data gathered in Phase III from the different source categories into extremely precise risk models.  Lassiter Decl. ¶ 30.  Currently, EPA has organized the data it already has and is drafting model input files.  *Id.*  The modeling files will include the following information for every emission point in the source category at each facility: precise stack location; stack parameters including height, diameter, stack gas velocity and temperature; emissions values for each pollutant; and other site-specific information. The modeling file also includes information for fugitive releases (i.e., emissions from a stationary source other than those that are captured and pass through a stack, chimney, vent or other such opening): precise location, release parameters including fugitive lengths and widths, gas velocity, and temperature. EPA also engages in extensive QA/QC activities to minimize errors because errors in this stage impact all future project activities.  *Id.*  Even though EPA has taken initial steps to begin Phase IV, EPA anticipates it will take 3-4 months to complete given the complexity of modeling for coke ovens due to the variety of complex fugitive and intermittent sources and the difficulties in characterizing and quantifying the emissions.  *Id.*  Additionally, EPA has only begun working on the risk review for Subpart CCCCC, as that is the only risk review for which EPA concedes liability.  *Id.*

**Phase V**: This phase involves several individual processes: an inhalation assessment, multipathway screening and refined assessments, an ecological screening assessment, and a risk-based demographic assessment.   Lassiter Decl. ¶ 31.  Each analysis is conducted for a source category as needed.  *Id.*  Each component includes QA/QC.  *Id.*  If sufficient QA/QC is not conducted, the time required for risk modeling can increase several fold.  *Id.*  EPA's estimate of the time for a source category is governed by our preliminary evaluations of the complexity of the project, the size of the source category, and the types of analyses anticipated.  Because coke ovens are a complex source category, EPA anticipates modeling will take six months.  *Id.* Additionally, once the model is constructed, a single run of that model can take up to two weeks given the large file size.  *Id.*

Each assessment is described in turn.  Lassiter Decl. ¶ 31.  An inhalation assessment estimates the risk from chronic inhalation of each pollutant.  *Id.*  The three-tiered multipathway screening assessments are used to provide upper-bound estimates of risk from ingestion of food contaminated with pollutants emitted from the source category (e.g., metals that bioaccumulate in fish).  *Id.*  If needed, EPA conducts a refined multipathway assessment.  This assessment attempts to replace parameter default values with site-specific values and is used to determine if emissions from a particular source category result in disproportionate risks to various demographic groups living near facilities in that particular source category.[5]  *Id.*  It is an important tool for EPA's consideration of environmental justice issues as required under Executive Order 12898.  *Id.*

Concurrent with the residual risk analyses, EPA also performs the technology review.  Lassiter Decl. ¶ 31.  The technology review involves evaluation of developments in practices, processes and controls to determine whether or not standards should be updated to reflect those developments.  *Id.*  To do so, EPA evaluates the performance of control technologies and other emission reduction measures that have become available or have been implemented or improved since the original standards were finalized.  *Id.*  The technology review takes into account technological developments, does not require all of the modeling and screening described above, but considers costs of the technology.  *Id.*  If no viable technologies are found, the technology review can be a more streamlined assessment.  *Id.*

**Phase VI**: Here, EPA develops the rule proposal package.  Lassiter Decl. ¶ 32.  For this phase, many different processes overlap:

- Drafting briefing materials for EPA management for the selection of the proposed regulatory options;

---

[5] If refined multipathway assessments are required, EPA will need an additional three to four months per facility to conduct each assessment.  Lassiter Decl. ¶ 31.  1 to 2 additional weeks will be required if EPA determines that a risk-based demographic assessment is necessary.  *Id.*  A risk-based demographic is likely here.  *Id.*

- Development of regulatory options for the proposed rule for a workgroup comprised of health and policy professionals;[6]

- Drafting the proposal preamble and regulatory text and supporting documents for workgroup review;[7] and

- Preparation of proposal package for review by EPA management in many different offices and – for some projects – OMB.

After the final approvals from EPA management, the EPA Administrator signs the proposed rule and sends to the office of the Federal Register for publication. *Id.* EPA anticipates Phase VI will take 12 to 15 months. *Id.*

**Phase VII**: This is the rule publication and comment period. Lassiter Decl. ¶ 33. Publication in the Federal Register usually takes between two weeks and one month following signature. EPA has no control over the timing of publication. *Id.* The CAA requires that the public comment period remain open for 30 days following a public hearing on the rule. 42 U.S.C. § 7607(d)(5). Since it is reasonable to hold a public hearing no earlier than about two weeks after publication of the proposal (to allow interested parties to make travel plans and prepare), the default "minimum" amount of time for the comment period is 45 days, but EPA anticipates providing a 60-day comment period given the complexity of these rules. *Id.* Accordingly, EPA apportioned three months for Phase VII. *Id.*

**Phase VIII**: EPA summarizes comments on the proposed rules, develops comments responses, and analyzes data presented in comments. Lassiter Decl. ¶ 34. On RTR proposals, EPA typically receives between 10 and 50 unique, substantive comment letters, some including detailed technical data and information, although there have been as many as 200 for some of the larger, more complex source categories. Drafting a written summary of comments for these source categories will likely take one to two months depending on the volume of comments received. EPA's responds to each relevant comment. *Id.* The comment drafting process takes

---

[6] The workgroup is extremely valuable in assuring rulemaking quality. The workgroup provides input on health benchmarks, various technical analyses and aspects of the risk assessment, ease of enforcement, monitoring and testing technology, policy, and other aspects of the rulemaking.

[7] Internal EPA procedures mandate that workgroup review is a minimum of 15 working days.

from two to three months for each source category because some responses require additional analysis. *Id.*

Phase IX: EPA finalizes the rules. Lassiter Decl. ¶ 35. This phase requires involvement of EPA management as well as the workgroup, and – in many cases – OMB. *Id.* First, EPA drafts regulatory options for changes to the proposed rule based on comments received during the public comment period and briefing the workgroup, which is estimated to take 15 days. *Id.* Next, there are briefings for EPA management on comments received and changes recommended as a result of those comments as well as general recommendations. *Id.* This briefing process takes at least a month. *Id.* EPA must also complete all technical analyses during this phase to reflect any new recommendations, which involves updating financial effects as well as health effects. *Id.* EPA also updates the rule preamble and regulatory effects to incorporate any changes. For these updates, EPA allots one month. *Id.*

The workgroup receives all draft materials to review. Lassiter Decl. ¶ 35. Workgroup involvement ensures legal sufficiency, sound scientific support, and consistency with other programs. *Id.* After the workgroup's comments are incorporated, EPA management in several offices review the draft materials. For significant regulatory actions, OMB also reviews, and that that requires three months. *Id.* Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993). Concurrently with OMB review, EPA compiles and indexes the administrative record, finalizes the response to comments document, and finalizes various supporting technical documents as needed. *Id.* After any necessary revisions are made to the final rulemaking package, the final rule is signed and sent to the Office of Federal Register for publication. EPA estimates that this will take a minimum of three to four months. *Id.* So, in total, EPA allocates six to eight months for all components of Phase IX. *Id.*

**IV.    Plaintiffs' Proposed Timetable Is Unreasonable and Fails to Address the Complexity of the Actions at Issue.**

The deadlines proposed by the Plaintiffs are unworkable and unsupported by the facts presented here. As an initial matter, Plaintiffs' proposed schedule lacks any manner of time accounting. Second, Plaintiffs' proposed deadlines are unsupported by case law. Finally, the

schedule Plaintiffs propose for EPA's coke ovens rulemakings would jeopardize the soundness of the regulatory actions, their legal defensibility, and the protection of public health.  Lassiter Decl. ¶ 25.

Plaintiffs fail to provide any rationale for their suggested schedule.  They merely toss out deadlines of 12 and 16 months for proposed and final rules respectively without recognition of all aspects of the source categories and the necessary reviews and analyses.  Doc. 31 at 17-25.  In particular, Plaintiffs fail to explain how their proposed schedule would allow for sufficient data collection and modeling analysis for the RTRs.  The merits of these analyses are described in Ms. Lassiter's declaration.  Lassiter Decl. ¶¶ 29-31.  The data collection for risk reviews is particularly burdensome due to the site-specific data and analysis required.  *Id*.  Additionally, a four-month period between issuance of the proposed rule and signature on a final rule would significantly hamper the Agency's ability to thoroughly consider and respond to the public comments, conduct additional analyses if needed, and revise the rule accordingly.  *Id*. ¶¶ 34-35.

In an effort to suggest bad faith on the part of EPA, Plaintiffs point to discretionary actions EPA has recently taken.  Doc. 31 at 21-22.  However, the staff working on the RTRs at issue here do not overlap with staff performing those discretionary tasks.  Lassiter Decl. ¶ 21.  Since the beginning of 2018, EPA has proposed and taken final action on RTRs in nine source categories and proposed RTR rules addressing 21 additional source categories.  Lassiter Decl. ¶ 18.  Additionally, EPA has already completed two phases on the three undisputed duties in this matter and has not requested any additional time for those steps.  Lassiter Decl. ¶¶ 27-28.  Accordingly, EPA's proposed schedule here is not simply "footdragging;" it apportions sufficient time for the remaining steps to develop an analytically sound rulemaking.

Plaintiffs inappropriately exaggerate the overlap between RTR analyses under Subparts L and CCCCC.  Doc. 31 at 19.  The analyses for these two source categories are distinct as they regulate separate and different emission points and processes.  Processes and emission points regulated by the standards for Subpart L include: leaks from coke oven doors, leaks from topside port lids, leaks from the offtake system, emissions from charging operations, flare systems, and leaks from collecting mains.  *See* 40 C.F.R. Pt. 63, Subpt. L, specifically 40 C.F.R. §§ 63.302,

63.303, 63.307, 63.308.  Alternatively, processes and emission points regulated by the standards for Subpart CCCCC include: emissions from pushing, emissions from soaking, emissions from quenching, and emissions from battery stacks.  *See* 40 C.F.R. §§ 63.7290, 63.7291, 63.7292, 63.7293, 63.7294, 63.7295, 63.7296.

Plaintiffs contend that increased or improved staffing could result in expedited promulgation.  *See* Doc. 31 at 22.  Even if EPA had unlimited resources and staffing, however, Plaintiffs completely ignore the time required to complete certain steps in the RTR process.  As stated in EPA's declaration, there are certain steps required for the RTRs that have statutory required timeframes, such as the public comment period, or that simply take a long time to complete, such as computer runs of risk modelling and analysis.  Lassiter Decl. ¶¶ 26-35.

Plaintiffs' proposed deadlines are also inconsistent with relevant case law.  Plaintiffs have not cited any case in which EPA was required to complete RTRs within 16 months.  In *Community In-Power*, even though the court found that EPA did not prove that it was impossible to properly staff the RTRs that the Plaintiffs challenged, the court further acknowledged it could not "ignore the fact that EPA is subject to other recent court orders," and ultimately imposed a schedule of approximately three years for EPA to complete the RTRs at issue.  304 F. Supp. 3d at 221-224.  In *Blue Ridge*, the Court also gave EPA more time to complete the mandatory duties in light of the number of other duties EPA was obligated to perform.  261 F. Supp. 3d at 61.

In sum, the issue is what amount of time is needed for EPA to make well-reasoned, scientifically supportable, and defensible decisions.  The unduly short deadlines requested by the Plaintiffs would result in a rulemaking that lacks the necessary collection of data, technical analyses, and consideration of public comments, which would undermine the quality of the rule at issue.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for summary judgment and grant EPA's cross motion.

Date: January 17, 2020

_____/s/ Sydney A. Menees_____
SYDNEY A. MENEES (D.C. Bar No. 1027544)
United States Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
4 Constitution Square
150 M St. NE
Room 4.140
Washington, DC 20002
sydney.menees@usdoj.gov
Telephone (202) 514-2398

*Attorney for Defendant*

Of counsel:

Emily Seidman
Office of General Counsel
U.S. Environmental Protection Agency

26