UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITIZENS FOR PENNSYLVANIA'S FUTURE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ANDREW R. WHEELER, <br><br> Defendant. | Case No.  19-cv-02004-VC <br><br> **ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. Nos. 31, 32 |

This case addresses the provisions of the Clean Air Act that restrict types of air pollution that are particularly hazardous to human health. The Act requires the Environmental Protection Agency to regulate the sources of this pollution in two primary ways. First, the agency must adopt "technology-based standards" to which polluters must adhere. As the name suggests, these standards are designed to ensure that the polluters are using the best available technology to mitigate the hazards created by their activities. And the statute requires EPA to revisit technology-based standards periodically. Second, even after adopting technology-based standards, the agency must assess the risks created by the polluters to determine whether additional restrictions should be imposed. Such additional restrictions are referred to as "risk-based standards."

This case involves EPA's failure to fulfill its statutory obligations to regulate pollution from coke ovens. EPA mostly concedes its failures, so judgment will be entered for the plaintiffs on most issues presented by this case. But one key legal issue remains in dispute: whether the

Clean Air Act requires EPA to perform a risk assessment every time it revises its technology-based standards for a hazardous pollution source, or only in connection with its *initial adoption* of technology-based standards for that pollution source.

The plaintiffs have a reasonable legal argument (as well as a reasonable policy argument) that the statute should be read to impose a mandatory duty on the agency to conduct risk assessments repeatedly rather than merely initially. But having a reasonable argument is not enough in this context. Courts may not interpret statutes as imposing mandatory duties on agencies unless the mandate is clear and unequivocal. The Clean Air Act does not clearly speak to whether repeated risk assessments are mandatory or discretionary; that is to say, the statute could reasonably be interpreted either way. Therefore, the Court may not interpret the statute as imposing a mandatory duty on EPA to revisit its risk-based standards for hazardous pollution sources whenever the agency revises technology-based standards.

I

A

In 1970, Congress amended the Clean Air Act to create a system of national emission standards for hazardous air pollutants. *See* Clean Air Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676. The cornerstone of that legislative effort was Section 112, which directed the EPA Administrator to publish and, when appropriate, to revise a list of hazardous air pollutants "for which he intends to establish an emission standard." § 112(b)(1)(A), 84 Stat. at 1685. Upon the listing of a hazardous air pollutant, the EPA Administrator was required to promulgate emission standards that would provide an "ample margin of safety to protect the public health" from that pollutant. § 112(b)(1)(B), 84 Stat. at 1685. This margin-of-safety standard was (and is) called a "risk-based" approach because EPA calibrates emission standards to mitigate risks to human health. *Sierra Club v. EPA*, 353 F.3d 976, 979 (D.C. Cir. 2004).

The regime established by the 1970 amendments was—to put it bluntly—a failure. Two

decades later, Congress surveyed EPA's lack of progress in establishing national emission standards, compiling a "record of false starts and failed opportunities." S. Rep. No. 101-228, p. 132 (1989). Congress, not content merely to blame EPA for the problem, acknowledged the shortcomings of its own efforts to craft a workable statutory framework.

For one thing, Section 112 conferred a great deal of discretion on EPA in deciding whether to regulate any particular pollutant. Although that provision required the EPA Administrator to promulgate emission standards within 360 days of the listing of a hazardous air pollutant, no provision of the Act forced him to decide in the first instance whether to add a pollutant to the list. *See* Clean Air Act § 112(b), 84 Stat. at 1685. The upshot was that the EPA Administrator didn't have to assert authority over a pollutant, but if he did list a pollutant, he then had to finalize emission standards on an "unrealistic" timetable. S. Rep. No. 101-228, at 132. Small wonder that EPA had established standards for only seven hazardous air pollutants in the prior 20 years. *See Sierra Club*, 353 F.3d at 979.

Section 112's risk-based approach to emission standards had also been difficult to administer in practice. Because people in industrial and urban areas are exposed to higher quantities of hazardous air pollutants, they suffer from higher rates of adverse health outcomes. *See* S. Rep. No. 101-228, at 132. This inequality with respect to exposure created uncertainty regarding what the appropriate emissions standard should be for a given pollutant. The Senate Report therefore proposed to shift EPA's "principal focus" under Section 112 away from directly regulating *pollutants* and toward regulating pollution *sources* to reduce emissions with the "best available control technology." *Id.* at 133. This target, the Senate hoped, would prove an easier mark for EPA to hit.

With these findings in hand, Congress substantially restructured Section 112. *See* Clean Air Act Amendments of 1990, Pub. L. No. 101-549, § 301, 104 Stat. 2399, 2531–74. Section 112, as amended, is codified at 42 U.S.C. § 7412. For simplicity's sake, this ruling will refer to the provision by its U.S. Code location—that is, "section 7412"—from this point forward.

The 1990 amendments altered the original 1970 design in several important ways. Rather than wait for EPA to take the initiative, Congress itself identified 189 hazardous air pollutants and directed EPA to revise that initial list on a regular basis. 42 U.S.C. § 7412(b). Congress then reoriented EPA's attention, as the Senate Report suggested, to "sources" of pollution, specifying two categories: "major sources" and "area sources." § 7412(c). The former are defined as having the potential to emit many tons of pollutants, while the latter are defined as "any building, structure, facility, or installation [other than a vehicle] which emits or may emit any air pollutant" at an amount below a major source. §§ 7411(a)(3), 7412(a)(1)–(3). To remedy the perceived failings of the risk-based approach, Congress adopted the Senate Report's proposal of technology-based standards. § 7412(d). And to give teeth to this alternative regime, Congress set a strict statutory timeline for EPA to promulgate technology-based standards for each source category. § 7412(e)(1). Congress nonetheless preserved the risk-based approach to protect against residual risks to public health that might linger after the adoption of technology-based standards. § 7412(f). Taken together, these changes "eliminate[d] much of EPA's discretion" in setting national emission standards. *New Jersey v. EPA*, 517 F.3d 574, 578 (D.C. Cir. 2008).

The Clean Air Act thus now establishes a "two-phase approach" to emission standards for hazardous air pollutants. *Sierra Club*, 353 F.3d at 980. At the first phase, EPA promulgates technology-based emission standards requiring the "maximum achievable control technology" for the source category. *Id.*; *see* 42 U.S.C. § 7412(d)(2) (discussing "measures, processes, methods, systems or techniques" that reduce, eliminate, or capture emissions). Section 7412(d)— once you muddle through its jargon—simply means that polluting businesses must adopt the technology, techniques, and practices that their best-performing peers use (or that the source category could practically adopt if the industry as a whole has not installed cost-effective control technology). § 7412(d)(3). Every eight years, EPA must assess whether the technology-based standards should be updated to reflect advances in control technology. § 7412(d)(6).

At the second phase, EPA performs a "risk-based analysis" to assess "whether residual risks remain that warrant more stringent standards" to supplement the technology-based

standards. *Sierra Club*, 353 F.3d at 980; *see* 42 U.S.C. § 7412(f). This backstop—commonly called a "residual risk review"—reflects Congress' concern about "lingering public health risk" not eliminated by "the initial standard" mandating the adoption of maximum achievable control technology. *National Association for Surface Finishing v. EPA*, 795 F.3d 1, 5 (D.C. Cir. 2015). Congress chose a very specific type and amount of risk that would force EPA to act: If "lifetime excess cancer risks to the individual most exposed to emissions from a source" exceed one in one million, EPA must promulgate risk-based standards that "provide an ample margin of safety to protect public health." 42 U.S.C. § 7412(f)(2)(A). Although the margin of safety must be "ample," EPA need not lower cancer risks below the one-in-one-million threshold. *See Natural Resource Defense Council v. EPA*, 529 F.3d 1077, 1081–82 (D.C. Cir. 2008). The agency may consider, in addition to health outcomes, other relevant factors like cost, feasibility, and environmental impacts. *See Surface Finishing*, 795 F.3d at 5.

B

This dispute involves coke ovens, which convert coal into coke, a component in steel production. Coke ovens emit multiple substances, including benzene and lead, that are harmful to human health, and coke oven emissions are accordingly listed as a hazardous air pollutant by the Clean Air Act. *See* 42 U.S.C. § 7412(b)(1). Indeed, the 1990 amendments, perhaps due to the outsized health risks posed by coke oven emissions, prescribed a fixed statutory deadline for the promulgation of technology-based standards for coke oven batteries (which are groups of ovens connected by common walls) and enumerated a series of considerations that EPA must evaluate for this particular source of pollution. 42 U.S.C. § 7412(d)(8), (e)(1)(B). Nor does the Act stop at coke oven batteries. In fact, coke ovens give rise to multiple "source categories"—that is, multiple types of polluting infrastructure regulated under the Clean Air Act.

The two source categories in this case are "Coke Oven Batteries" and "Coke Ovens: Pushing, Quenching, and Battery Stacks." The initial technology-based standards for coke oven batteries were promulgated in 1993. 58 Fed. Reg. 57,898 (Oct. 27, 1993); *see generally* 40 C.F.R. Part 63, Subpart L. Then, in 2005, EPA revised the technology-based standards for this

5

category following its technology review under section 7412(d)(6); the agency also issued risk-based standards following its residual risk review under section 7412(f)(2). 70 Fed. Reg. 19,992 (Apr. 15, 2005). As for the category of pushing, quenching, and battery stacks, EPA established technology-based standards in 2003. 68 Fed. Reg. 18,008 (Apr. 14, 2003); *see generally* 40 C.F.R. Part 63, Subpart CCCCC. Two years later, these standards were amended pursuant to a litigation settlement. 70 Fed. Reg. 44,285 (Aug. 2, 2005).

But EPA has taken no further action on either category in the last 15 years. This rulemaking hiatus for coke ovens is no oversight or fluke. The agency has struggled mightily to meet the statutory deadlines created by the 1990 amendments. In just the past few years, district courts have determined that the EPA Administrator violated the deadlines in section 7412 for more than 40 source categories. *See Community In-Power & Development Ass'n, Inc. v. Pruitt*, 304 F. Supp. 3d 212, 217 (D.D.C. 2018); *Blue Ridge Environmental Defense League v. Pruitt*, 261 F. Supp. 3d 53, 57 (D.D.C. 2017); *California Communities Against Toxics v. Pruitt*, 241 F. Supp. 3d 199, 202 (D.D.C. 2017); *Sierra Club v. McCarthy*, No. 15-cv-01165-HSG, 2016 WL 1055120, at *3 (N.D. Cal. Mar. 15, 2016).

The Clean Air Act contains an external enforcement mechanism—the citizen suit—to keep EPA in compliance with its statutory and regulatory obligations. The Act's citizen-suit provision vests subject-matter jurisdiction in the federal district courts over actions brought by "any person" who alleges "a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 42 U.S.C. § 7604(a)(2). Taking up that charge, four environmental groups—Citizens for Pennsylvania's Future, Gasp, Louisiana Bucket Brigade, and Sierra Club—filed this citizen suit to compel EPA Administrator Andrew Wheeler to complete both a technology review and a residual risk review for each of the two source categories at issue in this case, Coke Oven Batteries and Coke Ovens: Pushing, Quenching, and Battery Stacks. The lawsuit's theory is that these duties (four in total) are non-discretionary under section 7412(d)(6) and (f)(2). The parties have filed cross-motions for summary judgment on these four claims.

EPA concedes three of the four claims. As it relates to pushing, quenching, and battery stacks, EPA has neither performed a technology review of its initial technology-based standards nor its first residual risk review. Accordingly, the parties agree that the Court should order EPA to comply with its statutory duties by conducting both a technology review (because that type of review is long overdue) and a residual risk review (because that type of review has never been done). The only dispute is over the appropriate deadline for EPA to complete these tasks.

As it relates to coke oven batteries, EPA performed both a technology review and a residual risk review in 2005. EPA concedes that a follow-up technology review is long overdue under the recurring eight-year deadline, and thus that the plaintiffs should win on this claim as well. But the plaintiffs also contend that EPA must perform a second residual risk review because EPA revised the technology-based standards during its 2005 technology review. Resisting this duty, EPA contends that a follow-up residual risk review is *not* required by the statute because this type of review is mandatory only in connection with the *initial* technology review. This dispute is the only substantive legal issue left in the case.

Section II of this ruling addresses this key substantive question: whether EPA violated a non-discretionary duty by failing to perform a second risk review for the source category of coke oven batteries. Section III determines the appropriate remedy for EPA's conceded failure to perform the three undisputed mandatory duties: the technology and risk reviews for pushing, quenching, and battery stacks, and the technology review for coke oven batteries.

II

As detailed above, the Clean Air Act regulates hazardous air pollutants through a combination of technology-based emission standards and risk-based emission standards. Those technology-based standards, all agree, must be reviewed for potential revision every eight years. 42 U.S.C. § 7412(d)(6). But the plaintiffs contend that EPA must perform another residual risk analysis within eight years of the revision of a technology-based standard—a recurring duty that EPA allegedly triggered with its 2005 revisions to the technology-based standards for coke oven batteries. In contrast, EPA argues that the residual risk review is a *one-time* obligation performed

within eight years of the date that the *initial* technology-based standards are established for a

given source category—a duty that EPA discharged in 2005 by conducting a risk review for coke

oven batteries. Both sides ground their conflicting positions in the language of section 7412(f).

That densely worded statute provides in relevant part:

> If Congress does not act on any recommendation submitted under
> paragraph (1), the Administrator shall, *within 8 years after
> promulgation of standards for each category or subcategory of
> sources pursuant to subsection (d)*, promulgate standards for such
> category or subcategory if promulgation of such standards is
> required in order to provide an ample margin of safety to protect
> public health in accordance with this section (as in effect before
> November 15, 1990) or to prevent, taking into consideration costs,
> energy, safety, and other relevant factors, an adverse environmental
> effect. Emission standards promulgated under this subsection shall
> provide an ample margin of safety to protect public health in
> accordance with this section (as in effect before November 15,
> 1990), unless the Administrator determines that a more stringent
> standard is necessary to prevent, taking into consideration costs,
> energy, safety, and other relevant factors, an adverse environmental
> effect. If standards promulgated pursuant to subsection (d) and
> applicable to a category or subcategory of sources emitting a
> pollutant (or pollutants) classified as a known, probable or possible
> human carcinogen do not reduce lifetime excess cancer risks to the
> individual most exposed to emissions from a source in the category
> or subcategory to less than one in one million, the Administrator
> shall promulgate standards under this subsection for such source
> category.

§ 7412(f)(2)(A) (emphasis added).

To reemphasize the key portion of the statute, section 7412(f) mandates that EPA address

residual risks "within 8 years after promulgation of standards for each category or subcategory of

sources pursuant to subsection (d)." The parties offer competing interpretations of this language.

The question presented by the cross-motions—apparently one of first impression in any court—

is whether that duty is triggered only by the initial technology-based standards for a given source

category (as EPA argues) or also by each successive revision to the technology-based standards

(as the plaintiffs argue). Put differently, does the phrase "promulgation of standards" include

revisions to existing standards?

To prevail, the plaintiffs' position must be more than merely plausible, because a "clear

statement rule" applies to citizen suits brought against the EPA Administrator under the Clean

Air Act. *WildEarth Guardians v. McCarthy*, 772 F.3d 1179, 1182 (9th Cir. 2014). That clear-statement rule recognizes a duty as non-discretionary only when the duty takes the form of a "'specific, unequivocal command' from the text of the statute at issue using traditional tools of statutory interpretation." *Id.* Here, the standard interpretive toolkit doesn't eliminate the ambiguity in the term "promulgation of standards" as applied to revisions. Section 7412(f) therefore does not create a non-discretionary duty to review risk-based standards when existing technology-based standards are revised.

To begin with, the text does not supply a readymade answer to the parties' dispute. The statute requires EPA to perform a residual risk review "within 8 years after promulgation of standards for each category or subcategory of sources pursuant to subsection (d)." 42 U.S.C. § 7412(f)(2)(A). The triggering event for a mandatory risk review is the "promulgation of standards . . . pursuant to subsection (d)"—a phrase that, at first glance, seems broad enough to sweep in the revisions to the technology-based standards. That broad interpretation can be distilled into three steps. First, a revision to an existing standard can itself be a "standard," meaning a requirement that "limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis." 42 U.S.C. § 7602(k). Second, a revision to a technology-based standard is, technically speaking, "promulgated" in the Federal Register. *See Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 673 (D.C. Cir. 2013) (per curiam). And third, the revision is "pursuant to" (that is, under the authority of) section 7412(d)(6). *See Kucana v. Holder*, 558 U.S. 233, 244 (2010). So at least in some sense, each element of the text is present: (1) a promulgation (the publication), (2) a standard (the revised emissions requirement), and (3) the exercise of authority pursuant to subsection (d). But this is not the only reasonable interpretation of the disputed statutory language, especially when the term "promulgation" is viewed in its larger statutory context.

The word "promulgation" has no plain, ordinary meaning of universal application, nor is "promulgation of standards" a term of art with a well-settled meaning. At times, you might say "promulgation" when you intend to describe any "publication in the *Federal Register*."

*Horsehead Resource Development Co. v. EPA*, 130 F.3d 1090, 1093 (D.C. Cir. 1997); *see, e.g.*, *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 199 (2011). The plaintiffs advance that technical, procedural meaning here. But you wouldn't be taken aback if you heard an agency say "promulgation of standards" when referring only to the establishment of a new standard, as opposed to a revision to an existing standard. That definition, no less than the one favored by the plaintiffs, is firmly within the ballpark of permissible meanings. *See* "Promulgation," *Black's Law Dictionary* (11th ed. 2019) ("The official publication of a *new* law or regulation, by which it is put into effect.") (emphasis added). Because both definitions are commonplace, the text of section 7412(f) can't settle the debate on its own.

Nor can a uniform definition of "promulgation" be sensibly applied across the Clean Air Act. Although "[a] term appearing in several places in a statutory text is generally read the same way each time it appears," *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994), this interpretive principle "readily yields to context, especially when a statutory term is used throughout a statute and takes on distinct characters in distinct statutory provisions," *Return Mail, Inc. v. U.S. Postal Service*, 139 S. Ct. 1853, 1863 (2019) (internal quotation marks omitted). The plaintiffs observe—quite correctly—that the Act sometimes uses the term "promulgation" in a way that indisputably covers revisions to a standard. For example, technology-based standards are "effective upon promulgation," a phrase that surely includes revisions to such standards, lest the revisions never take effect. 42 U.S.C. § 7412(d)(10). Yet the Act's rulemaking procedures refer to "the promulgation *or* revision" of 20 types of regulations. § 7607(d)(1)(A)–(M), (O)–(U) (emphasis added). That promulgation-revision distinction applies to the technology-based standards at issue here: "the promulgation or revision of any . . . emission standard or limitation under section 7412(d)." § 7607(d)(1)(C).

By linking "promulgation" and "revision" with the disjunctive "or," these provisions indicate that the promulgation of a revision to a standard (in the technical sense of publication in the Federal Register) is not itself a "promulgation of standards" (as the Clean Air Act uses that phrase). *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1141 (2018). Perhaps

Congress wanted to make doubly clear that these statutes apply to revisions of standards as an important subset of promulgations of standards. *See Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 226 (2008). But that interpretation "effectively reads 'or' to mean 'including'"—a feat of linguistic gymnastics that invites a healthy dose of skepticism. *Loughrin v. United States*, 573 U.S. 351, 357 (2014). The phrase "promulgation or revision" therefore suggests (and courts have likewise reiterated) that the revision of a standard is treated as a separate process from its promulgation. *See Surface Finishing*, 795 F.3d at 5 (referring to "the standard's promulgation or last revision"); *see also Our Children's Earth Foundation v. EPA*, 527 F.3d 842, 849 (9th Cir. 2008) (discussing the Clean Water Act's "requirement of a technology-based approach to promulgation and revision of regulations").

The belt-and-suspenders explanation for "promulgation or revision" also clashes with the principle that statutes should be interpreted, when possible, such that "no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Redundancy, standing alone, is no reason to ignore the best reading of the statute. *See Barton v. Barr*, 140 S. Ct. 1442, 1453 (2020). But the plaintiffs' interpretation is undermined by the number of times Congress distinguished between promulgation and revision in the Clean Air Act. Consider, for instance, the statute's reference to "the promulgation of a national primary ambient air quality standard (or any revision thereof)." 42 U.S.C. § 7410(a)(1). Or the allowance that EPA "may promulgate (and from time to time revise) regulations establishing" fees for the motor vehicle compliance program. § 7552(a). Or the Act's command that EPA designate air quality control regions "[u]pon promulgation or revision of a national ambient air quality standard." § 7407(d)(1)(B)(i). Congress thus knew how to make non-discretionary duties explicitly contingent on both promulgations and revisions, but it did not take this path in section 7412(f). Indeed, the Clean Air Act's repeated distinction between promulgation and revision makes Congress' selection of only one of the two terms here "seem quite deliberate." *DHS v. MacLean*, 574 U.S. 383, 392 (2015); *see, e.g.*, 42 U.S.C. §§ 7409(b)(1), 7410(n)(2)(A), 7617(a), 7620(d). The Act's structure thus supports the conclusion "that Congress differentiated

duties stemming from a 'promulgation' versus a 'revision.'" *WildEarth Guardians v. Jackson*, 870 F. Supp. 2d 847, 854 (N.D. Cal. 2012).

Precedent confirms that a revision to an existing standard does not necessarily qualify under the Clean Air Act as a "promulgation of standards." In *WildEarth Guardians*, the Ninth Circuit interpreted a statute that requires EPA to promulgate Prevention of Significant Deterioration (PSD) regulations "not more than 2 years after the date of promulgation of such standards" setting national ambient air quality standards (NAAQS). 42 U.S.C. § 7476(a). There, like here, the plaintiffs sued the EPA Administrator for her failure to revise one set of regulations upon the revision of a related standard. EPA, the plaintiffs argued, must "promulgate PSD regulations not only when NAAQS are first issued for a newly regulated pollutant, but also when NAAQS are *revised* for any pollutant." *WildEarth Guardians*, 772 F.3d at 1181. But the plaintiffs' claim could not overcome the clear-statement rule for citizen suits brought under the Clean Air Act. The Ninth Circuit explained that the statutory language—"promulgation of such standards"—could plausibly be read to require PSD regulations only upon the initial NAAQS for a pollutant, and that Congress could sensibly leave "to the agency's discretion the responsibility for making whatever revisions to those regulations might be warranted when the corresponding NAAQS were revised." *Id.* at 1182.

The plaintiffs protest the relevance of *WildEarth Guardians* to section 7412(f). The Ninth Circuit, as they read the court's opinion, found ambiguity only as to which pollutants are covered by the statute. To be sure, the statute in *WildEarth Guardians* draws a distinction between those pollutants for which Congress itself had established NAAQS and the pollutants for which EPA would establish the initial NAAQS. *See* 42 U.S.C. § 7476(a). But the court didn't rely solely on that point. To the contrary, the Ninth Circuit also recognized the plausibility of EPA's argument that "Congress could have been content to kick-start the PSD program" with "a *one-time* duty of limited scope: to promulgate PSD regulations within two years after NAAQS are first issued for a *newly regulated* pollutant." *WildEarth Guardians*, 772 F.3d at 1181–82 (first emphasis added). So too here.

The plaintiffs' interpretation also runs contrary to the guidepost that "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1058 (2019) (internal quotation marks omitted). While section 7412(f) says nothing explicit about revising risk-based standards, neighboring subsections direct EPA in no uncertain terms to "revise" four other types of regulations: the list of hazardous air pollutants, the list of source categories, technology-based emission standards, and certain emissions limitations. 42 U.S.C. § 7412(b)(2), (c)(1), (d)(6), (i)(8)(C). EPA, for example, must "review, and revise as necessary (taking into account developments in practices, and control technologies), emissions standards promulgated under this section no less often than every 8 years." § 7412(d)(6). Thus, where Congress wanted to establish a recurring obligation in section 7412, the statute appears to accomplish that goal by express language, not by latent implication. *See Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 572 U.S. 915, 922–23 (2014). The absence of parallel language in section 7412(f) is yet another reason to be skeptical that the statute clearly commands the plaintiffs' interpretation.[1]

Prior interpretations of the statute further reinforce the plausibility of EPA's position. While no court has addressed this question head-on, the D.C. Circuit characterized section 7412(f) as a "one-time risk review." *Surface Finishing*, 795 F.3d at 5. The court's

---

[1] Speaking of section 7412(d)(6), that statute arguably requires EPA to review risk-based standards for potential revision. Risk-based standards, like technology-based standards, fit the description in the phrase "review, and revise as necessary . . . , emission standards promulgated under this section"—that is, standards authorized by section 7412. 42 U.S.C. § 7412(d)(6); *see* § 7412(f)(2) (titled "Emission standards"). "But when read in context, with a view to its place in the overall statutory scheme," section 7412(d)(6)—despite its textual overbreadth—likely applies only to standards promulgated under section 7412(d). *King v. Burwell*, 135 S. Ct. 2480, 2490 (2015) (internal quotation marks and brackets omitted). The strongest clue that Congress intended a narrower reach is that the provision is nestled within a subsection that pertains only to technology-based standards. At a bare minimum, section 7412(d)(6) is ambiguous on this point, and EPA has concluded, in a notice-and-comment rulemaking, that "section 112(d)(6) should be interpreted as applying only to standards adopted under section 112(d)." 70 Fed. Reg. at 20,008. So while section 7412(d)(6) is no model of careful draftsmanship, not even the plaintiffs contend that this provision is an unequivocal command to review risk-based standards promulgated under section 7412(f).

passing remark was dictum, but its description matches EPA's nearly decade-long position that section 7412(f) is a "one-time review." 81 Fed. Reg. 97,046, 97,048 (Dec. 30, 2016); 77 Fed. Reg. 55,698, 55,699 (Sept. 11, 2012). As the plaintiffs note, the D.C. Circuit's interpretation is not binding in this (or any) case, and EPA's interpretations—although far from a "convenient litigating position" or "*post hoc* rationalization"—are too conclusory to merit any form of deference. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (internal quotation marks and brackets omitted). Yet the fact that judges and agency officials have both articulated an interpretation of section 7412(f) contrary to the plaintiffs' only underscores the absence of a clear statement.

As the plaintiffs point out, the original Senate bill would have unambiguously dictated the interpretation urged by EPA by conditioning residual risk reviews on "the *initial* promulgation of emissions standards for a category or subcategory of sources pursuant to subsection (d)." S. 1630, 101st Cong. § 301 (1989) (emphasis added) (proposing Clean Air Act § 112(e)(7)(A)). The word "initial" is not present in the provision eventually passed by Congress. *See* 42 U.S.C. § 7412(f)(2)(A). Relying on this absence, the plaintiffs intone the familiar maxim that when "Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Russello v. United States*, 464 U.S. 16, 23–24 (1983). To the extent that drafting history can substitute for (or more charitably put, elucidate) a "'specific, unequivocal command' from the text of the statute," *WildEarth Guardians*, 772 F.3d at 1182, the inference that Congress intended "promulgation" to include revisions is surely debatable here. Congress did not merely strike the word "initial" with red pen when marking up the Senate bill; instead, Congress "entirely rewrote" subsections (e) and (f) during the legislative process, and the adjective "initial" may have been "simply lost in the shuffle." *United States v. Wilson*, 503 U.S. 329, 336 (1992); *compare* 42 U.S.C. § 7412(e), (f) *with* S. 1630 § 301. But even assuming (somewhat doubtfully) that the drafters intentionally omitted the word "initial," and even assuming (yet more doubtfully) that the legislators who voted on the bill considered this issue, it's equally plausible that Congress decided that the

14

adjective would be superfluous because "promulgation" already excludes revisions of existing standards. *See Murphy v. Smith*, 138 S. Ct. 784, 790 n.2 (2018).

The plaintiffs, moving to the frontier of policy, contend that EPA's interpretive arguments from text, context, and precedent (however reasonable in the abstract) threaten to severely undermine the Clean Air Act's framework for the regulation of hazardous air pollutants. *Cf. County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1474 (2020). Their main objection is that EPA is never forced to perform an additional residual risk review, no matter what new risks emerge in the future. For example, the plaintiffs observe that EPA, under its interpretation, would not be required to perform a risk review after listing a new hazardous air pollutant emitted by a source for which standards already exist. The listing of a new pollutant might call into question whether the risk-based standards for that source truly "provide an ample margin of safety to protect public health," since the particular risks posed by the new pollutant have never been considered as part of a risk review for the source category. 42 U.S.C. § 7412(f)(2)(A). But nothing in the text or legislative history suggests that anyone in Congress considered whether the risk-review process should be repeated. In any event, the plaintiffs' interpretation does not guarantee another residual risk review at all, let alone a prompt response to a new listing, because the duty would be triggered only if the corresponding technology-based standards are later revised.

Finally, the plaintiffs argue that their claim does not implicate "whether the EPA's duty is clear-cut, but whether the duty is triggered at all" by revisions, a proposition they support by citing *Natural Resources Defense Council v. McCarthy*, 231 F. Supp. 3d 491, 502 n.10 (N.D. Cal. 2017). But in that case, EPA possessed a clear-cut duty to act upon a State's submission of any "revised or new standard," and the parties disputed only whether certain state orders as a factual matter constituted revisions. 33 U.S.C. § 1313(c)(2)(A); *see McCarthy*, 231 F. Supp. 3d at 498. In contrast, as the foregoing analysis shows, whether a revision to an existing technology-based standard counts as a "promulgation of standards" under section 7412(f) is a purely legal question of statutory interpretation, not a mixed question of applying a statute to the real-world

facts on the ground. *See U.S. Bank N.A. v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 965–66 (2018). Here, as in *WildEarth Guardians*, the scope of the statute—and thus the scope of EPA's duty—is unclear.

Both parties have put forward plausible interpretations of the statute, and when the statute could reasonably be read either way, the clear-statement rule dictates the outcome of the case. To acknowledge that risk-based standards *may* or even *should* be revised does not answer whether and when they *must* be revised. Indeed, the Clean Air Act expressly contemplates that EPA might revise its risk-based standards. *See* 42 U.S.C. § 7607(d)(1)(C) (referring to "the promulgation or revision of . . . any standard under section 7412(f)"). But Congress—wisely or foolishly, by compromise or by oversight—did not establish a clear-cut duty to review risk-based standards for potential revision when technology-based standards are revised.[2]

The only remaining question is whether the absence of a clear-cut duty means that this claim should be dismissed for lack of subject-matter jurisdiction or denied on the merits. The most on-point precedent (once again) is *WildEarth Guardians*, which dismissed a claim for lack of jurisdiction under similar circumstances. *See* 772 F.3d at 1182. To rebut this conclusion, the plaintiffs insist that they need make only a "colorable claim" that the revisions qualify as promulgations of standards to get to the merits of the claim. *Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969, 979 (9th Cir. 2012). *Leeson* addressed the burden of establishing subject-matter jurisdiction when material facts are disputed, but as just explained, this case turns on a "pure question of statutory construction." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1318 (2017) (internal quotation marks omitted). At least "[w]here, as here, the facts are not in dispute," the colorable-claim standard is inconsistent with the Supreme Court's recent admonition that plaintiffs must "show (and not just arguably show)" that the jurisdictional prerequisites are met. *Id.* at 1324. That means that "[s]imply

---

[2] That said, the plaintiffs are not left entirely without recourse. Out-of-date risk-based standards can be challenged by a petition for rulemaking under the Clean Air Act, and EPA's action on any such petition would be subject to judicial review. 42 U.S.C. § 7607(b)(1); *cf. Massachusetts v. EPA*, 549 U.S. 497, 533 (2007).

making a nonfrivolous argument" in support of jurisdiction under 42 U.S.C. § 7604(a)—as the plaintiffs have done here—"is not sufficient." *Id.* Although *Helmerich* interpreted a statute related to foreign sovereign immunity, citizen-suit provisions operate in the analogous context of federal sovereign immunity. *See Department of Energy v. Ohio*, 503 U.S. 607, 615 (1992). Accordingly, this claim is dismissed for lack of subject-matter jurisdiction. *See Coos County Board of County Commissioners v. Kempthorne*, 531 F.3d 792, 802–03, 810 (9th Cir. 2008) (explaining that the existence of a citizen-suit provision precludes review of identical claims under the Administrative Procedure Act).

III

EPA concedes liability on the plaintiffs' three remaining claims, admitting its failure to perform: (i) an initial technology review for the "Pushing, Quenching, and Battery Stacks" category; (ii) any risk review at all for the "Pushing, Quenching, and Battery Stacks" category; and (iii) a follow-up technology review for the "Coke Oven Batteries" category. Summary judgment is therefore granted to the plaintiffs on these three claims.

When a failure-to-act violation is proved by citizen suit, the Clean Air Act authorizes the district court "to order the Administrator to perform such act or duty." 42 U.S.C. § 7604(a). The parties have proposed dueling timelines for completing these non-discretionary tasks. The plaintiffs ask for an injunction requiring EPA to publish a notice of proposed action within 12 months and to finalize each action within 16 months; EPA counters that 24 and 36 months, respectively, are necessary for each task. EPA also argues that no intermediate deadlines for notices of proposed action are warranted here.

In this context, the courts have applied an "impossibility" standard for remedying violations of statutory deadlines. *Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1975); *Sierra Club v. Thomas*, 658 F. Supp. 165, 171 (N.D. Cal. 1987). Congress already prescribed a timeline, and its "deadlines are not aspirational." *Natural Resources Defense Council, Inc. v. EPA*, 966 F.2d 1292, 1300 (9th Cir. 1992). Respect for congressional prerogatives means that once the agency violates a statutory deadline, the judiciary

should not balance the costs and benefits of further delaying Congress' objectives. The remedial question is instead one of parsimony. Courts should grant no more—but also no less—time than necessary for EPA to perform its non-discretionary duties.

The impossibility standard is tempered somewhat by the recognition that the agency's speed in completing a rulemaking is subject to multiple constraints. Most prominently, the court must consider "budgetary commitments and manpower demands" because EPA can expend only those resources appropriated by Congress. *Train*, 510 F.2d at 712; *cf.* 31 U.S.C. § 1341. Nor would a more stringent deadline benefit anyone—not Congress, the plaintiffs, or people exposed to hazardous air pollutants—unless EPA can adequately compare the "relative merits" of different regulatory paths. *Train*, 510 F.2d at 712. In addition, a lengthier schedule "may well ensure earlier, not later, implementation of any eventual regulatory scheme," because a hasty rulemaking process risks "later judicial invalidation and remand to the agency." *Sierra Club v. Thomas*, 828 F.2d 783, 798–99 (D.C. Cir. 1987). The remedial question, notwithstanding the "impossibility" label, is really about feasibility given the agency's existing constraints. Still, EPA shoulders a "heavy burden" to demonstrate that its proposal is the shortest feasible schedule. *Blue Ridge*, 261 F. Supp. 3d at 61.

The plaintiffs contend that EPA could complete the two technology reviews and the single risk review within 16 months. There is reason to doubt that this schedule would be feasible. No court has ordered a risk or technology rulemaking to take place in so short a period, and the plaintiffs have not adequately explained how EPA could complete each crucial step of the rulemaking process during their timeframe. Nor do the plaintiffs dispute EPA's representation that coke ovens are among the most complex of the nearly 200 source categories. Finally, the plaintiffs have not supported their contested (and contestable) assertions that because the source categories cover different emission points in a single type of facility, and because EPA has already completed a technology review for coke oven batteries, these rulemakings can be completed faster than normal.

EPA, for its part, submitted a declaration from Penny Lassiter, the Director of the Sector

Policies and Programs Division, which is responsible for EPA's risk and technology reviews. She estimated the time necessary to complete each of the remaining seven phases in the rulemaking process, concluding that these rulemakings could not be completed in under 36 months. Yet her schedule builds in extra steps beyond those necessary to produce an environmentally sound and legally defensible rule. Most glaringly, her schedule allots six months total for two separate pre-publication reviews by the Office of Management and Budget (OMB). But EPA has blown through its statutory deadlines, and additional rulemaking procedures beyond those required by law are a luxury that people exposed to hazardous coke oven emissions can ill afford. *See Community In-Power*, 304 F. Supp. 3d at 223. Whatever the ideal practices might be, it is not impossible or infeasible to direct the agency to adopt the most expeditious procedures to remedy a statutory violation. *Cf. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 543 (1978) (recognizing agencies' ability to fashion their procedures within broad constitutional and statutory limits). And EPA can—indeed, must—reallocate resources to the extent possible to satisfy its court-ordered deadlines. *See Community In-Power*, 304 F. Supp. 3d at 222–23.

Courts have also considered the agency's diligence when crafting the appropriate remedy. Here, the Administrator has not exercised "the utmost diligence in discharging his statutory responsibilities." *Train*, 510 F.2d at 713. Recent district court decisions have confirmed that EPA regularly violates its statutory deadlines and waits for a citizen suit to concede liability before beginning the technology and risk reviews required by section 7412. That is to say, EPA has effectively swapped out concrete congressional deadlines for later-in-time, ad hoc judicial deadlines; meanwhile, the Sector Policy and Programs Division has expended resources on discretionary tasks. *See Community In-Power*, 304 F. Supp. 3d at 221–22. This factor weighs against EPA's proposed schedule.

The Court is not bound to pick between the parties' proposals when neither adheres to the impossibility standard. *See id.* at 224. Although the Lassiter declaration is a useful starting point, its phase-by-phase breakdown of the rulemaking process allots six of the 36 months to optional

OMB review. Moreover, it appears that rulemakings in the mine-run of source categories can be completed in 18 to 21 months, *see, e.g.*, *Blue Ridge*, 261 F. Supp. 3d at 61, and another court deemed a "2.5-year timeframe to be a useful benchmark" in this context, *California Communities Against Toxics*, 241 F. Supp. 3d at 205. Taking account of the complexity of the coke oven source categories, the Court determines that EPA could feasibly take final action in these two categories within 30 months of this ruling. The employees in the Sector Policy and Programs Division should be able to turn to these rulemakings as many of the court-ordered deadlines mentioned earlier come off the books. And the 30-month deadline runs from this ruling, rather than February's hearing on the cross-motions, in light of the strain on resources created by the current global pandemic. The Court declines to impose any intermediate deadlines here, so EPA can distribute the 30 months across the various rulemaking phases as it deems appropriate.

**IT IS SO ORDERED.**

Dated: June 26, 2020

VINCE CHHABRIA
United States District Judge