IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

CITIZENS FOR PENNSYLVANIA'S
FUTURE, *et al.*,

           Plaintiffs,

      v.

MICHAEL S. REGAN, in his official capacity
as the Administrator of the United States
Environmental Protection Agency,

           Defendant.

Case No. 3:19-cv-02004-VC

**DECLARATION OF PENNY LASSITER**

1.    I, Penny E. Lassiter, under penalty of perjury, affirm and declare that the following statements are true and correct to the best of my knowledge and belief, and are based on my personal knowledge or on information contained in the records of the United States Environmental Protection Agency ("EPA"), or supplied to me by EPA employees under my supervision.

2.    I am the Director of the Sector Policies and Programs Division ("SPPD") within the Office of Air Quality Planning and Standards ("OAQPS"), Office of Air and Radiation ("OAR") at EPA. I have held this position in a permanent capacity since May 26, 2019. Prior to this permanent appointment I served as Acting Director of SPPD from February 4, 2018, until June 23, 2018, and from January 6, 2019, until May 25, 2019. Prior to serving as the SPPD Acting Director in 2018, I served as Group Leader for the Refining and Chemicals Group within SPPD, a position I held since March 13, 2011. I have held various other positions within EPA during

1

my 36 years of employment by the Agency, including multiple leadership positions since September 1998.

3.  SPPD is the division within OAQPS that has responsibility for developing, reviewing, and revising, as required and appropriate, the National Emission Standards for Hazardous Air Pollutants ("NESHAP") relating to coke ovens pursuant to CAA section 112, 42 U.S.C. § 7412. SPPD also has responsibility for developing regulations, policy, and guidance for other major Clean Air Act air quality programs, including the New Source Performance Standards ("NSPS") program under CAA section 111, 42 U.S.C. § 7411, the regulations relating to solid waste combustion under section 129 of the Clean Air Act ("CAA"), 42 U.S.C. § 7429, and the 40 CFR Part 60 NESHAPs developed prior to the publication of the 1990 Clean Air Act Amendments that established the updated, revised NESHAP program under CAA section 112, 42 U.S.C. § 7412.

4.  In my capacity as Director of SPPD, I am responsible for overseeing EPA's promulgation of regulations under CAA section 112 for coke ovens and other industrial source categories. Further, I am involved in the prioritization and allocation of EPA's resources to meet the legal requirements of the CAA as well as the air quality needs of the nation. Given the funding and other resource constraints facing the Agency, EPA is not able to perform all activities that it is authorized to perform, is obligated to perform, or that it may want to perform, at any given time. These constraints influence the manner and schedule by which EPA takes its required actions under the CAA, and the timing of such actions can greatly affect the scope, quality, and informational bases that underlie them.

5.  In allocating resources and prioritizing particular projects, OAR and SPPD consider multiple factors, including but not limited to: (1) whether the CAA or a court order requires a

project to be completed by a certain time; (2) the environmental and public health impacts of proceeding with a particular project compared to other projects for which EPA action is required or necessitated; (3) the amount of resources that would be needed to complete a particular project and the availability of such resources; (4) the other mandatory duties under the CAA that are assigned to a particular office; and (5) the amount of information (including needs for additional information) required in order to appropriately support a project.

6.      From my longstanding experience, including 25 years of leadership in SPPD and its predecessor division with similar regulatory development responsibilities, I am very familiar with the processes required in developing and promulgating major EPA regulations under the CAA and the time periods allotted for EPA to take regulatory actions thereunder, including issuing rules pursuant to CAA section 112.

7.      I have relied upon my staff to provide the factual information concerning the regulatory steps and schedule needed for the particular CAA section 112 actions at issue in the case for which I make this declaration.

8.      Section 112 addresses the control of hazardous air pollutants ("HAP") from stationary sources. Section 112(d)(2) requires EPA to establish emission standards for existing stationary sources based on the level of control achieved by the best controlled sources within the source category or subcategory and to set standards for new sources based on the best controlled similar source. For major sources, sections 112(d)(2) and (3) require that these technology-based standards are based on Maximum Achievable Control Technology ("MACT") standards. Section 112(d)(6) requires EPA to review these technology-based standards every 8 years and update the standards "as necessary" to reflect advances in control technologies. In addition, section 112(f)(2)(A) requires EPA to undertake an assessment to determine whether the technology-

based standards provide an ample margin of safety. The review conducted pursuant to section 112(d)(6) is known as the technology review, and the review conducted pursuant to section 112(f)(2)(A) is commonly called the residual risk review. During the technology review, EPA must also develop, propose, and promulgate MACT standards for any remaining unregulated HAP emitted from the source category. *Louisiana Envt'l Action Network v. EPA,* 955 F.3d 1088,1095-1099 (D.C. Cir. 2020).

9.      EPA generally performs the residual risk review at the same time as the first technology review (collectively the "risk and technology review" or "RTR"). Although the reviews are not directly related, both concern potential additional regulation of facilities within a source category. As such, it is beneficial to all interested parties to consider what additional level of control might be necessary for both requirements at the same time rather than in two separate rulemaking actions.

10.     Coke ovens produce metallurgical coke, most of which is used at integrated iron and steel facilities. A small percentage (less than 10 percent) of this coke is used at iron and steel foundries. Coke is produced by heating coal in refractory silica and brick ovens to high temperatures (2000°F) in heating periods of up to 24 hours to drive off volatile materials in the coal to produce solid carbon, or "coke."

11.     Coke is produced in one of two processes: (1) by-product recovery, where chemical by-products are recovered from coke oven gas in a co-located chemical plant; or (2) nonrecovery, where chemicals are not recovered, but heat may be recovered. This second process is called heat and nonrecovery ("HNR"). There are 14 remaining coke plants in the U.S., of which nine facilities are by-product facilities and five are HNR facilities.

12.     Coke ovens are known to be a significant source of HAP emissions and have the potential to pose serious air pollution issues to the local communities. Therefore, it is very important to the EPA to develop robust and complete emissions standards for this industry.

13.     EPA primarily regulates coke oven emissions under CAA section 112 through two sets of regulations: (1) 40 CFR Part 63 subpart CCCCC (5C) for "Pushing, Quenching, and Battery Stacks" and (2) 40 CFR Part 63 subpart L "Coke Oven Batteries." Subpart 5C, which was promulgated in 2003, addresses emissions from pushing coke out of ovens, quenching hot coke, and battery stacks of oven combustion. Subpart L, which was promulgated in 1993, addresses leaks from oven doors, "topside" oven lids, "offtake" ducts, and charging.  Consistent with the detailed provisions for coke ovens in CAA sections 112(d)(8) and (i)(8), Subpart L establishes two sets of standards for by-product facilities known as the MACT track and Lowest Achievable Emissions Rate ("LAER") track.

14.     EPA also regulates benzene emissions from by-product recovery plants, a type of chemical plant co-located with by-product coke ovens. These co-located sources are not part of the subparts 5C or L source categories but are a type of chemical plant designed and operated for the separation and recovery of by-products evolved from coal during the coking process. These chemical plants are regulated under 40 CFR part 61 subpart L, promulgated in 1989 prior to the CAA Amendments of 1990, Pub. L. No. 101-549, § 301, 104 Stat. 2399, 2531–74.  These regulations require by-product facilities to implement a leak detection and repair ("LDAR") program. These chemical plants were initially listed as a source category pursuant to section 112(c) of the CAA, which would have required EPA to establish emission standards under section 112(d) of the Act. *See, e.g.*, 57 Fed. Reg. 31576 (July 16, 1992); 63 Fed. Reg. 17838 (Apr. 10, 1998).  Before establishing such regulations, however, EPA deleted coke by-products

plants from the list of source categories to be regulated. 66 Fed. Reg. 8221 (Jan. 30, 2001). As described below, we have now determined that these chemical plants most likely should be listed under CAA section 112(c) and regulated under CAA section 112(d) and made subject to MACT standards pursuant to the CAA section 112(d)(2) and (3) and/or 112(h).

15.     On June 26, 2020, this court ordered EPA to complete a risk and technology review for subpart 5C and an updated technology review for subpart L by December 26, 2022. EPA staff have been gathering and analyzing data, developing, and evaluating regulatory options, completing technical support documents, briefing various levels of management and developing a proposed rule for many months. In addition, as noted in Paragraph 8 above, pursuant to the U.S. Court of Appeals for the D.C. Circuit's April 2020 decision in *Louisiana Envt'l Action Network,* EPA now must establish MACT emission limits for any unregulated emissions in the source category when undertaking a technology review under section 112(d)(6), such as the two reviews ordered by this court. During the process of preparing a proposed rule, we have identified a significant need for additional data and information in order to complete a robust risk and technology review for subpart 5C and a similarly robust technology review for subpart L and to establish missing MACT standards. For example, we have discovered the presence of several unregulated HAP and sources for which we must propose MACT standards during the technology review. For two of these unregulated emissions points at HNR facilities, we have very limited data, as we have emissions test data from only one of the five facilities. We think it would be prudent for EPA to gather more emissions test data for these emission points from other HNR facilities so that we can develop appropriate and robust MACT standards for these currently unregulated HAP.

16. Another area of uncertainty and data needs concerns the coke oven door leak emissions regulated under subpart L. Coke oven door leak emissions are calculated using an equation based on a 1981 study that includes a default estimate of 6 percent as the percent of doors that can only be seen leaking at close view (Reference: Compilation of Emission Factors (AP-42). Section 12.2, Coke Production. See https://www3.epa.gov/ttn/chief/old/ap42/ch12/s02/final/c12s02.pdf). We think it would be beneficial to require one or more facilities to repeat this type of study so that we can obtain data and information to inform the development of a revised, updated equation, which would allow us to complete a more accurate, robust and appropriate technology review pursuant to CAA section 112(d)(6).

17. Another area for which we have no data or need more information concerns potential control measures to reduce coke oven door leak emissions. Based on analyses completed thus far, we think door leaks are likely one of the most significant sources of HAP emissions at these facilities and a substantial contributor to the risks to public health near these facilities. Therefore, we see potentially substantial value in obtaining additional data and information regarding potential controls and other measures to reduce HAP emissions from these door leaks, which would allow us to complete a more accurate and appropriate technology review pursuant to CAA section 112(d)(6).

18. Finally, and perhaps most importantly, we think it would be prudent, efficient, and helpful for the public and regulated entities to expand the scope of this rulemaking to include the following actions: relisting the chemical by-product plants under section 112 of the CAA and developing and proposing MACT standards for these chemical plants under CAA section 112(d). We also think it would be very helpful to gather fenceline ambient air monitoring data near these plants, as that data would provide a better understanding of the overall cumulative impacts to

public health near these facilities. We also intend to undertake a risk assessment for the subpart L LAER track sources as part of this rulemaking. The by-product chemical plants are known to significantly contribute to the risks to public health near coke oven facilities, and with additional time for actions as described herein, EPA could take action efficiently and effectively to address the HAP emissions from these plants at the same time EPA completes the RTR for subpart 5C and technology review for subpart L.

19.     To accomplish a comprehensive robust sector-based rulemaking, which would include addressing by-product chemical plants and the other issues activities described above, we would first need to gather emissions test data and other important information from by-product chemical plants along with the data collection for the 40 CFR part 63, subpart 5C and subpart L sources. To gather the data and information described in the paragraphs above, we would send a request pursuant to CAA section 114 to approximately nine facilities in the near future, including an extensive survey and request for the facilities to undertake various emissions testing and other measures (such as fenceline ambient air monitoring). After we receive the data, we would analyze the data; develop and evaluate regulatory options; undergo necessary management briefings; develop a comprehensive, sector-based proposed rule; complete all the necessary Agency and Interagency reviews; and publish a proposed rule. After receipt, consideration, and review of public comments, we would repeat the steps described above and develop a final rule.

20.     Undertaking and completing the tasks and work described above that are needed for a comprehensive, sector-based rulemaking requires time, which would necessitate an extension to the current deadline for actions involving portions of the sector. Therefore, we are requesting that the court-ordered final rule deadline for the 40 CFR part 63, subpart 5C risk and technology review and subpart L technology review be extended by approximately 17 months (from

December 26, 2022, to May 23, 2024). The following paragraphs detail EPA's plans to use this time to efficiently conduct a comprehensive, sector-based rulemaking.

21.     **Phase I.** Development and Completion of a CAA Section 114 Information Request (2 months).

This type of information collection anticipated by EPA, authorized under section 114 of the CAA, 42 U.S.C. § 7414, is of limited scope and thus does not require approval by the Office of Management and Budget ("OMB") under the Paperwork Reduction Act. Developing a request ordinarily can require several months. However, because we already have been studying the coke ovens source category for some time and have identified the information and data needs, we estimate that two months is sufficient to complete and send a CAA section 114 request. This time period would include developing a draft CAA section 114 request (including a comprehensive survey questionnaire and emissions testing requirements), engaging with key stakeholders regarding the contents of the draft section 114, and allowing those stakeholders an opportunity to provide input. After considering their input, we would finalize the CAA section 114 request and send it to facilities.

22.     **Phase II.** Time Needed for Industry to Complete Testing and Submit Data to EPA (5 months).

To complete the requirements of the section 114 request, facilities would need to arrange a contract with emissions testing companies, develop a test plan, have EPA review and approved the test plan, schedule the testing by testing companies, conduct the testing, complete the lab analyses, and conduct quality assurance and quality control (QA/QC) analyses. When testing is completed, facilities would then develop test reports and submit them to EPA. We estimate this process will take 5 months.

23.     **Phase III.** Development and Completion of Proposed Rule (6 to 7 months).

This work requires technical analyses, multiple briefings for EPA management, drafting of technical memoranda and the regulatory package, and review of the regulatory package by the workgroup, EPA management, and, in many instances, OMB. Overall, we estimate this phase to take 9 months. The major tasks to be accomplished in this phase include:

(a)     Drafting workgroup briefing materials, including development of regulatory options for possible inclusion in the proposed rule, and the impacts and issues associated with each option, and meeting with the workgroup to discuss the materials. The EPA workgroup includes staff with a wide range of expertise, including health researchers, attorneys, compliance and enforcement staff, and regional office representatives, and their review is extremely valuable in assuring the quality of EPA's rulemakings. Workgroup members provide input on health benchmarks, various technical analyses and aspects of the risk assessment, ease of enforcement, monitoring and testing technology, and policy.

(b)     Preparing briefing materials and briefing EPA management for selection of the regulatory option(s) for inclusion in the proposed rule.

(c)     Drafting proposed preamble and regulatory text, including preliminary review by OAR management.

(d)     Drafting supporting documentation for the proposed rulemaking package based on the selected regulatory option(s).

(e)     Submitting draft regulatory preamble and text and supporting documents to the EPA workgroup for review, which helps to ensure, among other things, legal sufficiency, sound scientific support, and consistency with other programs. Internal EPA procedures mandate that

workgroup review is a minimum of 15 working days (approximately three weeks), and we therefore include 21 calendar days in our proposed schedule.

(f) After drafts are revised as necessary to obtain workgroup approval, the proposal package is reviewed by SPPD, OAQPS, and OAR management and, for projects that are considered significant regulatory actions, also by OMB. We have included 45 days for OMB review (we intend to request this expedited review because OMB review is typically 90 days or more). See Executive Order 12866. The docket for the proposed rule is compiled and indexed so as to be available for public review upon publication of the proposed rule.

(g) After EPA management provides final approval, the EPA Administrator signs the proposed rule, which is then sent to the Office of the Federal Register for publication.

24. **Phase IV.** Proposed Rule Publication and Public Comment Period (3 months).

The public comment period begins on the date that the proposed rule is published in the Federal Register, and publication in the Federal Register typically takes between 2-4 weeks following signature. Since EPA has very limited influence over the time for publication, we are assuming publication takes 4 weeks. The CAA requires that EPA provide an opportunity for a public hearing and that the public comment period remain open for 30 days following a public hearing on the rule. CAA section 307(d)(5). Since it is reasonable to hold a public hearing no earlier than about 2 weeks after publication of the proposal (to allow for interested parties to make plans whether to attend the hearing and to review the proposed rule and prepare oral comments), the default "minimum" amount of time for the comment period is 45 days. However, because of the complexity of these rules, including the detailed emissions data and the modeling analysis for risk, EPA anticipates providing a 60-day public comment period. This phase is expected to take a total of 3 months.

25. **Phase V.** Summarize Comments, Develop Responses, Complete Analyses (2 to 3 months).

Following the public comment period (45-60 days) and public hearing, if one is held, EPA drafts a summary of the comments. The number and complexity of the comments varies greatly from rule to rule. We typically receive between 10 and 50 unique, substantive comment letters, some including detailed technical data and information, on risk and technology review proposals, although the number of comments received has been as high as about 200 for some of the larger, more complex source categories. We estimate that drafting a written summary of comments for source categories will take 1 month.

(b)     EPA evaluates each relevant comment to determine an appropriate response. Some responses are straightforward, some require briefing EPA management, and some require re-analysis of data or analysis of new data supplied during the comment period. For each source category, we estimate between 2 and 3 months for developing and drafting initial comment responses and conducting additional data analyses, if needed.

26. **Phase VI.** Development of Final Rule Package (7 to 8 months)

The major tasks to be accomplished in this phase include:

(a)     Drafting regulatory options for changes to the proposed rule based on comments received during the public comment period, and briefing workgroup. We estimate 15 days to complete this task.

(b)     Preparing recommendations and briefing EPA management on comments received and changes recommended as a result of those comments. This task involves briefings for SPPD management, the EPA Work Group, OAQPS management, and OAR management. The briefing process typically takes 1 to 2 months.

(c) Completing all needed technical analyses, which may include evaluation of control options identified during the comment period and revising the technology review to reflect the new options; updating costs and economic impacts; changes to emissions impacts; re-running risk models; and re-evaluating risk decisions. EPA must also carry out the necessary tasks of preparing the draft final rule preamble and rule package; updating supporting documentation and drafting new supporting documentation as needed; and compiling the comment summary and response document. We estimate a minimum of 1 to 2 months for this phase, depending on the complexity of the rule.

(d) Submitting draft materials to the workgroup for review, which helps to ensure, among other things, legal sufficiency, sound scientific support, and consistency with other programs. The final rule workgroup is the same as that for the proposed rule and serves the same function. Internal EPA procedures mandate that workgroup review is a minimum of 15 working days (approximately 3 weeks), and we, therefore, include 21 calendar days in our proposed schedule.

(e) Completing final documents, with consideration of workgroup comments. The final preamble and rule are reviewed by SPPD, OAQPS, and OAR management and, for projects that are considered significant regulatory actions, OMB. We include 45 days for OMB review for this final rule (we intend to request expedited review because OMB review is typically 90 days or more). At the same time the rule is being reviewed by OMB, we compile and index the administrative record and finalize the response to comments document. After any necessary revisions are made to the final rulemaking package, the final rule is signed and sent to the Office of Federal Register for publication. We estimate that this process will take a minimum of 3 to 4 months.

27. EPA, in coordination with the Department of Justice, contacted Plaintiffs and presented the agency's position regarding the need for additional information and the additional work the agency would like to perform as part of this rulemaking described herein.

SO DECLARED:

_____

PENNY LASSITER

Dated: _____