1  TODD KIM
   Assistant Attorney General
2  United States Department of Justice
   Environment & Natural Resources Division
3
4  LUCY E. BROWN (HI Bar No. 10946)
   lucy.e.brown@usdoj.gov
5  MARTHA C. MANN (FL Bar No. 155950)
   martha.mann@usdoj.gov
6  Environmental Defense Section
   P.O. Box 7611
7  Washington D.C. 20044
   Telephone (202) 598-1868 (Brown)
8  Facsimile (202) 514-8865
9
10 *Attorneys for Defendant EPA*

11

12 **IN THE UNITED STATES DISTRICT COURT**
   **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
13 **SAN FRANCISCO DIVISION**

14

15 CITIZENS FOR PENNSYLVANIA'S
   FUTURE, *et al.*,                           Case No. 3:19-cv-02004-VC
16
17              Plaintiffs,
18
        v.                                       **[UNOPPOSED] RENEWED MOTION**
19                                               **TO AMEND ORDER AND JUDGMENT**
20 MICHAEL S. REGAN, in his official capacity
   as the Administrator of the United States
21 Environmental Protection Agency,
22
                Defendant.
23

24      Pursuant to Civil L.R. 7-1(a)(1),  Federal Rule of Civil Procedure 60(b), and this Court's

25 August 15, 2022 Order (Dkt. No. 68), Defendant Michael S. Regan, in his official capacity as

26 Administrator of the Environmental Protection Agency ("EPA" or "the Agency"), hereby moves

27

28
                                    [UNOPPOSED] RENEWED MOTION TO AMEND ORDER AND JUDGMENT
                                                              AND [PROPOSED] ORDER
                                            1

to amend the Order and Judgment entered by the Court on June 26, 2020 (Dkt. Nos. 43 and 44) (the "Order and Judgment").  EPA requests a hearing in the event an amicus brief is filed.

## I.   INTRODUCTION AND FACTUAL BACKGROUND

Under the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401-7671q, EPA regulates emissions of hazardous air pollutants from many different types of sources.  Coke ovens – industrial factories that convert coal into coke – have two distinct source categories that EPA regulates pursuant to section 112 of the Clean Air Act: (1) Coke Oven Batteries (40 C.F.R. Part 63 Subpart L) and (2) Coke Oven Pushing, Quenching, and Battery Stacks (40 C.F.R. Part 63 Subpart CCCCC).  In 2019, Plaintiffs, a group of environmental organizations, filed a CAA citizen suit against EPA.  Dkt. No. 1.  Plaintiffs alleged that EPA had failed to perform mandatory duties under the CAA to complete both a risk review and a technology review for the two coke oven source categories (Subpart L and Subpart CCCCC).  *Id.* ¶¶ 50, 52.  EPA contested its obligation to complete a risk review for coke oven batteries but acknowledged its obligations to complete the technology review for coke oven batteries and both the risk and technology review for coke oven pushing, quenching, and battery stacks.  Dkt. No. 32 at 2.  After summary judgment briefing and argument, the Court agreed with EPA that the CAA did not unambiguously place upon EPA a duty to complete a risk review for coke oven batteries and thus that there was no waiver of sovereign immunity for that claim.  Dkt. No. 43 at 16.  With respect to the other three alleged duties, this Court directed EPA to complete the risk and technology reviews within 30 months from the Court's Order (i.e., by December 26, 2022).  *Id.* at 20.

On June 2, 2022, EPA moved to amend the Order and Judgment to provide EPA additional time to complete these obligations in light of the agency's determination that additional information is needed in order to develop more appropriate and robust standards for

1  coke ovens.  Dkt. No. 46 at 2.  EPA sought an extension to May 23, 2024, assuming that Section

2  114 information collection requests ("Section 114 requests") were timely submitted to certain

3  coke oven facilities.  *Id.*   Plaintiffs did not oppose this request.  *Id.*

4        On June 8, 2022, Coke Oven Environmental Task Force and SunCoke Energy, Inc.,

5  (collectively, "Amici") moved to intervene to contest the motion to amend.  Dkt. No. 47.  The

6  Court held a virtual hearing on the motion to intervene on July 28, 2022.  Dkt. No. 67.  On

7  August 15, 2022, the Court issued an order denying both Amici's request to intervene and EPA's

8  motion to amend.  Dkt. No. 68 at 1.  The Court, however, granted EPA the opportunity to file a

9  renewed motion that includes: (1) additional justifications and (2) two proposed completion

10  dates—one for the event that the Court agrees that the mandatory duties at issue in this case can

11  be folded in with the new, more robust rulemaking and one for the event that the Court does not.

12  *Id.* at 1–2.  The Court also granted Amici leave to file an amicus brief on the renewed motion.

13  *Id.* at 1.

14

15        EPA now respectfully files this renewed motion to amend the Order and Judgment.  To

16  avoid a significant waste of agency and industry resources, EPA seeks to complete the

17  nondiscretionary actions at issue in this case—the risk and technology reviews for Subpart

18  CCCCC sources and the technology review for Subpart L sources—at the same time it conducts

19  a more robust rulemaking on coke ovens.  The proposed extension of time would allow EPA to

20  expand its data collection to support the development of new Maximum Achievable Control

21  Technology emission limits for coke ovens and expand the scope of the rulemaking in pertinent

22  areas.  In so doing, EPA would avoid unnecessary duplication of effort on the part of the

23  Agency, industry, and the public.  In light of the amount of time and resources necessary to

complete EPA's planned work, the Agency requests approximately seventeen additional months from this Court's order to complete these tasks (i.e., until May 23, 2024).

In the event this Court finds that the nondiscretionary duties cannot be folded into the new rulemaking, the soonest EPA can complete the rulemaking is November 30, 2023.

Counsel for EPA has conferred with Plaintiffs' counsel and explained the basis for the two completion dates. *See* Declaration of Lucy E. Brown ¶ 2. Plaintiffs consent to the requested relief. *Id.* ¶ 3. Should the Court grant EPA's motion, Plaintiffs strongly urge the Court to adopt the proposed May 23, 2024, deadline and intend to set out their position in support of that deadline in a separate brief to be filed today. *Id.*

## II.    LEGAL STANDARD

Rule 60(b) of the Federal Rules of Civil Procedure provides for relief from judgment where one or more of the following is shown: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

Rule 60(b)(5) "codifies the long-established principle of equity practice that a court may, in its discretion, take cognizance of changed circumstances and relieve a party from a continuing decree." *Gilmore v. Cal.*, 220 F.3d 987, 1007 (9th Cir. 2000). *See also Horne v. Flores*, 557 U.S. 433, 454 (2009). It likewise "codifies the courts' traditional authority, 'inherent in the

jurisdiction of the chancery,' to modify or vacate the prospective effect of their decrees." *Bellevue Manor Assocs. v. United States*, 165 F.3d 1249, 1252 (9th Cir. 1999).

As set forth in *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367 (1992), which involved a consent decree, a party seeking modification bears the burden to show that a "significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Id.* at 393; *see also Sharp v. Weston,* 233 F.3d 1166, 1170 (9th Cir. 2000) (same).  Applying this "flexible" Rule 60(b)(5) standard, the Ninth Circuit has directed courts to "take all the circumstances into account in determining whether to modify or vacate a prior injunction or consent decree."  *Bellevue Manor,* 165 F.3d at 1256.  While the considerations identified in *Rufo* (that is, a significant change in facts or law) may be relevant or even determinative in some cases, they do not define the universe of situations in which a court order should be modified.  *See Alexis Lichine & Cie v. Sacha A. Lichine Estate Selections, Ltd.,* 45 F.3d 582, 586 (1st Cir. 1995) ("In our view, Rule 60(b)(5) sets forth the umbrella concept of 'equitable' that both *Swift* and *Rufo* apply to particular, widely disparate fact situations," quoted with approval in *Bellevue Manor,*165 F.3d at 1256); *Bldg. & Const. Trades Council of Philadelphia & Vicinity, AFL-CIO v. N.L.R.B.,* 64 F.3d 880, 888 (3d Cir. 1995) ("It would be a mistake to view either *Rufo* . . . as encapsulating a universal formula for deciding when [a] point has been reached [where modification or dissolution is appropriate].  Instead, each of those cases represents a response to a particular set of circumstances.  A court of equity cannot rely on a simple formula but must evaluate a number of potentially competing considerations to determine whether to modify or vacate an [order]").

Rule 60(b)(6) is a "catchall provision" that applies when the reason for granting relief is not covered by any of the other reasons set forth in Rule 60.  *Morris v. Paramo*, No. 14-CV-

02108-VC (PR), 2015 WL 4273268, at *1 (N.D. Cal. July 14, 2015) (citing *Samish Indian Tribe v. Washington*, 394 F.3d 1152, 1157 (9th Cir. 2005)).  Rule 60(b)(6) thus "gives the district court power to vacate judgments 'whenever such action is appropriate to accomplish justice.'" *United States v. Sparks*, 685 F.2d 1128, 1130 (9th Cir. 1982) (quoting *Klapprott v. United States*, 335 U.S. 601, 615 (1949)); *see also Henson v. Fid. Nat'l Fin., Inc.*, 943 F.3d 434, 443 (9th Cir. 2019).  A movant seeking relief under Rule 60(b)(6) must show "'extraordinary circumstances' justifying the reopening of a final judgment."  *Jones v. Ryan*, 733 F.3d 825, 833 (9th Cir. 2013) (internal citations omitted).

## III.     THE CLEAN AIR ACT

CAA Section 112, 42 U.S.C. § 7412, addresses the control of hazardous air pollutants ("HAP") from stationary sources.  EPA is required to establish emission standards for existing stationary sources based on the level of control achieved by the best controlled sources within the source category or subcategory and to set standards for new sources based on the best controlled similar source.  *Id.* § 7412(d)(2).  For major sources, these technology-based standards are based on Maximum Achievable Control Technology ("MACT") standards.  *Id.* § 7412(d)(2), (3).  EPA must review these technology-based standards every eight years and update the standards "as necessary" to reflect advances in control technologies.  *Id.* § 7412(d)(6).  In addition, EPA must undertake an assessment to determine whether the technology-based standards provide an ample margin of safety.  *Id.* § 7412(f)(2)(A).  The review conducted pursuant to Section 112(d)(6) is known as the "technology review," and the review conducted pursuant to Section 112(f)(2)(A) is commonly called the "residual risk review."  Further, the D.C. Circuit Court of Appeals held in a decision issued at about the same time as this Court's summary judgment ruling that when EPA conducts a technology review, it must also develop,

1
2
3
4
5

propose, and promulgate MACT standards for any remaining unregulated HAP emitted from the source category.  *Louisiana Envt'l Action Network v. EPA,* 955 F.3d 1088, 1095–99 (D.C. Cir. 2020) ("*LEAN*").  This means that, in order to perform the technology reviews ordered by this Court, EPA has more to do than anticipated at the time the Court issued the Order and Judgment.

6

## IV.    THE RULEMAKING PROCESS

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Several regulatory steps are required to complete a defensible rulemaking.  In this case, EPA identified a need for additional data and issued Section 114 requests to coke manufacturing facilities.  *See* Dkt. Nos. 63–64.  The recipients of these requests will conduct testing and submit the requested data.  *See* September 2022 Declaration of Penny Lassiter, Director of the Sector Policies and Programs Division within EPA's Office of Air Quality Planning and Standards, Office of Air and Radiation ("Sept. 2022 Lassiter Decl."), ¶ 5.  EPA will then complete its drafting of a proposed rule by analyzing data, developing potential regulatory options, and assessing the costs and emissions reductions for each option and other potential impacts (e.g., energy use, impacts to other media, economic impacts).  *Id.*  The Agency will then brief various levels of management and the intra-EPA rulemaking work group, revise materials as needed based on the outcome of those briefings, meet with various stakeholders, and develop the proposed regulatory package.  *Id.*  EPA will then send the proposal package to the work group members for a formal review.  *Id.*  Then, EPA will revise the package based on work group input and comments, and submit the package for review by various levels of senior EPA management.  *Id.*  Unless the rule is determined to be non-significant, which is highly unlikely for a rule of this magnitude, EPA will then submit the package for approval by the Office of Management and Budget ("OMB") and interagency review.  *Id.*  Once the proposed rule is published in the Federal Register, it is subject to a notice and comment period and may include a public hearing upon

1   request.  *Id.*  EPA will then consider and respond to comments, complete final briefing of agency

2   decision makers, repeating many of the steps outlined above, and draft and publish the final rule.

3   *Id.*

4   **V.   ARGUMENT**

5        Amendment of the Court's Order and Judgment is appropriate under Rule 60(b)(5) or (6)

6   because completing the risk and technology review for Subpart CCCCC and the technology

7   review for Subpart L separate and apart from the discretionary rulemaking would result in a

8   significant waste of resources.  By integrating multiple actions into one rule, EPA can prevent

9   duplication of effort and resources on the part of the Agency while providing a more streamlined

10  rulemaking for the regulated industry and other stakeholders.  Additionally, EPA needs more

11  data to ensure that the rule is based on the best available information and to develop MACT

12  standards for previously unregulated HAP as required by *LEAN*.  Thus, the current deadline of

13  December 26, 2022 is infeasible.[1]

14  **A.  The May 23, 2024 completion date would allow EPA to develop a robust rulemaking
    based on the best available data while conserving agency and industry resources.**

15       Allowing EPA to complete the mandatory duties subject to the Order and Judgment at the

16  same time as it completes separate but related discretionary action in one rulemaking would be

17  the most efficient use of agency and industry resources and is in the best interest of the public.

18  The Agency needs time to sufficiently evaluate the new information it will receive in the context

19  of complex technical issues and "[t]he public has a significant interest in ensuring that the

20  government does not [act] via a process that emphasizes expediency over quality and accuracy."

---

[1] Amici "do not dispute the need for an extension to the December 26, 2022 deadline."  Dkt. No. 47 at 5.

1  *Cronin v. Browner*, 90 F. Supp. 2d 364, 373 (S.D.N.Y. 2000).  As this Court has recognized, "a

2  lengthier schedule 'may well ensure earlier, not later, implementation of any eventual regulatory

3  scheme,' because a hasty rulemaking process risks 'later judicial invalidation and remand to the

4  agency.'"  *Citizens for Penn. Future v. Regan*, 469 F. Supp. 3d 920, 933 (N.D. Cal. 2020)

5  (quoting *Sierra Club v. Thomas*, 828 F.2d 783, 798–99 (D.C. Cir. 1987)); *see also United*

6  *Steelworkers of Am. v. Rubber Mfrs. Ass'n*, 783 F.2d 1117, 1120 (D.C. Cir. 1986) (holding

7  judicial imposition of overly hasty timetable on agency would ill serve the public interest);

8  *Maine Ass'n of Handicapped Persons v. Dole*, 623 F. Supp. 920, 926 (D. Me. 1985) (recognizing

9  "the need to implement clear and effective regulations capable of withstanding the scrutiny of

10  challenges following enactment").  In short, when an agency has missed a statutory deadline, a

11  court should examine the relevant facts and circumstances and evaluate the time frame needed by

12  the agency to make well-reasoned, scientifically supportable, and defensible decisions.

13  
14  **1.  The robust rulemaking would address important technical issues, fill data gaps, and ensure compliance with the *LEAN* decision.**

15  A comprehensive, sector-based rulemaking on coke plants would result in a quality rule,

16  be the best use of agency resources, and ensure ease of regulatory compliance for industry and

17  other stakeholders.  With the additional time requested, EPA could: (1) collect data and complete

18  the risk and technology review for Subpart CCCCC and the technology review for Subpart L

19  (which are required under the Court's Order); (2) collect data to determine whether to relist the

20  chemical by-product plants[2] under section 112 of the CAA and develop and propose MACT

---

[2] These plants are known to significantly contribute to the risks to public health near coke oven facilities.  May 2022 Declaration of Penny Lassiter, Director of the Sector Policies and Programs Division within EPA's Office of Air Quality Planning and Standards, Office of Air and Radiation ("May 2022 Lassiter Decl."), Dkt. No. 46-2, ¶ 18.

standards for these plants under section 112(d); and (3) conduct a risk review for the Subpart L Lowest Achievable Emissions Rate ("LAER") track facilities.  Sept. 2022 Lassiter Decl. ¶¶ 8–12.

EPA also needs more time to fill data gaps and set MACT standards for unregulated HAP as required by the holding in *LEAN*.  Following this Court's Order and Judgment, EPA staff began gathering and analyzing data, developing and evaluating regulatory options, completing technical support documents, briefing various levels of management, and developing a proposed rule.  May 2022 Lassiter Decl. ¶ 15.  Through this process, EPA identified a significant need for additional data and information in order to complete a robust risk and technology review for Subpart CCCCC sources and a similarly robust technology review for Subpart L sources.  *Id.*; *see also id.* ¶¶ 16–17 (describing uncertainty and data needs concerning coke oven door leak emissions and control measures to reduce such emissions).

When EPA determined the need for additional data, the Agency invested substantial time and resources into developing comprehensive Section 114 requests.[3]  *See* May 2022 Lassiter Decl. ¶ 21; *see also* Dkt. No. 64.  The Agency also spent many months conferring with Plaintiffs about EPA's plan to collect data and develop a more robust rulemaking.  *See* Dkt. No. 46-1, ¶ 2.  EPA successfully justified its request for additional time to Plaintiffs, resulting in Plaintiffs' consent to the requested extension.  *See* Dkt. No. 46.  In sum, the proposed completion date that is now before the Court is the product of the Agency's good faith efforts to ensure that the rulemaking is carried out in an efficient manner and based on the best available data.

---

[3] As EPA stated in its cross-motion for summary judgment, "EPA expects information collection will be necessary for one or both of the source categories in order to complete sound and defensible rulemakings," and lists as one possibility a Section 114 request.  Dkt. No. 32 at 19; *see also* Dkt. No. 32-1, ¶ 29.

Finally, as noted above, at about the same time this Court issued its Order and Judgment, the D.C. Circuit held that EPA must establish MACT emission limits for any unregulated emissions in the relevant source category when undertaking a technology review under Section 112(d)(6), such as the two reviews ordered by this court. *LEAN*, 955 F.3d at 1095–99. EPA has identified several unregulated HAP for which the Agency seeks to propose MACT standards during the technology reviews subject to this Court's Order and Judgment. May 2022 Lassiter Decl. ¶ 15. For two of these unregulated emissions points at heat and nonrecovery ("HNR") facilities, EPA has very limited data and believes it would be appropriate to gather more emissions test data for these emission points in order to develop appropriate and robust MACT standards for these currently unregulated HAP. *Id.* Therefore, data collection is important to the nondiscretionary portion of the intended rulemaking and has been incorporated into the timeline for the rule's completion.

### 2. The robust rulemaking would increase efficiency and conserve resources for the Agency, industry, and the public.

Failure to allow for a consolidated rulemaking process would cause duplication of effort by the Agency, industry, and the public. Sept. 2022 Lassiter Decl. ¶¶ 6–7. There would be significant loss of efficiency in developing separate regulatory packages (e.g., preamble, regulatory text, technical memos) and completing each task in the rulemaking process. *Id.* ¶ 6. EPA would need to develop and publish two proposed rules, undergo iterative work group, management, OMB, and interagency reviews on two separate but related rules, provide two notice and comment periods, and draft and seek approval on two final rules. *Id.* Although the rulemakings would emphasize different actions, all of the work would involve the same project team, work group, contractors, and stakeholders. *Id.*

A comprehensive rulemaking schedule is also in the best interest of the industry and the public.  With two separate rulemakings, industry and other stakeholders would be subject to multiple notice and comment periods on proposed rules that do not paint a full picture of the scope of Section 112 regulation on coke plants.  *Id.* ¶ 7.  Industry would also lose efficiency by being subject to multiple, iterative rules.  *Id.*  For example, facilities may need to adjust operations to reduce coke oven door leaks to satisfy the first rule, then later meet new leak reduction standards based on a facility-wide fenceline action level standard in the second rule. *Id.*  Furthermore, because EPA would focus its efforts on timely completing the risk and technology reviews with a judicially enforceable deadline, the discretionary rulemaking would likely lag behind, potentially prolonging public exposure to elevated levels of toxic pollutants for a longer period than if the rulemakings were consolidated—a public health risk that EPA realized once it commenced the limited-scope rulemaking ordered.  *Id.*

**B.  The soonest EPA could complete the risk and technology review for Subpart CCCCC and the technology review for Subpart L is November 30, 2023.**

The absolute soonest EPA could complete the risk and technology review for Subpart CCCCC and the technology review for Subpart L is November 30, 2023.  *Id.* ¶ 4; *see also* ¶¶ 13–17 (outlining the proposed schedule).  However, it should be noted that such a deadline places EPA in the position of having to defend a final rule that does not take into account the supplemental data EPA expects to receive in response to the Section 114 requests.

To meet the November 30, 2023 deadline, EPA would have to develop and release for public comment a proposed rule based on the limited data it currently possesses instead of waiting to receive the Section 114 request responses.  *Id.* ¶ 13.  EPA would then receive the supplemental data in response to the Section 114 requests during some phase of the rulemaking

process.  In order to consider and use the supplemental data for the final rule, EPA would first have to provide adequate notice of such as the basis for a rulemaking under Section 307(d) of the Clean Air Act, 42 U.S.C. § 7607(d).  If EPA did not provide notice of a final rule based on consideration of the supplemental data, the final rule could be subject to procedural challenge. *See, e.g.*, *Nat. Res. Def. Council v. U.S. E.P.A.*, 279 F.3d 1180, 1186 (9th Cir. 2002) ("[A] final rule which departs from a proposed rule must be a logical outgrowth of the proposed rule . . . . The essential inquiry focuses on whether interested parties reasonably could have anticipated the final rulemaking from the draft [rule]."); *Chesapeake Climate Action Network v. EPA*, 952 F.3d 310, 318–22 (D.C. Cir. 2020) (granting petitioners' request for reconsideration of EPA's final rule under CAA section 307(d) because the analyses and data relied upon in the final rule were absent from the proposed rule).  And if EPA were to disregard the supplemental data altogether, that could lead to reconsideration and/or judicial challenge, causing further administrative and judicial delays and duplication of effort.  *See, e.g.*, *Fla. Power & Light v. Lorion*, 470 U.S. 729, 744 (1985) (recognizing that, at the time EPA issues a final rule, the record for that decision must include all information before the Agency at the time it makes a final decision).

In sum, the November 2023 deadline will require EPA to take final action without consideration of information expected to be submitted to the Agency after the proposal, and thus place EPA at risk of significant challenge to its final rule.

## IV.     CONCLUSION

For the foregoing reasons, EPA respectfully requests that the Court amend its Order and Judgment to extend the time for EPA to complete its obligations from December 26, 2022 to May 23, 2024.  In the event that the Court declines to provide sufficient time for EPA to fold in the mandatory duties at issue in this case with a more comprehensive rulemaking, EPA

1    respectfully requests that the Court amend its Order and Judgment to extend the time for EPA to

2    complete its obligations from December 26, 2022 to November 30, 2023.

3

4    Respectfully submitted,

5
     Dated:  September 19, 2022
6
                                        TODD KIM
7                                       Assistant Attorney General
                                        U.S. Department of Justice
8                                       Environment and Natural Resources Division

9                                        /s/ Lucy E. Brown
                                        LUCY E. BROWN (HI Bar No. 10946)
10                                      MARTHA C. MANN (FL Bar No. 155950)
                                        Environmental Defense Section
11                                      P.O. Box 7611
                                        Washington D.C.  20044
12                                      lucy.e.brown@usdoj.gov
                                        martha.mann@usdoj.gov
13                                      Telephone (202) 598-1868 (Brown)
                                        Facsimile (202) 514-8865
14

15
                                        *Attorneys for Defendant*
16

17   Of Counsel:

18       M. Lea Anderson
19       Office of General Counsel
         United States Environmental Protection Agency
20

21

22

23

24

25

26

27

28