IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITIZENS FOR PENNSYLVANIA'S FUTURE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL S. REGAN, in his official capacity as the Administrator of the United States Environmental Protection Agency,<br><br>Defendant. | Case No. 3:19-cv-02004-VC |

**DECLARATION OF PENNY LASSITER**

1. I, Penny E. Lassiter, under penalty of perjury, affirm and declare that the following statements are true and correct to the best of my knowledge and belief, and are based on my personal knowledge or on information contained in the records of the United States Environmental Protection Agency ("EPA"), or supplied to me by EPA employees under my supervision.

2. I am the Director of the Sector Policies and Programs Division ("SPPD") within the Office of Air Quality Planning and Standards ("OAQPS"), Office of Air and Radiation ("OAR") at EPA. I have held this position in a permanent capacity since May 26, 2019. Prior to this permanent appointment I served as Acting Director of SPPD from February 4, 2018, until June 23, 2018, and from January 6, 2019, until May 25, 2019. Prior to serving as the SPPD Acting Director in 2018, I served as Group Leader for the Refining and Chemicals Group within SPPD, a position I held since March 13, 2011. I have held various other positions within EPA during my 38 years of employment by the Agency, including multiple leadership positions since

September 1998. Additional descriptions regarding myself and the division, including our duties, responsibilities, the process for resources allocation, and other related information are provided in my previous declaration dated May 6, 2022 ("May 2022 Declaration") (Dkt. No. 46-2, ¶¶ 3–9).

3. In the May 2022 Declaration, I provided background information regarding the coke ovens industry sector, the relevant Clean Air Act mandates, the two 40 CFR Part 63 subparts and the 40 CFR Part 61 subpart that apply to coke plants, and our data needs for each of the subparts. *Id.* ¶¶ 10–18. Furthermore, based on my expert knowledge of this sector and experience with rulemaking, I explained EPA's position that it would be prudent, efficient, and helpful for the public and regulated entities to expand the scope of this rulemaking to include relisting the associated chemical by-product plants under section 112 of the CAA and developing and proposing maximum achievable control technology (MACT) standards for these chemical plants under CAA section 112(d). *Id.* ¶ 18. As I explained in the May 2022 Declaration, these by-product chemical plants are currently not subject to MACT standards and are known to significantly contribute to the risks to public health near coke oven facilities. *Id.* ¶¶ 14, 18. In the May 2022 Declaration, I also provided information concerning the timing of each regulatory step and a requested deadline for the expanded rulemaking for Coke Ovens that subsumed the mandatory actions at issue in this case. *Id.* ¶¶ 21–26.

4. In response to this Court's order dated August 15, 2022 (Dkt. No. 68), this declaration serves to explain why it would cause a significant waste of agency or industry resources (including time) for the agency to comply with the immediate judgment before conducting the additional rulemaking (see ¶¶ 5–7 below). Also consistent with the order, I have identified two potential completion dates. If the Court grants an amendment of its order to allow sufficient time

for compliance with EPA's nondiscretionary duties to be carried out in conjunction with the new discretionary rulemaking (i.e., EPA would complete the more comprehensive sector-based rulemaking as described in the May 2022 Declaration), EPA requests that the court-ordered final deadline be extended by approximately 17 months—from December 26, 2022, to May 23, 2024. This schedule is outlined in the May 2022 Declaration, ¶¶ 21–26. If, on the other hand, the Court does not allow time for EPA to carry out the nondiscretionary and discretionary rulemaking simultaneously, the soonest EPA can complete the nondiscretionary actions is November 30, 2023 (see ¶¶ 13–16 below).

5.  As outlined in the May 2022 Declaration and the steps below, every rulemaking requires a substantial amount of time (e.g., weeks to several months depending on the task/step) and considerable resources (multiple agency staff experts and contractor support costs).

> Data Collection and Analysis: At the outset, EPA must identify any data needed and sources of that data. EPA then gathers data, usually through a request for information under CAA section 114 submitted to the relevant sources; analyzes the data; develops potential regulatory options; and assesses the costs and emissions reductions for each option and other potential impacts (e.g., energy use, impacts to other media, economic impacts, etc.).
>
> Briefings and Proposed Rule Package: Once the Agency completes data collection and analysis, it develops briefing materials for various levels of management and the intra-EPA rulemaking work group, conducts extensive briefings, revises materials as needed based on the outcome of those briefings, schedules and leads multiple meetings with the agency work group and various stakeholders, and develops the proposed regulatory

package (including the Federal Register Notice that explains all the aspects of the proposed action, regulatory text for the CFR, and multiple technical support documents).

<u>Review and Approval</u>: Once prepared, EPA sends the proposal package to the work group members for a formal review. Subsequently, EPA must revise the package based on work group input and comments, then submit the package for review by various levels of senior EPA management. Unless the rule is determined to be non-significant, which is highly unlikely for a rule of this magnitude, EPA then submits the package for interagency review and approval by the Office of Management and Budget (OMB). *See* Executive Order (EO) 12866.

<u>Public Comment and Final Rule</u>: After OMB and interagency review, EPA publishes a proposed rule and initiates a public comment period that usually lasts at least forty-five days, holds public hearings if requested, repeats stakeholder meetings, and then repeats many of the steps described above to develop the final rule package.

6. If the Agency carries out these actions in a piecemeal fashion, addressing the discretionary and nondiscretionary components of the intended rulemaking in separate actions, it will require duplication of many of the steps, tasks, and associated resources described above. For example, the Agency would need to develop briefing materials and conduct all necessary briefings for the initial rulemaking, and then go through the entire briefing process a second time for the additional rulemaking. The same would be true for the work group review process, management reviews, development of proposed rules, public comment period and hearings, and OMB and interagency reviews. Furthermore, there would be a significant loss of efficiency with regard to developing the regulatory packages (e.g., preamble, regulatory text, technical memos, etc.). Although the two rulemakings would be focused on different subparts or actions, all of the

work would involve the same project team, work group, contractor, and stakeholders. In addition, because of the interconnectedness of the co-located sources, the types of analyses that would be conducted for each rulemaking, and background information (such as legal authorities, data gathering process, methodologies used, etc.), it would be much more efficient to conduct all of this work at the same time.

7. These inefficiencies would also impact industry and other stakeholders. Industry would be subject to multiple rules with potentially evolving standards. For example, if EPA promulgates certain requirements for specific process units under one subpart (e.g., leaks from subpart L coke oven doors) and then later establishes a facility-wide based standard (such as potentially a fenceline action level), this could result in facilities needing to address some process units in a piecemeal fashion (e.g., a facility could potentially need to reduce door leaks initially to meet the requirements in the first rulemaking, and then later learn that they need to reduce door leaks further to meet a potential fenceline action level standard). Also, if EPA proposes and promulgates various standards on different schedules, industry and other stakeholders who want to participate would be faced with two comment periods, potentially two public hearings, and additional stakeholder meetings. Furthermore, delaying action on certain aspects concerning coke oven facilities (e.g., addressing associated chemical by-product recovery plants and other actions, discussed subsequently in more detail) could potentially result in unnecessary continued exposure to elevated levels of toxic pollutants for a longer period of time than if the rulemakings were consolidated – a public health risk that we realized once we commenced the limited-scope rulemaking ordered.

Contents of a Comprehensive, Sector-Based Rulemaking

8.  This Court's June 26, 2020, Order and Judgment requires EPA to complete the technology review for subpart L and the risk and technology review for subpart 5C. As EPA began the process of developing the rule to meet this obligation, including an assessment of the risks associated with these facilities, EPA concluded that it should determine whether to list chemical by-product plants under section 112 of the CAA and develop and propose MACT standards for these sources under CAA section 112(d). Because there remains some uncertainty regarding the appropriateness of listing chemical by-product plants, EPA expects that the data received in response to the Section 114 requests will reduce this uncertainty and inform the ultimate decision whether to list and regulate the chemical by-product plants under CAA section 112.

9.  EPA also believes it is appropriate and necessary to complete a risk review for the set of subpart L coke oven batteries subject to emission standards under CAA section 112(d)(8)(C). Section 112 establishes two "tracks" of technology-based standards for coke ovens and specifies different compliance timetables depending on the track chosen by the source. The two tracks are generally referred to as MACT track and Lowest Achievable Emissions Rate ("LAER") track, the latter being a technology-based standard that was more stringent than MACT at the time of the 1990 CAA Amendments were passed. Sources subject to the LAER track requirements elected to comply with these more stringent technology-based standards beginning in 1993 and in return were exempted from compliance with residual risk standards until 2020. As a result, the review completed by EPA in 2005 determined the residual risk standards required for MACT track batteries—but not the LAER track batteries. Combining the residual risk review of the

LAER units with that for subpart 5C will allow us to undertake a determination of facility-wide risk and to address residual risk more comprehensively.

10. EPA would also prefer to collect sufficient data to ensure a well-supported and defensible rule. Under a 2020 decision issued by the D.C. Circuit Court of Appeals, EPA is now required to set MACT standards for unregulated hazardous air pollutants (HAP) for the source category when conducting a technology review, such as the technology reviews at issue in this case for subparts 5C and L. *See Louisiana Envt'l Action Network v. EPA* ("*LEAN*"), 955 F.3d 1088, 1095–99 (D.C. Cir. 2020). This requires the accumulation of sufficient data to set those standards. Additionally, EPA staff have been gathering and analyzing data and developing and evaluating regulatory options and a proposed rule (for the subpart 5C risk and technology review and subpart L technology review) for many months. Through this process, the Agency has identified data gaps and needs with regard to coke oven door leak emissions, emissions controls, and other measures to minimize emissions from doors, and emissions from heat nonrecovery (HNR) process units. As explained in the May 2022 Declaration, EPA believes that door leaks are likely one of the most significant sources of HAP emissions at these facilities and a substantial contributor to the risks to public health near these facilities. Therefore, EPA sees substantial value in obtaining additional data and information regarding potential controls and other measures to reduce these HAP emissions.

11. Regarding the HNR operations, there are two important emissions sources at HNR facilities, known as the heat recovery steam generating (HRSG) units main stack and bypass/waste stacks. EPA currently only has test data for one of the five facilities with such units. The bypass/waste stacks are especially important because, based on the limited data EPA has, it appears these stacks may emit hundreds of tons of HAP per year. EPA therefore thinks it

would be prudent to gather more emissions test data for these emission points from other HNR facilities to develop appropriate and robust MACT standards for these currently unregulated HAP.

12. Following this Court's Order and Judgment, EPA has been gathering and analyzing data, developing and evaluating regulatory options, completing technical support documents, briefing various levels of management, and developing a proposed rule.  In addition, as noted in Paragraph 10 above, pursuant to the *LEAN* decision, EPA must now establish MACT emission limits for any unregulated emissions in the source category when undertaking a technology review under section 112(d)(6), such as the two reviews ordered by this Court.  During the process of preparing a proposed rule, EPA has identified a significant need for additional data and information in order to complete a robust risk and technology review for subpart 5C and a similarly robust technology review for subpart L, and to establish missing MACT standards.

November 30, 2023, Completion Schedule

13. The following schedule reflects EPA's timeline for a narrower rulemaking (i.e., only the technology review for subpart L and risk and technology review for subpart 5C), which would not allow time for EPA to receive, analyze, and incorporate data from the Section 114 requests in its rulemaking.

14. **Phase I.** Finish the Development and Completion of Proposed Rule (5 months).

This work requires organizing data, conducting various technical analyses, developing and evaluating regulatory options, completing multiple briefings for the EPA workgroup and management, drafting of technical memoranda and the regulatory package, and review of the regulatory package by the workgroup, EPA management, and, in many instances, OMB. Because the team has already completed some of this work, we estimate that approximately 5 additional

months (from the date this declaration is signed) are needed for this Phase. The major tasks to be accomplished in this phase include:

(a) Organizing data, conducting various technical analyses, developing and evaluating regulatory options and the impacts and issues associated with each option (this task is mostly done, estimate 1 additional week to complete).

(b) Preparing briefing materials and conducting briefings for the EPA workgroup and various levels of EPA management (e.g., the Sector Policies and Programs Division (SPPD) the Office of Air Quality Planning and Standards (OAQPS), and the Office of Air and Radiation (OAR)) for selection of the regulatory option(s) for inclusion in the proposed rule (estimate 3 weeks to complete this task).

(c) Drafting proposed preamble and regulatory text and drafting of supporting documentation for the proposed rulemaking package based on the selected regulatory option(s), and to present the supporting data, analyses conducted, and various options considered in the development of the proposed rule (estimate 2 weeks for this task).

(d) Submitting draft regulatory preamble and text and supporting documents to the EPA workgroup for review, which helps to ensure, among other things, legal sufficiency, sound scientific support, and consistency with other programs. Internal EPA procedures mandate that workgroup review is a minimum of 15 working days (approximately three weeks), and we therefore include 21 calendar days in our proposed schedule. Subsequently, the team must revise the preamble and regulatory text based on work group comments, which takes at least 1 week (estimate 1 month for this task).

(e) After drafts are revised as necessary to obtain workgroup approval, the proposal package is reviewed by SPPD, OAQPS, and OAR management and, for projects that are

considered significant regulatory actions, also by OMB. We have included 45 days for OMB review (we intend to request expedited review because OMB review is typically 90 days or more). *See* Executive Order 12866. The docket for the proposed rule is compiled and indexed so as to be available for public review upon publication of the proposed rule (estimate 2.5 months for this review process).

(f)     After EPA management provides final approval, the EPA Administrator signs the proposed rule, which is then sent to the Office of the Federal Register for publication.

15.   **Phase II.** Proposed Rule Publication and Public Comment Period (2 to 2.5 months).

The public comment period begins on the date that the proposed rule is published in the Federal Register, and publication in the Federal Register typically takes between 2–4 weeks following signature. Since EPA has very limited influence over the time for publication, we are assuming publication will take 4 weeks. The CAA requires that EPA provide an opportunity for a public hearing and that the public comment period remain open for 30 days following a public hearing on the rule. 42 U.S.C. § 7607(d)(5). Since it is reasonable to hold a public hearing no earlier than about 2 weeks after publication of the proposal (to allow for interested parties to make plans whether to attend the hearing and to review the proposed rule and prepare oral comments), the typical "minimum" amount of time for the comment period is 45 days. EPA anticipates providing a 45-day public comment period for this proposed action (estimated 2 to 2.5 months for this phase).

16.   **Phase III.** Summarize Comments, Develop Initial Responses, and Conduct Analyses (2 months).

(a)     Following the public comment period (45 days) and public hearing, if one is held, EPA drafts a summary of the comments. The number and complexity of the comments varies

greatly from rule to rule. We typically receive between 10 and 50 unique, substantive comment letters, some including detailed technical data and information, on risk and technology review proposals. We estimate that drafting a written summary of comments for the coke ovens subpart 5C and subpart L rulemaking will take approximately 1 month.

(b)     We must evaluate each relevant comment to determine an appropriate response. Some responses are straightforward, some require briefing EPA management, and some require re-analysis of data or analysis of new data supplied during the comment period. Potential analyses may include evaluation of control options identified during the comment period and revising the technology review to reflect the new options; updating costs and economic impacts; changes to emissions impacts; re-running risk models; and re-evaluating risk decisions. For this rulemaking, we estimate 1 month for developing and drafting initial responses and conducting additional data analyses, as needed.

17.     **Phase IV.** Development of Final Rule Package (5.5 months)

The major tasks to be accomplished in this phase include:

(a)     Preparing regulatory options, recommendations and briefing EPA management on comments received and changes recommended as a result of those comments. This task involves briefings for the EPA's SPPD management, the EPA Work Group, OAQPS management, and OAR management. We estimate the briefing process for the narrower focused rulemaking will take approximately 1 month.

(b)     Preparing the draft final rule preamble and rule package; updating supporting documentation and draft new supporting documentation as needed; and compiling the comment summary and response document (estimate a minimum of 1 month for this phase).

(c) Submitting draft materials to the workgroup for review, which helps to ensure, among other things, legal sufficiency, sound scientific support, and consistency with other programs. The final rule workgroup is the same as that for the proposed rule and serves the same function. Internal EPA procedures mandate that workgroup review is a minimum of 15 working days (approximately 3 weeks), and we, therefore, include 21 calendar days in our proposed schedule for the work group review. After the review, we need to revise the rule package (preamble, regulatory text and other documents) based on work group comments, which will take a minimum of 1 week (estimate 1 month for this task).

(d) After we revise the rule package, we need to complete the necessary EPA management and interagency reviews of the draft final rule documents. The final preamble and rule are reviewed by SPPD, OAQPS, and OAR management and, for projects that are considered significant regulatory actions, OMB. We include 45 days for OMB review for this final rule (we intend to request expedited review because OMB review is typically 90 days or more). At the same time the rule is being reviewed by OMB, we compile and index the administrative record and finalize the response to comments document. After any necessary revisions are made to the final rulemaking package, the final rule is signed and sent to the Office of Federal Register for publication. We estimate that this process will take 2.5 months.

18. EPA, in coordination with the Department of Justice, contacted Plaintiffs and presented the agency's position regarding the need for additional information and the additional work the agency considers essential to include as part of this rulemaking described herein.

SO DECLARED:

_____

PENNY LASSITER

Dated: _September 15, 2022__